**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WEATHERFORD INTERNATIONAL SECURITIES LITIGATION | 11 Civ. 1646 (DLC) |
| | (ECF Case) |
| | <u>CLASS ACTION</u> |
| | <u>DEMAND FOR JURY TRIAL</u> |

AMENDED COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## INTRODUCTION AND SUMMARY OF ACTION

1.        This is a putative securities class action on behalf of purchasers of Weatherford International Ltd. ("Weatherford" or "the Company") securities between April 25, 2007 and March 1, 2011, inclusive (the "Class Period").  Lead Plaintiff American Federation of Musicians and Employers' Pension Fund ("Plaintiff") seeks to pursue remedies against Weatherford, several of its most senior executives and Weatherford's registered purported independent auditor, Ernst & Young LLP ("Ernst & Young"), under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.   The "Insider Defendants" are Bernard J. Duroc-Danner ("Duroc-Danner") (Chief Executive Officer ("CEO"), President and Chairman), Andrew P. Becnel ("Becnel") (Senior Vice President and Chief Financial Officer ("CFO")), Charles E. Geer, Jr. ("Geer") (former Vice President and Principal Accounting Officer) and Jessica Abarca ("Abarca") (Chief Accounting Officer and Vice President – Accounting).  Geer was Weatherford's Principal Accounting Officer from 2007 until his sudden departure from the Company was announced on March 16, 2011.

2.        Plaintiff, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, lead counsel's investigation, which includes without limitation: (i) review and analysis of regulatory filings issued by Weatherford with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of corporate press releases, disclosures and media reports issued and disseminated by Weatherford; (iii) review of other publicly available information concerning Weatherford, including transcripts of public investor presentations and conference calls; and (iv) interviews with former Weatherford employees (¶¶54-60, *infra*).

3. Plaintiff's claims arise out of a fraudulent course of business whereby the Insider Defendants, along with Ernst & Young, issued materially false and misleading statements about Weatherford's net income, net earnings, effective income tax rate and other key financial information. Defendants' four-year accounting fraud culminated in the Company's March 1, 2011, announcement that the Company expected to restate approximately *$500 million* in falsely reported net income expense – roughly *$100-$150 million per year* in 2007, 2008, 2009 and 2010 – and that Weatherford's financial results should "no longer be relied upon" (the "Restatement").

4. Throughout the Class Period, Defendants misled investors concerning Weatherford's true effective tax rate in order to: (i) meet or beat Wall Street consensus earnings per share ("EPS") estimates in key quarters; (ii) generate upward movement in Weatherford's stock price; (iii) induce rating agencies to upgrade Weatherford's credit rating; (iv) meet forecasted net income amounts; (v) permit the Company to raise $5.6 billion from the sale of debt securities; (vi) use the Company's artificially inflated stock price to acquire numerous companies; (vii) maintain the illusion of Weatherford's "growth" to investors – particularly during the economic downturn; and (viii) justify the excessive compensation and undeserved bonuses the Insider Defendants were awarded.

**Defendants' Class Period Federal Securities Laws Violations**

5. As the smallest of the world's big four oilfield service companies, Weatherford is publicly perceived as the "perpetual underdog of the full-service oil patch players" with "something to prove." At various times throughout the Class Period, Weatherford operated in dozens of resource-rich countries across the globe, including doing so *unlawfully* alongside some of the most despicable regimes in the world (*i.e.*, Iran, Libya, Sudan, Syria and Myanmar).

To keep pace with Weatherford's larger and more established oilfield servicing rivals, and to rid Weatherford of its "underdog" status, the Insider Defendants devised a competitive edge that its rivals could not match, a simple and crude tax accounting fraud designed to inflate Weatherford's net income and net EPS to create an overall false façade of financial success during an otherwise very difficult period for the Company.  As has now been admitted, the financial manipulations culminating in the Restatement did not implicate ***any*** complex tax or accounting judgments, and they were substantial:

| Weatherford International Ltd. Reported and restated results, 2007-2010 (dollars in millions, rounded) | Years Ended: 2007-2010 | | | |
| --- | --- | --- | --- | --- |
| | Reported (False) | Restated (Actual) | Errors: Amount of Overstated | Errors: % of Actual |
| Net Income | 2,776 | 2,284 | 493 | *22%* |
| Diluted Earnings Per Share | $3.97 | $3.28 | $0.69 | *21%* |
| Provision for income taxes | (775) | (1,245) | 471 | *38%* |
| Income tax expense rate (understated) | 21% | 34% | 13% | *38%* |

6.      Ultimately, Defendants' deceptive intercompany tax accounting helped conceal approximately $500 million in false publicly-reported net income for four consecutive years, and caused the Company to consistently report artificially low and rapidly declining effective tax rates – one of the lowest, if not the lowest, in the industry.  As a Morgan Stanley analyst noted after the Class Period, the average tax rate for two of the Company's U.S.-based competitors (*i.e.*, Halliburton and Baker Hughes Inc.) was substantially higher (*i.e.*, 31%-32%) during the four-year period covered by Weatherford's Restatement.   Weatherford's current ***restated*** effective tax rate is now again in line with that of its competitors.

7.      Notably, before the Class Period, Weatherford's effective income tax rate had been on a steady rise from 22% in 2004, to 25% in 2005, to 26% in 2006.  In 2007, when Defendants intentionally manipulated the Company's books with a bogus intercompany "deferred tax asset," Weatherford was caused to report an effective tax rate that dropped sharply.

In 2008 and 2009, for instance, as Defendants' intercompany accounting misstatements ballooned, Weatherford's publicly-reported effective income tax rate fell even further, to 17% in 2008, and then to as low as 13% in 2Q08 and 10% in 2Q09.  For all of 2010, the Company's effective tax rate was 17%, nearly 10% lower than the rate before the Class Period, and approximately 15% lower than some of its top U.S.-based rivals.[1]  The Company's true effective income tax rate for the period covered by the Restatement was, in truth, higher than its rivals' – *34%*.  Every one percent reduction in the Company's effective tax rate added between $0.01 and $0.02 of bogus EPS to the Company stock price.

8.     The Insider Defendants closely monitored Weatherford's effective income tax rate, and specifically touted it in numerous SEC filings and analyst conference calls.  Defendants' repeated misrepresentations about the Company's purported stellar tax "planning" were not only important to investors, but also correlated to the inflation in Weatherford's falsely-reported EPS.  For example, during an April 25, 2007 analyst conference call for Weatherford's (false) 1Q07 reported financial results, Jim Crandell of Lehman Brothers Holdings Inc. ("Lehman Brothers") asked Becnel (CFO) about the Company's surprisingly low tax rate for that quarter: "*what surprised me was the lower tax rate of 24%, and the expectation it will continue*.  Can you talk to that a minute?"[2]  Without hesitation, Becnel (CFO) bluntly represented that "*[y]es, that was good work from our tax group in terms of planning*."

9.     Following the Company's 1Q07 announcements, the Company's stock price jumped 6.64% and, on April 26, 2007, Morgan Stanley analyst Ole Slorer, in a research note on Weatherford called "1Q07 Results: Continued *Flawless Execution*," observed that the

---

[1]     As of the date of this filing, the Company's effective tax rate is approximately 30%.

[2]     Unless otherwise noted, all emphasis is added.

4

Company's "*tax rate was better than expected*," giving the Company's share price a target of $75.00. At the time, the Company's stock price was trading at only $51.99 per share. Unbeknownst to the market, the "good work" in tax "planning" was actually due primarily to the fictitious net income and reported EPS generated by Defendants' tax accounting fraud. Not coincidentally, during the first year of Defendants' scheme, Duroc-Danner's yearly total compensation surged from $14 million in 2006 to *$21.6 million in 2007*.

10.     On July 23, 2007, J.P.Morgan issued a research note on Weatherford for its clients called "Raising Est[imates] on Acquisitions & *Lower Tax Rate*," noting that Weatherford's "stock rallied 3% based on a *$0.04 bump to EPS from a lower tax rate*." On July 24, 2007, RBC Capital Markets raised its price target for the Company, concluding that "*[h]igher estimates are primarily a function of a lower effective tax rate*." Similarly, in a 4Q07 report about Weatherford dated January 28, 2008, a Wachovia analyst noted that the Company's "Q4 [was] SOLID. WFT's recurring Q4 2007 EPS of $0.99 *only beat our and the Street's $0.96 on lower tax rate* (16% versus 21% expected, +$0.055 impact)." As demonstrated by the foregoing and in the graph below, Defendants' representations were designed to, and did, artificially inflate the Company's publicly-reported EPS often by just the right amounts to meet Wall Street's consensus EPS for the Company during the Class Period:



11.    Defendants' tax accounting manipulations enabled Defendants to successfully create the (false) impression among investors that Weatherford was better positioned than other oil servicing companies during the U.S. financial crisis which began to take hold in 2007, and accelerated in 2008 with the collapse of Bear Stearns and Lehman Brothers.  Of course, as with most companies during this period, the global recession had a hard impact on the Company's operations.   However, but for Defendants' misrepresentations, the worldwide 2007-2010 recession would have had a far more severe impact on Weatherford's publicly-reported financial health.   As a result of Defendants' now-admitted misrepresentations, throughout 2007-2010, analysts and the broader market were therefore falsely led to believe that Weatherford was "outperforming its peers," when it was, in fact, a laggard in its peer group during that same period.

12.    Defendants even continued to promote the Company's stellar (but false) growth prospects and performance *after* Lehman Brothers filed for bankruptcy in September 2008.  For instance, on the Company's October 2008 nationwide conference call with analysts for the Company's 3Q08 results, Duroc-Danner raved that "[e]arnings at $0.55 were the *highest*

*quarterly performance in the Company's history*," and assured investors (who were by then worried about the accelerating credit crisis' effect on Weatherford), by forcefully stating that "*[b]usiness has not slipped*. *Business is not slipping*….*There is no evidence of slipping of anything*."

13.     Weatherford also successfully consummated four bond offerings worth approximately *$5.6 billion* dollars during the Class Period.  The Insider Defendants used the proceeds generated from the offerings to fund numerous large corporate acquisitions, and simultaneously used the Company's grossly artificially inflated shares to acquire numerous foreign companies at depressed levels during the economic downturn (¶¶163-164, *infra*).  Hence, not only did Weatherford obtain a pirate's bargain in making corporate acquisitions at depressed values during the time period covered by the Restatement, but the Company was caused to do so using artificially inflated shares of the Company's common stock for consideration.  On September 17, 2007, after the Company's $1.5 billion June 2007, debt offering, Deutsche Bank observed that Defendants' "growth" strategy enabled to it demonstrate remarkable "*growth in troubled times*."

14.     In February 2009, after proposed U.S. legislation sought to crack down on abusive tax shelters in foreign havens like Bermuda, Weatherford engineered a corporate "redomestication," and changed its place of incorporation from Bermuda to Switzerland.  A March 27, 2011 CBS News 60 Minutes segment called *A Look at the World's New Corporate Tax Havens* (with Lesley Stahl reporting) revealed that, while Weatherford had earlier advised investors and others that the Company had, in fact, relocated to Switzerland, the Company's

presence in Zug, Switzerland consisted of little more than a nondescript mail drop.[3]  Following

the 60 Minutes report, in an amended Annual Report on Form 10-K/A (filed April 14, 2011),

Weatherford scrambled to establish a legitimate presence in Geneva, Switzerland, and advised

investors that "[m]ost of our executive officers, including our Chief Executive Officer, and other

key decision makers have relocated or will relocate to Switzerland."

15.     Moreover, for each and every quarter during the Class Period, Duroc-Danner and

Becnel personally signed certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of

2002 ("SOX Certifications"), under penalty of perjury, which falsely attested that each such

quarterly "report does not contain *any untrue statement* of a material fact or *omit to state a*

*material fact* necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading."  Duroc-Danner and Becnel also certified that each

such report "*fairly present[s] in all material respects* the financial condition, results of

operations and cash flows of the registrant as of, and for, the periods presented."  The SOX

Certifications also represented that Duroc-Danner and Becnel had personally "*[d]esigned* such

disclosure controls and procedures, or caused such disclosure controls and procedures to be

designed *under our supervision*, to ensure that material information relating to the registrant,

including its consolidated subsidiaries, is *made known to us* by others within those entities."

16.     The Company was later forced to admit that Duroc-Danner's and Becnel's SOX

Certifications were, in fact, utterly false.  In Defendants' own words, the Company had material

weakness over its internal controls surrounding accounting for taxes *due to* "1) *inadequate*

staffing and technical expertise…, 2) *ineffective* review and approval practices…, 3) *inadequate*

processes to effectively reconcile income *tax* accounts, and 4) *inadequate controls* over the

---

[3]     The 60 Minutes segment is available online at http://www.cbsnews.com/8301-504803_162-20047260-10391709.html.

preparation of quarterly *tax* provisions." Defendants also admitted that, in fact, the Company's controls "were *not designed* to provide for adequate and timely identification and review of various income tax calculations...in accordance with U.S. GAAP." In response to these startling disclosures, a Going Concern article issued on March 2, 2011, aptly titled *WFT's Material Weaknesses Led to Giant Tax WTF*, noted that, "in other words, Weatherford has *no tax experts* in their accounting department, *no one* to supervise or review the work of those experts and *no checks or balances* over the tax provision process *as a whole*."

17.     In addition to certifying the Company's Class Period quarterly reports filed with the SEC on Forms 10-Q, the Company's 2008 and 2009 Annual Reports, signed by Duroc-Danner and Becnel, qualitatively touted that the decreases in the Company's effective tax rates were "*due to benefits realized from the refinement of our international tax structure* and changes in our geographic earnings mix." These same Annual Reports also falsely represented that Weatherford's effective tax rate was 6.5% in 2009, 15% in 2008 and 23% in 2007, due to the purported "refinements" in the Company's tax structure. Not only were Defendants' effective income tax rate representations (now admittedly) false, but their stated reason for the effective tax rate – "*the refinement of our international tax structure*" – is now squarely contradicted by Defendants' myriad admissions (¶¶32, 134-137, 141-145, *infra*) that the Company lacked *any* controls over tax reporting. One does not "refine" what does not exist.

18.     Another adverse consequence of Weatherford's lack of internal controls related to the Company's capital expenditures ("capex"), which far exceeded its stated budgets. For example, during the Company's July 2007 earnings call, the Insider Defendants announced expected capex of $1.2 billion for 2007. Just *three* months later, in October 2007, Defendants revised this figure to $1.4 billion and ultimately reported 2007 capex of $1.6 billion, a 33%

increase from the originally budgeted amount.  Then, despite announcing an initial 2008 capex projection of $1.8 billion, the Company revised its projections upward and recorded capital expenditures of $2.3 billion in 2008 – missing its projection by $500 million (27% over budget).  On April 20, 2009, the Company again suddenly *increased* its 2009 capital expenditure estimate from $1.2 billion to $1.4 billion, a 16% increase over the budgeted amount.  In response to this news, the Company's stock price declined approximately 4%.  On January 26, 2010 the Company again missed its revised capex projections and had expended $1.5 billion on capex during FY09, 25% over the initial estimate.  On this news, Weatherford's stock price declined nearly 8% – to $16.39 per share.

19.     Notably, in addition to Defendants' stark federal securities law violations, Weatherford has had a long, sordid history of repeatedly flouting numerous *other* U.S. federal laws, including those prohibiting bribing foreign officials and conducting business in U.S. sanctioned countries designated as "State Sponsors of Terrorism" by the U.S. Department of State (*i.e.*, Cuba, Iran, Sudan and Syria).  During the course of the Class Period, Weatherford was forced to reveal *three* separate instances where the Company, and its regional offices and subsidiaries, were potentially violating U.S. law.

20.     For instance, the Company revealed that the Bureau of Industry & Security and the U.S. Department of Justice ("DOJ") were investigating allegations of improper sales of products and services by the Company in countries sanctioned by the United States.  This investigation led the Company "to direct [its] foreign subsidiaries to discontinue doing business in countries that are subject to U.S. comprehensive economic and trade sanctions, specifically Cuba, Iran, and Sudan as well as Syria."  On May 28, 2010, however, almost *three years* after Defendants represented that Weatherford would withdraw from operating in these countries, the

SEC was compelled to send Becnel a letter noting its concern that Weatherford had yet to complete its "withdrawal process" from the same countries Defendants told investors they had divested from three years earlier.   The SEC also requested "information regarding [Weatherford's] past, current, and anticipated contacts with Cuba, Iran, Sudan, and Syria…for the last three fiscal years and the subsequent period."  This investigation is ongoing.

21.     During the Class Period, the Company also disclosed that the SEC and the DOJ were investigating the Company's involvement in the United Nations' Iraq oil-for-food program, and the Company's 2007 Annual Report (filed February 21, 2008), revealed a DOJ investigation into "the embezzlement of approximately $175,000 at a European subsidiary and the possible improper use of these funds, including possible payments to government officials in Europe in violation of the Foreign Corrupt Practices Act ["FCPA"]."   The Company itself has recently admitted that it had "uncovered potential violations of U.S. law in connection with activities in West Africa," which the Company and Insider Defendants earlier trumpeted as a significant source of increasing growth.  These "activities" included bribing foreign officials to unfairly and unlawfully gain market share over its competitors in various countries.  These investigations, too, are ongoing.

22.     Weatherford's shoddy regulatory compliance record and conscious disregard for the law did not, however, dissuade the Insider Defendants from personally showering themselves with unjustified riches during the Class Period.  On June 26, 2008, the SEC sent Duroc-Danner a letter regarding the Company's February 21, 2008 Form 10-K and April 28, 2008 Proxy Statement on Schedule 14-A, seeking confirmation that "in your 2008 executive compensation disclosure, you **will provide** a discussion and analysis of how you determined the amounts of the discretionary cash awards given to your executive officers as 'incentives for each executive

officers' continuing and future service and performance *even though you failed to meet your performance targets*."   In other words, the SEC wanted to know why Duroc-Danner had inexplicably received a $3 million *bonus* in 2008 (which put him above the 75th percentile in his peer group), even though the bonus appeared inconsistent with the Company's own stated compensation policies.

23.     In addition to receiving suspiciously-timed bonuses, on February 28, 2011, the *day before* Weatherford suddenly announced its need to restate its financial results (*i.e.*, March 1, 2011), Duroc-Danner and Becnel delivered tens of thousands of their personally-held Weatherford shares back to Weatherford.  And, on February 16, 2011, the *day after* Defendants claim they first learned of their $500 million, four-year tax accounting "mistake" (but before disclosing it publicly), (i) Becnel was given a CHF 59,400 raise; (ii) James M. Hudgins, *Vice President of Tax* received a $50,000 *raise*; and (iii) the Board of Directors ("Board") approved *discretionary* cash bonuses of $1.3 million to Duroc-Danner and CHF 500,000 to Becnel.

**The Truth Reaches the Market**

24.     On March 1, 2011, Weatherford announced that it would be restating its financial results for 2007, 2008, 2009 and for the first three quarters of 2010, and that Weatherford's financial results for those periods "should no longer be relied upon" due to material errors in the Company's accounting for taxes.  The Restatement reduced previously reported net income by approximately $500 million, consisting of $460 million in false understatement of tax expense relating to "intercompany" transactions and another $40 million of errors relating to foreign tax assets.  On this news, Weatherford's stock price declined nearly 11% in one trading day ($2.38 per share), closing at $21.14 per share on March 2, 2011.  The decline eliminated over *$1.8 billion* from the Company's market capitalization in less than seven hours of trading.

25.     The $308 million fictitious deferred tax asset that Defendants have now admitted was improperly included in the Company's books had drastically reduced the Company effective income tax rate during the Class Period.  According to Becnel, Defendants' "improper[]" tax accounting was repeated every quarter throughout the four-year Class Period, and enabled the Company to beat or meet in numerous reporting quarters where it would have badly missed Wall Street consensus EPS.   In other words, Defendants' purported "mistake" somehow *always* implausibly inured to the Company's benefit – *never* to its detriment.  Lucky mistake.  As set forth herein, the magnitude of the deferred tax asset, and the corresponding amount of time Defendants permitted the fictitious entry to linger on the Company's books – *half a billion dollars for four years* – renders Defendants' "mistake" excuse as fictitious as the deferred tax asset that suddenly and magically appeared on Weatherford's books in 2007.

**The Aftermath of Defendants' Fraud**

26.     Although the Company has desperately hoped to blame its accounting misstatements on a poorly-staffed accounting department that was unable to properly assess or identify even the simplest intercompany tax accounting, former Weatherford employees dispute that account.  Confidential Witness ("CW") 1, a Senior Financial Executive at Weatherford during part of the Class Period, was "not shocked" that Weatherford issued the Restatement.  According to CW1, Becnel was "aware at all times" that he was "playing with the [tax] rules," and Becnel used the complexity of intercompany transactions to "push the boundaries" of tax accounting.  According to CW1, Becnel used Weatherford's offshore tax structure to justify "playing" with the Company's taxes, which CW1 described as a "*time bomb that could blow up at anytime*."

13

27.     During the Company's March 2, 2011, "material weakness" conference call with analysts, Becnel was forced to admit that "[t]his mistake, the embarrassment of which is difficult, if not impossible to quantify, highlight that we have work to do on strengthening the process piece."   On the same call, Becnel also let it slip that the Company had not only "incorrectly" accounted for taxes, but had done so "*improperly*."   Becnel's *mea culpa*, however, failed to assuage a by-then justifiably jittery market which abandoned Weatherford in droves with a massive sell-off of the Company's securities.   Analysts also explicitly questioned Defendants' credibility.   For instance, immediately following Becnel's *mea culpa*, Simmons & Company International analyst Bill Herbert noted that the disclosure repeated problems with the Company's financial reporting, stating "*it opens an old wound attendant to the reliability and quality of earnings*."   Similarly, on March 2, 2011, J.P.Morgan issued a report entitled, *Weatherford International: New Set of Problems as Taxes Restated – ALERT*, warning that "there have *always been questions* regarding the integration of [the Company's acquisitions and capital spending]," and that "[t]oday's announcement serves to *amplify* those concerns."

28.     During the same investor conference call, Duroc-Danner was forced to reveal that the Company's $500 misstatement was "an *internal mistake*, it has nothing to do with the tax filings.  This was an internal mistake on dividends from one subsidiary to the other subsidiary.  It really has nothing to do with the actual tax filing in the jurisdiction, so there is [sic] no penalties or there is not actually tax jurisdictions involved."   In other words, Weatherford purportedly had sufficient controls in place to accurately account for its income tax liabilities on a cash basis, file complete and accurate income tax returns and declare the proper amount of income taxes payable to external authorities and paid them.  However, the Company inexplicably failed to accomplish the same steps with regard to U.S. Generally Accepted Accounting Principles ("GAAP") for

14

those very same income taxes, resulting in the understatement of the Company's U.S. GAAP effective tax rate and tax expense, thereby inflating net income and EPS by massive amounts:[4]

| Projected, Reported & Restated EPS[5] | | | |
|---|---|---|---|
| **Year** | **Projected*** | **As Reported** | **As Restated** |
| **2010 (First Three Quarters)** | $0.32 | $0.10 | $(0.06) |
| **2009** | $0.54 | $ 0.35 | $0.24 |
| **2008** | $1.99 | $1.99 | $1.80 |
| **2007** | $1.55 | $1.54 | $1.38 |

*Bloomberg Consensus Estimate.*

29.     In response to Defendants' March 1-2, 2011, announcements, shares of Weatherford's common stock immediately fell nearly 11% on massive volume of 105 million shares traded (roughly 14% of all outstanding shares).  As one commentator put it, "investors voted with their feet."  Even after the Company's March 2, 2011 "material weakness" call, analysts and credit rating agencies continued to express skepticism about Defendants' cryptic explanations for the false intercompany accounting entries.  For instance, on March 3, 2011, Standard & Poor's Financial Services LLC ("Standard & Poor")  noted that:

> The errors indicate that the company had historically underreported aggregate income tax expense by roughly 40% and ***inflated aggregate net income by more***

---

[4]     The Company only provided restated income on an annual basis for 2008-2010, and on a quarterly basis for 2009-2010.  Restated income for 2007 was not reported by Weatherford, but derived from its 2008 restated beginning equity (*e.g*., as of December 31, 2007), which reduced cumulative retained earnings by $130 million.  Separately, the Company disclosed that its 2007 tax provision error was $154 million.

[5]     The following notes apply to Plaintiff's charts throughout the Complaint: (i) the Company used non-GAAP figures in press releases and conference calls, but did not provide restated non-GAAP results, so Plaintiff only compared restated GAAP to GAAP; (ii) Plaintiff extrapolated restated non-GAAP amounts for full years (to calculate restated non-GAAP tax rate), but not quarters; (iii) net income is reported twice for GAAP purposes – one figure is consolidated, one is adjusted by removing minority interest.  The effective tax rate is based on consolidated net income, while EPS is based on net income after removing minority interest; and (iv) Plaintiff included discontinued operations in GAAP numbers, but Weatherford (improperly) excluded discontinued operations when referring to GAAP results.

***than 20% over the four year-period***.   In addition, the $500 million error represents a loss of future anticipated cash flows….We also note that over the past several years, the company has ***consistently*** reported a number of one-time charges, leading us to an ***increased level of concern related to the company's accounting and financial reporting***.

30.     The same day, an FBR Capital Markets analyst report bluntly called the Restatement a "***blow to management's credibility***," and the Houston Chronicle confirmed that "[t]he largest error was a 2007 ***accounting decision*** that erroneously booked certain items as tax receivables Weatherford expected from some of the countries where it operates….***The company said its tax rate likely will increase to as much as 30 percent*** from the 20 percent projected previously."[6]   On March 4, 2011, The Street's Eric Rosenbaum added even more color to Defendants' disclosures:

> The real kicker here for analysts and investors frustrated by the Weatherford announcement is that it comes four years after Weatherford International relocated to its headquarters to Switzerland in an effort to create a more efficient multinational tax structure.   ***Weatherford not only revealed that its lack of internal controls missed a big accounting error in 2007, but that the company let the error linger for four years***.
>
> It's not just that the accounting flap will require four years worth of financial restatements, either, but that it will result in a higher tax rate, potentially higher than Weatherford's tax rate had been when it decided to reincorporate in Switzerland.

31.     Mr. Rosenbaum's article also quoted an unnamed stock analyst who had decided to stop covering Weatherford altogether as follows:

> [T]o me it often felt like ***management was trying to twist things***.  I'm not a big fan of one-off charges and ***management did that a lot and seemed aggressive in accounting***.  I felt that if I had done some more scrubbing of financials I would have found things….In a sector where fundamentals are good, the fundamentals

---

[6]     The same article noted that the impact of the Restatement on the Company share price might signal a buying opportunity – not for shareholders, but rather for Halliburton to acquire Weatherford at a depressed value.  In other words, without Weatherford's unique competitive advantages – its tax scheme and financial manipulations – the Company had become just another cheap takeover target.

are good for everyone and ***I've learned to stay away from companies that are always trying to explain away earnings misses with financial items***.

32.     In response to Defendants' March 1-2, 2011 announcements, the SEC sent Becnel a letter demanding that the Company provide investors (and the SEC) with additional facts about the Company's "material weakness" press release and conference call.   In seeking additional information, the SEC warned Becnel that "since the Company and its management are in possession of all facts relating to a company's disclosure, ***they are responsible for the accuracy and adequacy of the disclosures they have made***."   Becnel's written response to the SEC, dated March 11, 2011, answered the SEC's inquiries as follows:

Nature and identification of material weakness. On or about February 15, 2011, the company's internal audit group concluded that there was a material weakness in the internal controls surrounding accounting for income taxes due to:

- ***inadequate*** staffing and technical expertise;

- ***ineffective*** review and approval practices;

- ***inadequate*** processes to effectively reconcile income tax accounts; and

- ***inadequate*** controls over the preparation of the company's quarterly tax provision.

The company's internal audit group concluded there was a material weakness based upon the group's review of controls, the existence of errors and consideration of a ***significant deficiency in the prior year***. With respect to controls, they noted apparent ***inconsistencies*** in the execution of controls, the quality of the execution of controls and in some cases the lack of documented performance of controls. They also considered aggregation and analysis of various errors in accounting for income taxes found in connection with the year-end financial close.

No changes in procedures. ***There were no significant changes to the procedures performed to evaluate the internal control over financial reporting as of December 31, 2010***, as compared with evaluations performed in prior periods. ***However, it should be noted that we appointed an experienced new Director of***

17

*Internal Audit in April 2010, and this individual was engaged in the review of controls related to income taxes for 2010.*[7]

<u>Steps that resulted in identification of material error</u>. After concluding that the internal controls over accounting for income taxes contained a *material weakness*, the company's accounting, tax and internal audit groups performed additional review of the balance sheet accounts related to taxes, as well as a review of the calculation of the income tax provision recorded by the company. This review was carried out in order to determine if the tax balances contained any material errors that our control structure did not detect.   Management's disclosure committee and the *Audit Committee of the Board of Directors were informed of the material weakness determination and the plan to perform the additional review*.

As part of the additional review, our internal audit and tax groups performed further analysis on the income tax receivable balance.  This balance consists of both corporate level amounts and local balances.  On or about February 20, our review identified a *current income tax receivable balance of approximately $308 million for which documentary support was not available*.  This receivable arose from a tax benefit incorrectly being applied to the elimination of intercompany dividends during 2008, 2009 and 2010.  Based on the reasonableness test of the effective tax rate for each of these years, the company initially believed that the balance would be supported by tax adjustments recorded in local tax accounts in international jurisdictions.   As a result, we continued our review of key tax accounts in significant jurisdictions.  The company substantially completed this effort on February 27.

33.     Hence, according to Becnel, the $308 million tax benefit was fabricated out of thin air (*i.e.*, "*documentary support was not available*" for it), did not involve any complex tax or other judgments subject to any reasonable dispute, and caused Weatherford to falsely publicly report positive financial statement about Weatherford's growth despite tightening global credit markets.

34.     Finally, in a March 15, 2011 press release on Form 8-K, the Company disclosed that Geer, the Company's Principal Accounting Officer, who signed the Company's now admittedly-false March 8, 2011 Annual Report on Form 10-K, August 3, 2010 Quarterly Report

---

[7]     The "experienced new Director of Internal Audit" referenced in ¶32 is, on information and belief, Jennifer Presnall, who was promoted to that position after Steven Wilberts – the Company's former "Director of Internal Audit" – left the Company in early 2010.

on Form 10-Q, September 1, 2010 Amended Quarterly Report on Form 10-Q/A, November 2, 2010 Quarterly Report on Form 10-Q, and participated on the Company's March 2, 2011 "material weakness" conference call with analysts, "has informed [Weatherford] of his decision to leave the company effective March 18, 2011 to pursue another career opportunity."  Geer's tenure at Weatherford unceremoniously began and ended on virtually the same two days that cabin Plaintiffs' proposed April 25, 2007 to March 1, 2011 Class Period.  On March 15, 2011, the Company also disclosed that its effective tax rate for FY 2011 was expected to be 27%, and revised its 1Q11 earnings guidance downward to $0.18 per share.  The Company's common stock has not recovered from these damaging revelations, and currently trades at a mere $15.63 per share.[8]

35.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

36.     The claims asserted herein arise pursuant §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].  Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.  Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

37.     Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the preparation and

---

[8]     During an April 21, 2011 investor conference call, Duroc-Danner finally conceded that he was responsible for Weatherford's overly-aggressive guidance and "unreliable" statements stating, "I think the conclusion is that I think if guidance *has been overly – how shall we say – well, it has been unreliable, you can blame me for it*."

dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

38.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Weatherford common stock during the Class Period, and suffered damages as a result of the federal securities law violations, including deceptive conduct, participation in a fraudulent scheme and course of business, and disseminating false and/or misleading statements and/or material omissions alleged herein.

**Corporate Defendant**

39.     Weatherford is a corporation incorporated under the laws of Switzerland with its principal executive offices located at 4-6 Rue Jean-François Bartholoni, 1204 Geneva, Switzerland.  The Company is an international provider of equipment and services used in the drilling, completion and production of oil and natural gas wells.  The Company's equipment and services are used in the drilling, evaluation, completion, production, and intervention of oil and natural gas wells to independent oil and natural gas producing companies worldwide. Weatherford's stock is traded on the New York Stock Exchange ("NYSE") and EuroNext market under the symbol "WFT."  As of December 31, 2010, the Company employed approximately 55,000 employees.

**Auditor**

40.     Ernst & Young is a firm of certified public accountants engaged by Weatherford to provide independent auditing, accounting and management consulting services, tax services, examination and/or review of Weatherford's filings with the SEC.  Ernst & Young's engagement including the following: (i) audits of Weatherford's yearly accounting and financial reporting, including tax compliance; (ii) quarterly reviews of Weatherford's accounting and financial reporting; and (iii) audits of Weatherford's internal controls over accounting and financial reporting.  Weatherford was also audited by Ernst & Young Ltd, Zurich and Ernst & Young AG, Zurich, the Company's Swiss auditors pursuant to the Swiss Code of Obligations.

41.     Ernst & Young was engaged to perform these services so that Weatherford's financial statements would be accurately presented to investors, government agencies, the investing public and members of the financial community.  Ernst & Young misled investors, made false representations and omitted material facts as to Weatherford's financial statements, recklessly ignored the audit evidence that it gathered, failed to design its audit to identify Weatherford's improprieties, and violated fundamental concepts of Generally Accepted Auditing Standards ("GAAS") (¶¶195-228, *infra*).

**Insider Defendants**

42.     Defendant Bernard J. Duroc-Danner was, at all relevant times, CEO and a director of Weatherford.  Duroc-Danner has been CEO, President and Chairman of Weatherford since 1998.  He joined Weatherford in 1987.

43.     During the Class Period, Duroc-Danner signed the following now admittedly false SEC filings: (i) 2007 Annual Report on Form 10-K; (ii) 2008 Annual Report on Form 10-K; (iii) 2009 Annual Report on Form 10-K; (iv) 2009 Annual Report on Form 10-K/A; (v) Form 10-Q for 1Q07; (vi) Form 10-Q for 2Q07; (vii) Form 10-Q for 3Q07; (viii) Form 10-Q for 1Q08; (ix)

Form 10-Q for 2Q08; (x) Form 10-Q for 3Q08; (xi) Form 10-Q for 1Q09; (xii) Form 10-Q for 2Q09; (xiii) Form 10-Q/A for 2Q09; (xiv) Form 10-Q for 3Q09; (xv) Form 10-Q for 1Q10; (xvi) Form 10-Q for 2Q10; (xvii) Form 10-Q/A for 2Q10; (xviii) Form 10-Q for 3Q10; and (xix) June 9, 2009 Current Report on Form 8-K.  Duroc-Danner also participated on every earnings conference call with analysts during the Class Period.

44.     Defendant Andrew P. Becnel was, at all relevant times, CFO and Senior Vice President of Weatherford.  Becnel was named Vice President of Finance in 2005 and became CFO in 2006.  He first joined the Company in 2002 and served as Associate General Counsel from 2002-2004.  Prior to joining the Company, he was Securities Counsel of Koch Investment Group from 2001-2002 and was an Associate with the law firm of Andrews Kurth LLP from 1995-2001.

45.     During the Class Period, Becnel signed the following SEC filings: (i) 2007 Annual Report on Form 10-K; (ii) 2008 Annual Report on Form 10-K; (iii) 2009 Annual Report on Form 10-K; (iv) 2009 Annual Report on Form 10-K/A; (v) Form 12b-25 [notification of late filing of 2010 10-K on March 1, 2011]; (vi) Forms 10-Q for every quarter covered by the Restatement; and (vii) Current Reports on Forms 8-K covered by the Restatement.  Becnel also participated on every conference call with analysts during the Class Period.

46.     Defendant Charles E. Geer, Jr. was, at all relevant times, Vice President of Financial Reporting and Principal Accounting Officer of Weatherford.  Geer joined the Company from Halliburton in 2007 and "resigned" from the Company effective March 15, 2011. During the Class Period, Geer signed the following SEC filings: (i) Form 10-Q for 2Q10; (ii) Form 10-Q/A for 2Q10; and (iii) Form 10-Q for 3Q10.  Geer also participated on the Company's March 2, 2011 "material weakness" conference call with analysts.

47.     Defendant Jessica Abarca was, at all relevant times, Chief Accounting Officer and Vice President – Accounting.  During the Class Period, Abarca signed the following SEC filings: (i) 2007 Annual Report on Form 10-K; (ii) 2008 Annual Report on Form 10-K; (iii) 2009 Annual Report on Form 10-K; (iv) Form 10-Q for 1Q07; (v) Form 10-Q for 2Q07; (vi) Form 10-Q for 3Q07; (vii) Form 10-Q for 1Q08; (viii) Form 10-Q for 2Q08; (ix) Form 10-Q for 3Q08; (x) Form 10-Q for 1Q09; (xi) Form 10-Q for 2Q09; (xii) Form 10-Q/A for 2Q09; (xiii) Form 10-Q for 3Q09; and (xiv) Form 10-Q for 1Q10.

48.     Because of the Insider Defendants' positions, they had access to the adverse undisclosed information about Weatherford's financial results, business, operations and practices through access to internal corporate documents, conversations and contact with other corporate officers and employees, attendance at meetings and through reports and other information provided to them.  Each of the Insider Defendants, by virtue of his or her high-level position, was directly involved in the day-to-day operations of Weatherford at the highest levels and was privy to confidential information concerning the Company and its business, operations and practices, including the accounting misstatements alleged herein.  Their positions of control and authority as officers or directors enabled the Insider Defendants to control the content of the SEC filings, press releases, and other public statements of Weatherford during the Class Period.  Accordingly, each of the Insider Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein, and is therefore primarily liable for the misrepresentations and omissions contained therein.

49.     During the Class Period, each of the Insider Defendants substantially participated and had exclusive authority and control over the content of the Company's false and misleading statements, financial results and how those results were communicated to investors.  Defendants

also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of Weatherford's false financial records, all of which made it necessary or inevitable that material misrepresentations and the false results of Defendants' scheme would be communicated to, and mislead, investors.

50.     The Insider Defendants were obligated to refrain from falsifying Weatherford's books, records and accounts, and were prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person.  Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Weatherford securities.

51.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Weatherford securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Weatherford's performance and financial condition. Defendants' scheme deceived the investing public regarding Weatherford's operations, financial statements, historical and future earnings and the intrinsic value of Weatherford's securities, enabled the Company to register for sale and sell billions of dollars in Weatherford securities through long term debt offerings, and caused Plaintiffs and other members of the Class to be damaged as a result of their purchases of Weatherford securities at artificially inflated prices.

52.     The Company's press releases and SEC filings were group-published documents, representing the collective actions of Company management.  The Insider Defendants directly

participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein.  The Insider Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

53.    The Insider Defendants were able to and did control and monitor the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Insider Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance, or cause them to be corrected.  Accordingly, each Defendant is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

## CONFIDENTIAL WITNESSES

**Confidential Witness 1**

54.    CW1, a Senior Financial Executive at Weatherford during part of the Class Period, was "not shocked" that Weatherford filed its Restatement.  According to CW1, the "mishandling" was on the part of Becnel who was "aware at all times" that he was "playing with the rules," and used the complexity of intercompany transactions to "push the boundaries" of tax accounting.  Further, Becnel used Weatherford's offshore tax structure to justify "playing" with the Company's taxes, which CW1 described as a "time bomb that could blow up at anytime."

55.     To CW1, blaming the Restatement on inadequate staffing was nonsensical because the Company's executive officers were responsible for much of the employee turnover, especially at the management level.  Weatherford's executive management style was "very volatile," and employees were "fired on a whim."  When he became CFO at age 40, Becnel was "inexperienced and less than well-suited" for the position.  Prior to joining Weatherford, Becnel had not worked in any financial accounting positions, and he was "eager to please" and show the market that Weatherford could meet its financial reporting numbers.

56.     In addition, to earn "brownie points," Becnel frequently "bent" accounting rules when Weatherford went on an "acquisition spree."  In accounting for the purchase of companies, Weatherford seldom reflected the true worth of the assets.  Instead, Weatherford inflated the value of the purchased assets on the books.  According to CW1, the assets were "not worth a fraction" of the indicated value.  Becnel was "in control" of all decisions at the "end of the day" and leadership was very centralized under Becnel.

**Confidential Witness 2**

57.     According to a senior-level audit executive (CW2) who worked in Weatherford's Internal Audit Department from approximately 2000 to 2010, Weatherford's taxes were "always an area of concern," and the Tax Department was a "constant" issue.  CW2 stated that the Tax Department was the only department at Weatherford that experienced unexplained audit delays which "genuinely concerned" CW2.  On a "recurring" basis, CW2 expressly informed Defendants Abarca, Becnel and the Audit Committee during quarterly Audit Committee meetings of CW2's inability to audit Weatherford's Tax Department in a timely manner due to audit delays. According to CW2, Becnel and Abarca regularly attended the Audit Committee

meetings and were "aware" of the Tax Department audit delays, but believed "that is just the nature of taxes and the Tax Department."

58.     According to CW2, on several occasions, Tax Department audits turned up multiple control deficiencies, including at least one "significant deficiency" in 2009, that were expressly raised with Becnel, Abarca and the Audit Committee.  All control deficiencies were also entered into "Exception Logs," which consisted of an electronic spreadsheet and database containing specific information on each control deficiency that were aggregated at the end of every fiscal year.  CW2 stated that summaries of the data derived from the Exception Logs were presented via PowerPoint at the Audit Committee meetings that Becnel and Abarca regularly attended.  CW2 also stated that tax information from foreign jurisdictions was "rolled up" and forwarded to Weatherford's corporate headquarters.

59.     CW2 stated that one of the reasons he/she ultimately left Weatherford in 2010 was because he/she became increasingly concerned that the Tax Department issues were not being addressed.  CW2 stated that he/she was not surprised to learn of Weatherford's Restatement after he/she left the Company.  The facts reported by CW2 are corroborated by Weatherford's Restatement disclosures revealing an astonishing lack of internal controls over financial reporting for taxes and material weaknesses over Weatherford's financial and tax reporting.

**Confidential Witness 3**

60.     CW3 was a Weatherford Treasury Analyst from 2005 until August 2008.  CW3's duties included reporting cash amounts from intercompany transactions from Company subsidiaries that were deposited into one main intercompany bank account.  CW3 prepared monthly spreadsheets detailing subsidiary deposits that were sent via e-mail to the Company's

27

Accounting Department.  According to CW3, Weatherford corporate "centralized everything," including reconciliations of all intercompany transactions.  CW3 stated that Weatherford *created a monthly master spreadsheet called "the M5 form" that detailed all intercompany receivables and payables*.  The existence of these spreadsheets confirms that Defendants, including Ernst & Young, had access to, but recklessly disregarded, the Company's fictitious intercompany transactions.

## COMPANY BACKGROUND

**Weatherford's Business and Tax Avoidance History**

61.     Weatherford was founded in 1941, as the Weatherford Spring Company.  In 1972, Weatherford was incorporated in Delaware and headquartered in Houston, Texas ("Weatherford-Delaware").  In 1998, Weatherford-Delaware merged with Energy Ventures Inc. resulting in an integrated Delaware entity.  Following the merger, Weatherford devoted the better part of a decade distancing itself from its original headquarters in Houston, as part of an orchestrated effort to avoid paying U.S. state and federal income taxes.

62.     In 2002, the Company reincorporated in Bermuda – a well-known tax haven – and recast itself as Weatherford International Ltd., a Bermuda exempted company ("Weatherford-Bermuda").  The Company's May 22, 2002 Proxy Statement explained that the Company was reincorporating in Bermuda because "[u]nder current Bermuda law, a Bermuda company is not required to pay taxes in Bermuda on either income or capital gains."  After its move, Weatherford drew the ire of several prominent U.S. political leaders who said the move to Bermuda was unpatriotic so soon after the September 11, 2001 attacks.

63.     Then, undeterred, in February 2009, after proposed U.S. legislation sought to crack down on abuse of tax havens like Bermuda, Weatherford again reinvented itself – this time as a Swiss joint stock company in Geneva, Switzerland – as part of a "redomestication"

transaction to take advantage of Switzerland's advantageous tax scheme. Weatherford's January 15, 2009 Definitive Proxy Statement described the Company's reason for redomesticating to Switzerland as follows:

> Switzerland has numerous tax treaties with many taxing jurisdictions throughout the world.  Bermuda has no comprehensive income tax treaties.  Switzerland has a developed and stable tax regime.   We believe that the redomestication will *improve our global tax position and substantially lower our risk related to possible changes in tax and other laws*, possible changes in tax treaties and disputes with tax and other authorities.

64.     To devise the deal, Weatherford and the Insider Defendants created a newly formed Swiss subsidiary, Weatherford International Ltd. ("Weatherford-Switzerland").  Pursuant to a "Scheme of Arrangement" under Bermuda law, shareholders of Weatherford-Bermuda exchanged their stock for shares in Weatherford-Switzerland, which became the new parent holding company of Weatherford-Bermuda and took over its business under a new Swiss tax regime.   According to the Company in January 2010, Weatherford recorded a "$24 million charge incurred in connection with the finalization of [its] tax reorganization, which was completed during the quarter," and disclosed "$4 million [in] fees associated with [its] global tax restructuring."   While shareholders were forced to incur $28 million in costs related to Weatherford's "redomestication" in 2009, ultimately, the move utterly failed to "substantially lower [Weatherford's] risk" or "improve [its] global tax position.  In fact, Defendants' tax manipulations accelerated in 2009 and 2010, increased its risk and ultimately resulted in vastly higher tax rates in any event.

**Weatherford's Tax Rate Was Material to Investors**

65.     One of Weatherford's most closely watched financial metrics was its effective income tax rate.  During virtually every quarterly and yearly press release, conference call and SEC filing throughout the Class Period, the Insider Defendants went to great lengths to

emphasize the Company's effective income tax rate.  As a result, investors and analysts paid close attention to the metric.  Defendants crudely manipulated the Company's effective tax rate expense by a few percentage points each quarter and fiscal year to generate enough earnings to meet or beat the Company's targets in key periods for the Company.

66.    Before the Class Period, Weatherford's effective income tax rate had increased from 22% in 2004, to 25% in 2005, to 26% in 2006.  Weatherford's top two U.S.-based competitors (*i.e.*, Baker Hughes, Inc. and Schlumberger, Limited) reported tax rates in the low 30%'s.  Because Weatherford could not compete on equal footing, Weatherford's effective income tax rate was crucial to distinguishing itself from its competitors, and maintaining its "growth" narrative during the economic downturn that started in 2007 and accelerated during the Class Period.  Then, following the Restatement, the Insider Defendants revealed that Weatherford's ***actual*** tax expense was understated by $154 million (31%), $123 million (34%), $68 million (79%) and $126 million (44%) during 2007, 2008, 2009 and 2010 respectively.

**Weatherford's Growth-by-Acquisition Strategy**

67.    Throughout the Class Period, the Insider Defendants focused obsessively on maintaining Weatherford's aggressive "growth" strategy, and emphasized it as a way to distinguish the Company from competitors like Baker Hughes Inc., Halliburton, Schlumberger Limited, Smith International and BJ Services Company.  Speaking on an October 20, 2008 investor conference call, Duroc-Danner bluntly expressed his view on being the leading "growth" story in the oilfield services industry as follows: "[t]he Company, by choice, is on a high organic growth trajectory and has been since 2005.  ***Growth is who we are and what we do***."  During a Merrill Lynch investor presentation on December 2, 2008, Duroc-Danner again proclaimed that:

*We are a growth company at our core*.  I'm not going to stand up here today and as a person with stripes pretend that we have spots.  We don't.  We have stripes. *We're a growth company – have been and will remain so for the foreseeable future.  That's not often a very popular story in today's market, where everybody's worried about global growth but there's nothing I'm going to do to change that*.

68.    Until March 1, 2011, the Company's "growth strategy" had generated rapid international expansion through foreign acquisitions.  As Becnel noted on October 20, 2008, "[t]ypically, we have 20 to 25 acquisition candidates on the board at any time."  Duroc-Danner was also obsessed with growth, noting that, "[s]ince I joined the firm's predecessor...and renamed it Weatherford in 1998...we have made *more than 270 acquisitions in our quest for growth*….*The day we stop growth, you won't see me around*…*I hate plateaus*."  Given Defendants' core "growth" narrative, the economic downturn had an especially detrimental effect on Weatherford.  The Insider Defendants' heavily promoted growth story needed cash (and good credit) to succeed.  Had Weatherford not been perceived as an industry growth leader, investors and lenders would have been far more likely to dump (or avoid) the Company's securities altogether between 2007-2010.  Investors were not given that opportunity.

69.    The Company's rapid expansion began with its June 2005 acquisition of Precision Drilling Corporation's Energy Services Division and International Contract Drilling Division (collectively, "Precision Energy") for approximately $2.28 billion – including $945 million in cash and 26 million Weatherford shares.  Prior to the Precision Energy acquisition, Weatherford employed approximately 18,000 employees.  After the acquisition, Weatherford's workforce swelled to 24,500 employees in just three months.  Following the Precision Drilling acquisition, Weatherford acquired numerous entities between 2006 and 2009.[9]  Between 2005 and 2010, the

---

[9]    From 2006 through 2009, Weatherford acquired Alpha Oil Tools (USA, 2006); OMNI Laboratories, Inc. (USA, 2006); Visean Information Services Pty. Ltd. (Australia, 2007); Reservoir Laboratories A.S. (Norway, 2007); NGKS International Corporation (Russia, 2007);

Company's revenue grew 135% from $4.3 billion in 2005 to $10.2 billion in 2010.  Total assets over this period increased 123% from $8.5 billion in 2005 to $19.1 billion in 2010.  By the end of 2010 Weatherford employed a total of 55,000 employees.

70.    Like the Company's effective income tax expense, Weatherford's buying-spree was closely monitored by the Insider Defendants.  For instance, on an October 20, 2008 conference call, Duroc-Danner stated that "the decisions on acquisitions are actually ***completely centralized***.  It comes from operations.  It is scanned by operations.  It makes its way up to where the few people in corporate – in interactions with regions this [side].  There's no acquisition, however small – to think, an acquisition of $0.5 million to $1 million, all the way up to something large, like ILI, obviously.  ***That gets done with our senior management specifically authorizing it***, on its merits."

## EXCHANGE ACT VIOLATIONS

### Weatherford's Restatement Establishes the Material Falsity of Its 2007-2010 Financial Results

71.    The Restatement constitutes an ***admission*** as a matter of law that Defendants' financial statements were ***materially*** false and misleading for all of the periods it covered.  On March 8, 2011, Weatherford restated its previously reported financial results for the years ended December 31, 2007, 2008 and 2009, and the first three quarters of 2010.  According to the Company, the Restatement was necessary to correct "errors in [the Company's] accounting for income taxes."  The Restatement reduced the Company's previously reported net income by approximately $500 million – of which $460 million "relate[d] to an error in determining the tax consequences of intercompany amounts over multiple years."  The following table depicts the

---

International Logging, Inc. ("ILI") (USA, 2008); Secure Drilling (UK, 2009); and TNK-BP Oil Field Services (Russia, 2009).

impact the Restatement had on Weatherford's reported net income for all of the periods covered by the Restatement:

| Reported Versus Restated Net Income | | | |
|---|---|---|---|
| *USD in MM* | | | |
| **Year Ended** | **As Reported** | **As Restated** | **% Change** |
| **2010 (First Three Quarters)** | $78.3 | $(21.6) | 462% |
| **2009** | $253.8 | $170.1 | 42.6% |
| **2008** | $1,393.2 | $1,246.5 | 11.3% |
| **2007** | $1,070.6 | $940.6 | 13.8% |

72.    As illustrated above, Weatherford's reported net income was overstated by massive amounts for each year covered by the Restatement.   Ultimately, Weatherford falsely reported that its total income tax provision was about $500 million less than the actual amount, $1.2 billion.  This overstated the Company's reported net income over the four-year period by roughly the same $500 million.  The following chart compares the corrected (restated) earnings per share and income tax provision for 2007-2010, on a GAAP basis – as Weatherford reported *after* the Class Period – to the inflated GAAP and non-GAAP amounts that it reported *during* the Class Period:

**Weatherford International, Ltd.**
**Actual and Reported GAAP Results**
**Compared to Reported non-GAAP Results**
**Fiscal Years 2007-2010**

| Diluted Earnings (Loss) Per Share | FY07 | FY08 | FY09 | FY10 | 2007-10 |
|---|---|---|---|---|---|
| **Actual earnings (loss) per share – GAAP** | **$1.38** | **$1.80** | **$0.24** | **$(0.15)** | **$3.28** |
| *Overstated earnings per share – GAAP* | 0.19 | 0.21 | 0.12 | 0.18 | 0.69 |
| Reported diluted earnings per share – GAAP | 1.57 | 2.01 | 0.35 | 0.03 | 3.97 |
| *Adjustments to diluted EPS – non-GAAP* | 0.10 | 0.04 | 0.15 | 0.53 | 0.82 |
| Reported earnings per share – non-GAAP | 1.67 | 2.05 | 0.50 | 0.56 | 4.78 |
| **Inflation of actual GAAP Results** | **$0.29** | **$0.25** | **$0.26** | **$0.71** | **$1.51** |

| Provision for Income Taxes | FY07 | FY08 | FY09 | FY10 | 2007-10 |
|---|---|---|---|---|---|
| **Actual income tax provision – GAAP** | **$487** | **$373** | **$87** | **$298** | **$1,245** |
| *Understated tax provision – GAAP* | 154 | 123 | 68 | 126 | 471 |
| Reported income tax provision – GAAP | 333 | 250 | 19 | 172 | 775 |
| *Adjustments to tax provision – non GAAP* | 42 | (7) | 9 | 84 | 128 |
| Reported income tax provision – non-GAAP | 291 | 257 | 10 | 88 | 646 |
| **Inflation of actual GAAP Results** | **$196** | **$116** | **$77** | **$210** | **$599** |

**Defendants' False and Misleading
Class Period Statements and Material Omissions**

**First Quarter 2007**

73.     The Class Period begins on April 25, 2007, with the Company issuing a press release on Form 8-K entitled, *Weatherford Reports First Quarter Results of $0.82 Per Diluted Share Before Non-Recurring Items*.  The Company "reported first quarter 2007 net income of $284.2 million from continuing operations, or $0.82 per diluted share, before non-recurring items.  First quarter diluted earnings per share reflected an improvement of 44 percent over the first quarter of 2006 diluted earnings per share of $0.57."

74.     The same day, Defendants hosted a nationwide conference call with analysts and investors to discuss Weatherford's 1Q07 results.  Duroc-Danner and Becnel each spoke during the call and addressed analysts' and investors' questions and concerns.  For example, Becnel stated, "[a]t 24.1%, our rate was 195 basis points tighter than Q4," and noted that the "tax rate [is] 24% on average for the entire year, though you should expect variations from quarter to quarter.  Geographics earnings mix and ***continued planning activities have reduced this from the 27% rate expected at the beginning of the year***."  On the same call, Duroc-Danner boasted that "Q1 was another strong quarter" with EPS "up $0.06 or 7.9% sequentially," and stated that, "Q1's international performance, although essentially flat, ***is the best we've seen in our history for first quarter***….What I will tell you is that 2008, in international markets, will be a good year.  There's no doubt about that."  Reacting favorably to Duroc-Danner's and Becnel's glowing

34

statements, Jim Crandell of Lehman Brothers said that he was pleasantly "*surprised [by the]*

*lower tax rate of 24%*, and the expectation it will continue."  In response to Crandell's comment,

Becnel gushed:

> *Yes, that was good work from our tax group in terms of planning*.  We had some
> benefits that rolled in that will appreciate over the – that we will recognize over
> the rest of the year in terms of those planning implementations.  And also it will
> depend…on where we are making our money.  *But we feel very good about that*.

75.     On April 25, 2007, Pierre E. Conner III of Capital One Southcoast, Inc.

highlighted the Company's "1-cent [EPS] *beat on taxes*."  The same day, Credit Suisse analyst

Arun Jayaram stated that "WFT did provide color on its expected tax rate and share count.

Owing to [a] mix and enhanced tax *planning strategies*, the company lowered its effective tax

rate guidance to 24% from 27% previously, *which boosted our full-year 2007 EPS estimate by*

*approximately $0.11*."  The same report noted that the Company's upside for the quarter was

"*driven by a lower tax rate*."  On April 26, 2007, Bear Stearns analyst Robin Shoemaker noted

that "Weatherford beat EPS…*handily* [and] [t]his is *primarily* because [the Company] *lowered*

*[its] estimated tax rate to 24%*, from 27%."  The same day, Morgan Stanley analyst Ole Slorer,

in a report on Weatherford called *1Q07 Results: Continued Flawless Execution*, noted that the

Company's "*[t]ax rate was…[better] than expected*" and gave the Company a per share price

target of $75.00 from its then-current trading price of $51.99 per share.

76.     Michael Lamotte of J.P.Morgan (despite being unaware of Defendants' fraudulent

tax accounting strategy), however, skeptically and presciently noted that "1Q07 earnings was

questionable:"

> *On the surface*, WFT's 1Q07 y/y EPS growth of 44% was *top-tier* (second only
> to SLB).  However, if we adjust for earnings quality, the results were not as
> impressive.  Specifically, a 360bp *decline in tax rate* and 2.3mm reduction in
> share count (buyback related) q/q/added $0.05 in the quarter, and accounted for
> 20% of growth in earnings y/y.  *Without these factors*, WFT's y/y earnings
> growth would have been 35% – about in-line with the peer average – and its 1Q07

miss would have been second only to that of BJS.  ***The bull argument here is that management aggressively managed thru some stormy seas to deliver the results – which is no doubt true***.  However, we believe that confidence in WFT's earnings growth should stem from consistency in operating results, ***as lower quality earnings benefits like tax rate adjustments are simply not repeatable***.

77.     Defendants' 1Q07 statements referenced above in ¶¶73-74 were false and/or misleading because: (i) as set forth in the Restatement, Weatherford's publicly-reported financial results and statements were materially false and misleading; (ii) Weatherford materially overstated the Company's net income, net earnings, effective income tax rate and purported growth by improperly accounting for income taxes; (iii) the Company's financial results were not prepared in accordance with GAAP and/or GAAS; (iv) contrary to Duroc-Danner's and Becnel's SOX Certifications, the Company's internal controls and procedures suffered from numerous material weaknesses over tax reporting; and (v) they created a false impression that the Company's strong reported financial health was based on a successful growth strategy and competitive tax advantages when, in fact it, was a direct result of the improper manipulation of the Company's income tax expense.

**<u>Second Quarter 2007</u>**

78.     On July 23, 2007, the Company "reported second quarter 2007 net income of $235.0 million from continuing operations, or $0.68 per diluted share, before non-recurring items.  Second quarter diluted earnings per share from continuing operations reflect an improvement of 28 percent over the second quarter of 2006 diluted earnings per share from continuing operations of $0.53, before non-recurring items."

79.     On a same-day investor conference call following the Company's 2Q07 Form 10-Q, Becnel touted a "***$0.03 of improvement [in EPS] due to a lower tax rate.  The effective rate for the quarter was 20%*** or 400 basis points below prior guidance due to geographic mix and ***more effective tax planning***."  Becnel also advised investors that "[o]ur tax rate will run between

20 and 21% on average for the entire year." As expected, the market responded favorably to Defendants' statements.

80. For example, on July 23, 2007, J.P.Morgan published a report on Weatherford called *Raising Est. on Acquisitions* & *Lower Tax Rate*, noting that the stock rallied 3% based on a $0.04 bump to EPS *from a lower tax rate*. The next day on July 24, 2007, Bear Stearns commented that the Company "*lowered its tax rate guidance* for 2007 to between 20% and 21% from its previous estimate of 24%." On July 24, 2007, RBC Capital Markets raised its price target for the Company noting that "*higher estimates are primarily a function of a lower effective tax rate*."

81. Defendants' statements above in ¶¶78-79 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**Third Quarter 2007**

82. On October 21, 2007, the Company issued a press release on Form 8-K entitled, *Weatherford Reports Third Quarter Income from Continuing Operations of $0.85 Per Diluted Share*, reporting, in pertinent part:

> [T]hird quarter 2007 income from continuing operations of $294.9 million, or $0.85 per diluted share. Third quarter diluted earnings per share from continuing operations reflect an improvement of 27 percent over the third quarter of 2006 diluted earnings per share from continuing operations of $0.67….Sequentially, the company's third quarter diluted earnings per share from continuing operations were $0.17 higher than the second quarter 2007 diluted earnings per share from continuing operations of $0.68, before non-recurring items. In the first nine months of 2007, revenues were $5.6 billion and income from continuing operations before non-recurring items was $816.4 million, or $2.35 per diluted share.

83. During a nationwide conference call convened by Defendants following the Company's 3Q07 press release, analysts highlighted the Company's effective tax rate, as illustrated in the following question and answer:

**BECNEL:** "A lower tax rate helped earnings by $0.01 as our effective rate for the quarter *settled at 19%* or 100 basis points below Q2's rate."

**JIM CRANDELL:** "Given the projected mix of earnings out through 2008, what is a good tax rate to project for the full year?"

**BECNEL**: "Difficult.  I would keep 21 to 22% for '08."

**JIM CRANDELL**: "*Why not 20% or less*?"

**BECNEL**: "*Believe me, I have challenged our folks to get there*.  So we will give updates if we can.  Very structure intensive."

**DUROC-DANNER**: "It really depends on the flow of business in a particular quarter."

**BECNEL**: "Absolutely.  *19% this quarter was exceptionally good*.  I would say better than we would have even expected given the uptick in NAM [North America] operating income."

84.     As designed, and in response to such statements, on October 22, 2007, Morgan Stanley commented on Weatherford's 3Q07 in a note called *3Q07 Results Comment: Continued Solid Execution* noting that the Company had beat consensus EPS by a penny "WFT delivered $0.85, marginally ahead of our estimate of $0.84 and consensus of $0.84.  While a *penny was due to a lower than expected tax rate*, there were several negative one-offs in the number.  *We continue to be impressed by the company's high growth*."

85.     The statements made by Defendants referenced above in ¶¶82-83 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**Fourth Quarter 2007 and FY 2007**

86.     On January 25, 2008, the Company issued a press release on Form 8-K entitled, *Weatherford Reports Fourth Quarter Income from Continuing Operations of $0.99 Per Diluted Share, Before Non-Recurring Items*, that, in relevant part:

> [R]eported fourth quarter 2007 income from continuing operations of $345 million, or $0.99 per diluted share, before non-recurring items.  Fourth quarter diluted earnings per share from continuing operations reflect an improvement of 30 percent over the fourth quarter of 2006 diluted earnings per share from

continuing operations of $0.76, before non-recurring items. The non-recurring item in the fourth quarter of 2007 results includes investigation and exit costs incurred in connection with the company's exit from sanctioned countries….Sequentially, the company's fourth quarter diluted earnings per share from continuing operations were $0.13 higher than the third quarter 2007 diluted earnings per share from continuing operations of $0.86, before non-recurring items. For the twelve months ended December 31, 2007, revenues were $7.8 billion and income from continuing operations before non-recurring items was $1,164 million, or $3.35 per diluted share. In 2006, the company reported revenues of $6.6 billion and income from continuing operations before non-recurring items of $900 million, or $2.54 per diluted share.

87.     The chart below reflects the magnitude of the misstatements in Weatherford's

FY07 financial statements:

| Weatherford International Ltd. | **Year Ended December 31, 2007** | | | |
|---|---|---|---|---|
| Reported and restated results, Fiscal 2007 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Overstated Income | Errors: % of Actual |
| Net Income | 1,071 | 941 | 130 | *14%* |
| Diluted Earnings Per Share | $1.54 | $1.35 | $0.19 | *14%* |
| Provision for income taxes | (333) | (487) | 154 | *32%* |
| Income tax expense rate (understated) | 23% | 33% | 10% | *31%* |

88.     During a conference call following the Company's 4Q07 and FY07 press release, Becnel touted the "$0.03…benefit *from a lower tax rate*." During the call, Bill Herbert of Simmons & Company International specifically asked Defendants about the Company's 22% projected tax rate for 2008. Demonstrating hands-on knowledge of the Company's effective tax rate, Duroc-Danner responded that "[i]t is a source of frustration," with Becnel adding, "[a]nd on the taxes, remember that those are a function of two things. Your geographic earnings mix, as well as multiple structures that you have in place in order to be able to be efficient with respect to taxes. At certain times, and there are not always convenient, those structures may mature, and the benefit may mature under it. And it is at that time that you are required to take the benefit. *The 22% may prove conservative in terms of being too high*, but we will see because I would rather not tell you guys to undershoot the mark there."

89.     Subsequently, a research report by Capital One Southcoast, Inc. analyst Pierre E. Conner III dated January 25, 2008, noted that the Company had *again beat EPS*, which *included "beats on taxes* and corporate expenses."  The same day, J.P.Morgan commented favorably on the Company's 4Q07 beat, stating that "*WFT picked up $0.05 from a lower tax rate*, about $0.02 of which we can explain by the mix shift in op[erating] inc[ome] (specifically, the US being lower).  *WFT has made a concerted effort to reduce net taxes in '07, and look to the conf. call for clarification on where the other $0.03 came from*."  Morgan Stanley described WFT's 4Q07 growth a "truly remarkable."  Similarly, on January 28, 2008, Wachovia analyst Brad Handler wrote "*Q4 SOLID.  WFT's recurring 4Q2007 EPS of $0.99 only beat our and the Street's $0.96 on lower tax rate*."

90.     On February 21, 2008, Weatherford filed its 2007 Annual Report with the SEC on Form 10-K.  The Annual Report was signed by Defendants Duroc-Danner, Becnel and Abarca, and reaffirmed the Company's financial results announced on January 25, 2008.  The Annual Report also represented that, "[o]ur effective tax rates were 23.0% in 2007, 25.9% in 2006 and 25.5% in 2005. The decrease in our effective tax during 2007 as compared to 2006 was due to benefits realized from the *refinement of our international tax structure and changes in our geographic earnings mix*."   The Annual Report included Ernst & Young's Report of Independent Registered Public Accounting Firm certifying that Weatherford had maintained effective internal controls, and expressing an unqualified opinion as to Weatherford's consolidated balance sheets.

91.     The statements made by Defendants referenced above in ¶¶86, 88 and 90 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**First Quarter 2008**

92.     On April 21, 2008, the Company issued a press release entitled, *Weatherford Reports First Quarter Income from Continuing Operations of $1.01 Per Diluted Share, Before Non-Recurring Items; Announces Two-for-One Share Split*, where, in relevant part, the Company:

> [R]eported first quarter 2008 income from continuing operations of $351 million, or $1.01 per diluted share, before non-recurring items.  First quarter diluted earnings per share from continuing operations reflect an improvement of 22 percent over the first quarter of 2007 diluted earnings per share from continuing operations of $0.83, before non-recurring items.…Sequentially, the company's first quarter diluted earnings per share from continuing operations, before non-recurring items, were $0.02 higher than the fourth quarter 2007 diluted earnings per share from continuing operations of $0.99, before non-recurring items.

93.     After assuring investors that the Company's effective tax rate would improve further in 4Q08 (¶88), Defendants delivered.  On a conference call after Weatherford's 1Q08 announcement, Becnel noted a net $0.02 per share improvement in taxes and stated that "*[n]ow that we have finalized our tax planning for '08*, we feel comfortable guiding you to a *full-year effective rate of between 18 and 19%*, identical to Q1."  The same day, Capital One Southcoast, Inc. analyst Pierre E. Conner III raised his target for the Company's share price from $87 to $93, and commented on Weatherford's "*outperformance over most of its peers over the past four weeks*."  Similarly, RBC Capital Markets noted that the Company's "upside was driven by a *lower than expected tax rate*."

94.     As admitted by the Restatement, Defendants' statements referenced in ¶¶92-93 were false and misleading for the same reasons set forth in ¶77, *supra*.

## Second Quarter 2008

95.     On July 21, 2008, the Company issued a press release entitled, *Weatherford Reports Second Quarter Income from Continuing Operations of $0.43 Per Diluted Share, Before Non-Recurring Items*, that, in relevant part:

> [R]eported second quarter 2008 income from continuing operations of $300 million, or $0.43 per diluted share, excluding an after tax gain from non-recurring items of $0.09.  Second quarter diluted earnings per share from continuing operations reflect an improvement of 26 percent over the second quarter of 2007 diluted earnings per share from continuing operations of $0.34, before non-recurring items....Sequentially, the company's second quarter diluted earnings per share from continuing operations, before non-recurring items, were $0.07 lower than the first quarter 2008 diluted earnings per share from continuing operations of $0.50, before non-recurring items.

96.     On a nationwide conference call that Defendants' convened for 2Q08, Becnel highlighted that "**the 15.9% effective rate for the quarter helped by $0.01**.  Our effective tax rate for the full year is projected to land between **17% and 18%**."   The statements made by Defendants referenced in ¶¶95-96 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

## Third Quarter 2008

97.     On October 20, 2008, the Company issued a press release on Form 8-K entitled, *Weatherford Reports Third Quarter Income from Continuing Operations of $0.55 Per Diluted Share, Before Non-Recurring Items*, where, in relevant part, the Company:

> [R]eported third quarter 2008 income from continuing operations of $384 million, or $0.55 per diluted share, excluding an after tax loss from non-recurring items of $0.02.  Third quarter diluted earnings per share from continuing operations reflect an improvement of 28 percent over the third quarter of 2007 diluted earnings per share from continuing operations of $0.43, before non-recurring items....Sequentially, the company's third quarter diluted earnings per share from continuing operations, before non-recurring items, were $0.12 higher than the second quarter 2008 diluted earnings per share from continuing operations of $0.43, before non-recurring items.  In the first nine months of 2008, revenues were $7.0 billion and income from continuing operations before non-recurring items was $1,035 million, or $1.48 per diluted share.

98.     On a same-day conference call following the Company's 3Q08 press release, Duroc-Danner raved that "[e]arnings at $0.55 were the **highest quarterly performance in the Company's history**," and assured investors who were concerned about the accelerating credit crisis' effect on Weatherford, forcefully stating "**[b]usiness has not slipped.  Business is not slipping**….**There is no evidence of slipping anything**."  Becnel also chimed in that "earnings per share are up 25% compared to last year.  Our sequential improvement of $0.12 represents the **largest quarter-on-quarter growth** posted by Weatherford in the current up cycle," and that "**[o]ur effective [tax] rate for the quarter was 17.3%, consistent with last quarter's guidance**."

99.     The statements made by Defendants referenced above in ¶¶97-98 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**Fourth Quarter 2008 and FY 2008**

100.    On January 26, 2009, the Company issued a press release entitled, *Weatherford Reports Fourth Quarter Income from Continuing Operations of $0.53 Per Diluted Share, Before Non-Recurring Items*, which, in relevant part:

> [R]eported fourth quarter 2008 income from continuing operations of $364 million, or $0.53 per diluted share, excluding an after tax loss of $0.03 for investigation and exit costs incurred in connection with the company's withdrawal from sanctioned countries.  Fourth quarter diluted earnings per share from continuing operations reflect an improvement of eight percent over the fourth quarter of 2007 diluted earnings per share from continuing operations of $0.49, before non-recurring items….Sequentially, the company's fourth quarter diluted earnings per share from continuing operations, before non-recurring items, were $0.02 lower than the third quarter 2008 diluted earnings per share from continuing operations of $0.55, before non-recurring items.…In 2007, the company reported revenues for the year of $7.8 billion and income from continuing operations before non-recurring items of $1,164 million, or $1.67 per diluted share.

101.    The chart below highlights the magnitude of the misstatements in Defendants' FY08 financial statements:

| Weatherford International Ltd. | **Year Ended December 31, 2008** | | | |
|---|---|---|---|---|
| Reported and restated results, Fiscal 2008 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Overstated Income | Errors: % of Actual |
| Net Income | 1,393 | 1,246 | 147 | *12%* |
| Diluted Earnings Per Share | $2.00 | $1.78 | $0.22 | *12%* |
| Provision for income taxes | (250) | (373) | 123 | *33%* |
| Income tax expense rate (understated) | 15% | 22% | 8% | *34%* |

102.     Based on Defendants' representations, on January 27, 2009, Pritchard Capital Partners, LLC noted that the Company beat EPS because "***favorable taxes*** were better than expected (+$0.03)."

103.     On February 24, 2009, Weatherford filed its 2008 Annual Report with the SEC on Form 10-K.  The Annual Report was signed by Defendants Duroc-Danner, Becnel and Abarca, and reaffirmed the Company's financial results announced on January 26, 2009.  The 2008 Annual Report further represented that "[o]ur effective tax rates were 17.1% in 2008, 23.0% in 2007 and 25.9% in 2006.  The decrease in our effective tax rate during 2008 and 2007 as compared to 2007 and 2006, respectively, was due to benefits realized from the ***refinement of our international tax structure and changes in our geographic earnings mix***.  During 2008, we recorded a benefit of approximately $100 million related to foreign taxes paid that will be used to reduce our future United States tax liability."  The same Annual Report included Ernst & Young's Report of Independent Registered Public Accounting Firm stating Weatherford had maintained effective internal controls, and expressing an unqualified opinion as to Weatherford's consolidated balance sheets.

104.     The statements made by Defendants referenced above in ¶¶100 and 103 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**First Quarter 2009**

105.    On April 20, 2009, the Company issued a press release on Form 8-K entitled,

*Weatherford Reports First Quarter Results*.  In the press release, the Company, in relevant part:

> [R]eported first quarter 2009 income from continuing operations of $186 million,
> or $0.27 per diluted share.…First quarter diluted earnings per share from
> continuing operations reflect a decrease of 46 percent over the first quarter of
> 2008 diluted earnings per share from continuing operations of $0.50, before non-
> recurring items, mainly due to a sharp drop off in customer activity in North
> America.…Sequentially, the company's first quarter diluted earnings per share
> from continuing operations, before non-recurring items, were $0.26 lower than
> the fourth quarter 2008 diluted earnings per share from continuing operations of
> $0.53, before non-recurring items.

106.    Defendants' 1Q09 financial statements referenced in ¶105 were materially false

and misleading under GAAP and as depicted in the chart below:

| Weatherford International Ltd. Reported and restated results, 1Q09 (dollars in millions, rounded) | **Quarter Ended March 31, 2009** | | | |
|---|---|---|---|---|
| | Reported (False) | Restated (Actual) | Errors: Overstated Income | Errors: % of Actual |
| Net Income | 165 | 128 | 37 | *29%* |
| Diluted Earnings Per Share | $0.23 | $0.18 | $0.05 | *29%* |
| Provision for income taxes | (33) | (64) | 31 | *49%* |
| Income tax expense rate (understated) | 16% | 32% | 16% | *50%* |

107.    On Weatherford's 1Q09 conference call, which followed the Company's 1Q09

announcement, Becnel noted "a sequentially lower tax rate [of] 15.5%."  Analysts sought further

clarification on Becnel's representation about the Company's lower sequential tax rate:

> **MARK BROWN** (Pritchard Capital Partners LLC): "Okay.  And just another
> question on tax rate.  I think you said 15.5% guidance.  *Just if you could give any
> color for why that was lower than previously*?"
>
> **BECNEL:** "*That we can answer*.  If you look at distribution of earnings by
> geographic segment and the different rates both what I would call the statutory
> rates versus effective rates that we have been able to achieve and incremental *tax
> planning* that we undertook during the quarter in connection with our move to
> Geneva, *all of those helped*.  Obviously we feel a lot more confident about
> putting our thumb on exactly where we will be by the end of the year in terms of
> earnings given the prognosis that Bernard [Duroc-Danner] just went through, *and*

45

*so I feel a lot more confident in that [tax] rate than where we were heading into Q1*."

108.    In response to these statements, on April 20, 2009, RBC Capital Markets noted that the Company's "***[t]ax rate was 15.5% vs. our 20% estimate, effectively adding $0.02*** [of EPS]."  Similarly, on April 24, 2009, Wachovia analyst Tom Curran repeated that "[o]n WFT's call, CEO Duroc-Danner said 'we can confirm with a higher degree of certainty we expect double digit growth.…' Due to the apparent resilience of key identified pieces of this growth; ***the ample credit management has amassed****…we are raising our [outlook]*."

109.    The statements made by Defendants referenced above in ¶¶105, 107 and 108 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

## Second Quarter 2009

110.    On July 20, 2009, the Company issued a press release entitled, *Weatherford Reports Second Quarter Results*, that, in relevant part:

> [R]eported second quarter 2009 income from continuing operations of $69 million, or $0.10 per diluted share.…Sequentially, the company's second quarter diluted earnings per share from continuing operations, before non-recurring items, were $0.17 lower than the first quarter of 2009 diluted earnings per share from continuing operations of $0.27, before non-recurring items.  This decline was principally due to the continued curtailment of North American activity during the second quarter of 2009.

111.    Defendants' 2Q09 reported financial statements were materially false and misleading in violation of GAAP as described in the following chart:

| Weatherford International Ltd. | **Quarter Ended June 30, 2009** | | | |
|---|---|---|---|---|
| Reported and restated results, 2Q09 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Overstated Income | Errors: % of Actual |
| Net Income | 42 | 21 | 21 | *101%* |
| Diluted Earnings Per Share | $0.06 | $0.03 | $0.03 | *101%* |
| Provision for income taxes | (5.4) | (24) | 19 | *78%* |
| Income tax expense rate (understated) | 10% | 45% | 35% | *78%* |

112.    During the investor conference call that Defendants hosted after the Company's 2Q09 quarterly press release, Becnel noted a "$0.01 [EPS] improvement below the line *due to a lower tax rate* for the year as a result of lower North American operating income."  In direct reliance upon Defendants' misrepresentations, on July 20, 2009, Deutsche Bank analysts Mike Urban and Fleur Brown, in a research note called *Growth Story Still on Track*, rated the Company a "buy."  On July 21, 2009, Credit Suisse analyst Brad Handler noted a positive increase in Weatherford's reported EPS due to a *favorable tax rate*.

113.    The statements made by Defendants referenced above in ¶¶110 and 112 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**Third Quarter 2009**

114.    On October 19, 2009, the Company issued a press release entitled, *Weatherford Reports Third Quarter Results*.  In relevant part, the Company:

> [R]eported third quarter 2009 income from continuing operations of $93 million, or $0.13 per diluted share....Third quarter diluted earnings per share from continuing operations reflect a decrease of 76 percent over the third quarter of 2008 diluted earnings per share from continuing operations of $0.55, before severance and investigation costs.  *Results for the third quarter include a tax benefit of approximately $0.05 resulting from the lowering of the company's estimate of its effective tax* rate….Sequentially, the company's third quarter diluted earnings per share from continuing operations, before severance and investigation costs, were $0.03 higher than the second quarter of 2009 diluted earnings per share from continuing operations of $0.10, before severance and investigation costs.

115.    During a nationwide conference call that Defendants convened with analysts to discuss the Company's 3Q09 press release, Becnel noted that "[t]he results include a *$0.05 benefit due to a reduced tax rate for the year*" and a "tax rate full-year effective rate of 3.4%."  Becnel further stated, "[t]o be completely clear, Weatherford expects to grow its international segment '09 on 2010 by 30% or more."  The same day, BMO Capital Markets highlighted that "Weatherford reported 3Q09 headline EPS of $0.13, versus our $0.11 and consensus of

47

$0.13…the $0.13 operating EPS includes a ***$0.05 tax rate benefit***."  Unbeknownst to investors,

however, but for the Company's fraudulent $0.05 "tax rate benefit," Weatherford would have

badly missed EPS for the quarter.  The same day, Deutsche Bank issued a research note for its

clients on Weatherford called ***When the Going Gets Tough, the Tough Keep Growing***, which

highlighted that "WFT will continue to enjoy ***industry leading growth*** over the long-term and we

therefore rate it a BUY."

116.    The statements made by Defendants referenced above in ¶¶114 and 115 were

false and/or misleading for the same reasons set forth in ¶77, *supra*, and as highlighted in the

chart below:

| Weatherford International Ltd. | **Quarter Ended September 30, 2009** | | | |
|---|---|---|---|---|
| Reported and restated results, 3Q09 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Overstated Income | Errors: % of Actual |
| Net Income | 77 | 32 | 46 | ***144%*** |
| Diluted Earnings Per Share | $0.11 | $0.07 | $0.04 | ***144%*** |
| Benefit (Provision) for income taxes | 34 | (5) | 39 | ***800%*** |
| Income tax (benefit) expense rate | (71%) | 12% | 82% | ***709%*** |

## Fourth Quarter 2009 and FY 2009

117.    On January 26, 2010, the Company issued a press release on Form 8-K entitled,

*Weatherford Reports Fourth Quarter Results*.  In relevant part, the Company:

> [R]eported fourth quarter 2009 income from continuing operations of $15 million,
> or $0.02 per diluted share….Fourth quarter diluted earnings per share from
> continuing operations reflect a decrease of 96 percent over the fourth quarter of
> 2008 diluted earnings per share from continuing operations of $0.53, before
> severance and investigation costs.

118.    Defendants' reported 4Q09 and FY09 financial statements were false when made,

as admitted in the Restatement, and as depicted below:

| Weatherford International Ltd. | **Quarter Ended December 31, 2009** | | | |
|---|---|---|---|---|
| Reported and restated results, 4Q09 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Overstated Loss | Errors: % of Actual |
| Net Loss | (30) | (11) | 20 | *188%* |
| Diluted Loss Per Share | $(0.04) | $(0.01) | $0.03 | *188%* |
| Benefit (Provision) for income taxes | (16) | 6 | 22 | *373%* |
| Income tax (benefit) expense rate | (143%) | 44% | 187% | *422%* |

| Weatherford International Ltd. | **Year Ended December 31, 2009** | | | |
|---|---|---|---|---|
| Reported and restated results, Fiscal 2009 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Overstated Income | Errors: % of Actual |
| Net Income | 254 | 170 | 84 | *49%* |
| Diluted Earnings Per Share | $0.35 | $0.24 | $0.12 | *49%* |
| Provision for income taxes | 19 | 87 | 68 | *78%* |
| Income tax expense rate (understated) | 6.5% | 31% | 24% | *79%* |

119.    On an investor conference call with analysts for 4Q09 and FY09, Becnel repeated that, "[o]n the positive side, two items of note – a net $3 million gain on acquisition and divestiture activity, *and two, a $3 million tax benefit for operations*."  Becnel also provided a 2010 "tax rate of 20%," and confirmed that "Q4 saw the end of a one-year tax reorganization, completing our move to a Swiss-based multinational structure.  *We should be set with long-term stability*."

120.    On March 1, 2010, Weatherford also filed its 2009 Annual Report with the SEC on Form 10-K.  The Annual Report was signed by Duroc-Danner, Becnel and Abarca, and it reaffirmed the Company's financial results announced on January 26, 2010.  The Annual Report further represented that "[o]ur effective tax rates were 6.5% in 2009, 14.8% in 2008 and 23.0% in 2007.  The decrease in our effective tax rate during 2009 is primarily due to a large decrease in earnings in certain jurisdictions, largely North America, with no corresponding decrease in certain tax deductions. *The decrease in our effective tax rate during 2008 was due to benefits realized from the refinement of our international tax structure and changes in our geographic earnings mix*….During 2008, we recorded a benefit of approximately $100 million related to

49

foreign taxes paid that will be used to reduce our future United States tax liability." The Company's 2009 Annual Report also included Ernst & Young's Report of Independent Registered Public Accounting Firm concluding that Weatherford had maintained effective internal controls, and expressing an unqualified opinion as to Weatherford's consolidated balance sheets.

121.    The statements made by Defendants referenced above in ¶¶117 and 119-20 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**First Quarter 2010**

122.    On April 20, 2010, the Company "reported first quarter 2010 income of $41 million, or $0.06 per diluted share, excluding an after tax loss of $0.11 per diluted share….Sequentially, the company's first quarter diluted earnings per share, before charges, were $0.04 higher than the fourth quarter of 2009 diluted earnings per share of $0.02, before severance and investigation costs."   As depicted in the following chart and as admitted in the Restatement, Defendants' overstatement of Weatherford's true income tax expense for the quarter was *629%*:

| Weatherford International Ltd. | **Quarter Ended March 31, 2010** | | | |
| Reported and restated results, 1Q10 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Understated Loss | Errors: % of actual |
| --- | --- | --- | --- | --- |
| Net Loss | (40) | (68) | 28 | *41%* |
| Diluted Loss Per Share | $(0.05) | $(0.09) | $0.04 | *41%* |
| Benefit (Provision) for income taxes | 15.5 | (3.5) | 19.0 | *548%* |
| Income tax expense rate (understated) | (30%) | 6% | 36% | *629%* |

**Second Quarter 2010**

123.    On July 20, 2010, the Company "reported second quarter 2010 income of $80 million, or $0.11 per diluted share, excluding an after tax loss of $0.15 per diluted share….Second quarter diluted earnings per share reflect an increase of ten percent over the

second quarter of 2009 diluted earnings per share of $0.10, before severance and investigation costs….Sequentially, the company's second quarter diluted earnings per share, before charges, were $0.04 higher than the first quarter of 2010 diluted earnings per share of $0.07, before severance, investigation costs and fair value adjustment for the put option."

124.    As admitted in the Restatement, Defendants' 2Q10 financial statements were false when made, and the chart below depicts, among other things, the material percentage errors for Defendants' various false financial statements:

| Weatherford International Ltd. | **Quarter Ended June 30, 2010** | | | |
|---|---|---|---|---|
| Reported and restated results, 2Q10 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Understated Loss | Errors: % of actual |
| Net Loss | (27) | (48) | 21 | *45%* |
| Diluted Loss Per Share | $(0.04) | $(0.06) | $0.02 | *45%* |
| Provision for income taxes | (16) | (40) | 24 | *59%* |
| Income tax expense rate (understated) | 230% | 826% | 595% | *72%* |

125.    In response to these announcements, on July 22, 2010, RBC Capital Markets noted that Weatherford *Appears to Have Turned a Corner* and highlighted the Company's illusory "strong beat" to EPS.

**Third Quarter 2010**

126.    On October 18, 2010, the Company issued a press release on Form 8-K entitled, *Weatherford Reports Third Quarter Results of $0.18 Per Share*.  Therein, the Company stated:

Sequentially, the company's third quarter diluted earnings per share, before charges and the fair value adjustment to the put option, were $0.07 higher than the second quarter of 2010 diluted earnings per share of $0.11, before severance, investigation costs and fair value adjustment for the put option.

*        *        *

The company expects earnings per share before excluded items of $0.23 in the fourth quarter and $1.30 in 2011.  Expected improvements in Q4 should be nearly evenly split between North America and International markets, with a $0.01 offset for increased interest expense.

51

127.    As admitted by the Restatement, Defendants' 3Q10 financial statements were false when made.  As set forth on the following chart, the Company's diluted EPS for the quarter was overstated by 53% for this reporting period:

| Weatherford International Ltd. | **Quarter Ended September 30, 2010** | | | |
| Reported and restated results, 3Q10 (dollars in millions, rounded) | Reported (False) | Restated (Actual) | Errors: Overstated income | Errors: % of actual |
| --- | --- | --- | --- | --- |
| Net Income | 145 | 95 | 50 | *53%* |
| Diluted Earnings Per Share | $0.19 | $0.13 | $0.06 | *53%* |
| Provision for income taxes | 7 | 54 | 47 | *87%* |
| Income tax expense rate (understated) | 5% | 35% | 31% | *87%* |

128.    On a nationwide conference call convened by Defendants following the Company's 3Q10 announcements, Becnel touted the Company's 2010 "tax rate of 18% to 19%" and stated that Weatherford's EPS was "*a $0.07 improvement over the second quarter and tops our $0.16 guidance*" and that "[t]hrough the first nine months of the year we are $138 million free cash flow positive."

129.    In response to Defendants' positive, but misleading statements, Guggenheim Securities, LLC highlighted, as one of its "[k]ey [p]oints," the Company's "[f]avorable [t]ax [r]ate," and commented that Weatherford beat EPS by reporting a "lower tax rate *(5% vs. guidance of 19%)*."  On October 19, 2019, Jeffries & Company, Inc. celebrated the Company's "*3Q Beat – [d]riven by better operating income, margins [and] a lower tax rate*."

130.    The statements made by Defendants referenced above in ¶¶126 and 128 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

**Fourth Quarter 2010 and FY 2010**

131.    On January 25, 2011, the Company issued a press release on Form 8-K entitled, *Weatherford Reports Fourth Quarter Results of $0.21 Per Share Before Charges, Primarily Tax*

*Reorganization and Bond Tender Premiums*.  The Company "reported fourth quarter 2010 income of $156 million, or $0.21 per diluted share, excluding an after tax loss of $210 million.

> Fourth quarter diluted earnings per share reflect an increase of $0.18 over the fourth quarter of 2009 diluted earnings per share of $0.03, before charges and fair value adjustment for the put option.

> Sequentially, the company's fourth quarter diluted earnings per share, before charges and the fair value adjustment to the put option, were $0.03 higher than the third quarter of 2010.

132.    As admitted by the Restatement, Defendants' 4Q10 and FY10 reported financial statements were materially false and misleading.  The charts below evidence, among other things, the Company's 123% error for reported net income for FY08:

| Weatherford International Ltd.<br>Reported and restated results, 4Q10<br>(dollars in millions, rounded) | Quarter Ended December 31, 2010 | | | |
|---|---|---|---|---|
| | Reported (False) | Restated (Actual) | Errors: Understated Loss | Errors: % of actual |
| Net Loss | (54) | (86) | 33 | *38%* |
| Diluted Loss Per Share | $(0.07) | $(0.13) | $0.06 | *38%* |
| Provision for income taxes | (164) | (200) | 36 | *18%* |
| Income tax expense rate (understated) | 145% | 171% | 26% | *15%* |

| Weatherford International Ltd.<br>Reported and restated results, Fiscal 2010<br>(dollars in millions, rounded) | Year Ended December 31, 2010 | | | |
|---|---|---|---|---|
| | Reported (False) | Restated (Actual) | Errors: Overstated income | Errors: % of actual |
| Net Income (Loss) | 25 | (108) | 132 | *123%* |
| Diluted Earnings (Loss) Per Share | $0.03 | $(0.15) | $0.18 | *123%* |
| Provision for income taxes | (172) | (298) | 126 | *42%* |
| Income tax expense rate (understated) | 81% | 146% | 64% | *44%* |

133.    During a conference call following Weatherford's press release, Becnel affirmed that "[t]axes came in at 16.2% compared to 16.7% in Q3" and predicted a 2011 "tax rate of 20%."  Defendants' statements in ¶¶131 and 133 were false and/or misleading for the same reasons set forth in ¶77, *supra*.

### THE TRUTH IS REVEALED

134.    After the close of trading on March 1, 2011, the Company filed a press release on

Form 8-K advising that Weatherford could not timely file its Annual Report on Form 10-K by

March 1, 2011.

> The reason for not filing by March 1, 2011 relates to the identification of a
> *material weakness in internal control over financial reporting for income
> taxes*….During management's assessment of the effectiveness of the Company's
> internal control over financial reporting as of December 31, 2010, management
> identified a *material weakness* in the Company's internal control over financial
> reporting for income taxes.…Because of the material weakness…our internal
> control over financial reporting…was *not effective*. The Company's processes,
> procedures and controls related to financial reporting *were not effective* to ensure
> that amounts related to current taxes payable, certain deferred tax assets and
> liabilities, reserves for uncertain tax positions, the current and deferred income tax
> expense and related footnote disclosures were accurate. Specifically, our
> processes and procedures *were not designed* to provide for adequate and timely
> identification and review of various income tax calculations, reconciliations and
> related supporting documentation required *to apply our accounting policies for
> income taxes in accordance with…GAAP*. The principle factors contributing to
> the material weakness were: 1) inadequate staffing and technical expertise…, 2)
> ineffective review and approval practices…, 3) inadequate processes to
> effectively reconcile income tax accounts and 4) inadequate controls over the
> preparation of the company's quarterly tax provisions….Approximately *$460
> million* of these adjustments relate to an error in determining the tax
> consequences of intercompany amounts over multiple years.

The Company also disclosed that it expected to revise (upward) its projected 20% tax rate for

2011.

135.    The same day, Weatherford filed a Current Report with the SEC on Form 8-K.

Therein, the Company, in relevant part, stated:

> **Item 2.02.  Results of Operations and Financial Condition.**
>
> As a result of identifying the material weakness described in Item 4.02(a) below,
> we performed additional testing to determine whether or not the material
> weakness failed to identify any material errors in our accounting for income taxes.
> Based on these procedures, we identified the errors set forth in Item 4.02(a), the
> correction of which will be adjustments to our historical financial statements and
> our 2010 fourth quarter earnings release. *As described below, these errors and
> the associated adjustments relate almost exclusively to taxes*. While we have

substantially completed our procedures, these amounts may vary based upon finalizing our procedures.   The adjustments set forth in Item 4.02(a) are incorporated by reference in this Item 2.02.

*     *     *

**Item 4.02(a).   Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On March 1, 2011, we filed a Form 12b-25 Notification of Late Filing advising that our Annual Report on Form 10-K for the year ended December 31, 2010 (our 'Form10-K') will not be filed by March 1, 2011.  The reason for not filing by March 1, 2011 relates to the identification of *a material weakness in internal control over financial reporting for income taxes* and the amount of time required to perform additional testing on, and reconciliation of, the tax accounts.

Based on our additional testing of our internal control over financial reporting, we identified certain errors, further described below, the correction of which will be adjustments to our historical financial statements and our 2010 fourth quarter earnings release.  While we have substantially completed our procedures, these amounts may vary based upon finalizing our procedures.  These corrections, once finalized, will be reflected in our Form 10-K when it is filed.

During management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2010, management identified a material weakness in the Company's internal control over financial reporting for income taxes.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – An Integrated Framework (September 1992).  *Because of the material weakness described below, management concluded that, as of December 31, 2010, our internal control over financial reporting for income taxes was not effective*.

The Company's processes, procedures and controls related to financial reporting *were not effective* to ensure that amounts related to current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, the current and deferred income tax expense and related footnote disclosures were accurate. Specifically, our processes and procedures *were not designed to provide for adequate and timely identification and review of various income tax calculations*, reconciliations and related supporting documentation required to apply our accounting policies for income taxes *in accordance with US GAAP*.

The principal factors contributing to the material weakness were: 1) *inadequate* staffing and technical expertise within the company related to taxes, 2) *ineffective*

55

review and approval practices relating to taxes, 3) *inadequate* processes to effectively reconcile income tax accounts and 4) *inadequate* controls over the preparation of quarterly tax provisions.

Approximately *$460 million* of these adjustments relate to an error in determining the tax consequences of intercompany amounts over multiple years.  These errors have no impact on previously reported operating cash flow.

In addition to the above items, we expect to make adjustments to correct for immaterial items that had been recorded in the incorrect period, which we expect to decrease net income by approximately $20 million in the aggregate for the years 2007 through 2010.

As a result of the estimated adjustments described above, the Audit Committee of our Board of Directors determined on February 28, 2011 that our previously issued financial statements for the years ended December 31, 2007, 2008 and 2009 and for the quarterly periods ended March 31, June 30 and September 30, 2010, *should no longer be relied upon*. Our Audit Committee has discussed the matters described above with our independent auditors.

136.    On March 2, 2011, the Company held its "material weakness" conference call to discuss the Company's prior day announcements.  Duroc-Danner, Becnel and Geer were all present on the conference call, where Becnel, in relevant part, stated the following:

Yesterday evening, we filed a notice of late filing and a Form 8-K advising that our Annual Report on Form 10-K would not be filed by yesterday's statutory due date.  *The reason for postponing the filing relates to the existence of a material weakness in our internal controls related to income taxes* and the subsequent testing of our income tax accounts, which resulted in the identification of errors in these accounts.

As a result of our assessment of internal controls this year, *we concluded that we will have a material weakness in our internal control over financial reporting, specifically related to income taxes*. Material weakness is a term [of art].  It is a *deficiency* or combination of *deficiencies* in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the financial statements would not be prevented or detected on a timely basis.

The existence of the material weakness with respect to internal controls for financial reporting for income taxes led to the need to perform additional testing on and reconciliation of the tax accounts.  The purpose of the testing was to determine whether or not the material weakness failed to identify any material errors in our accounting for income taxes.

We have substantially completed the testing procedures and have identified errors, the correction of which will be adjustments to our historical financial statements and our 2010 Q4 earnings release. ***These errors totaled approximately $500 million*** for the periods from 2007 to 2010.  The amount of the expected adjustment for each of the four years is expected to range from $100 million to $150 million.

The $500 million of errors consist of two parts.  First, approximately $460 million relates to an error in determining the tax consequences of ***intercompany*** amounts over multiple years.

Second, an additional $40 million approximately constitute corrections to foreign tax assets.  An example of this could be assessing collectability of a prepaid tax in a foreign jurisdiction.  This is an example only.

137.    During the same call, after Defendants' prepared statements ended, analyst Bill Herbert of Simmons & Company International asked:

Andy, ***so in plain English***, what was the mechanical breakdown in the 2007 intercompany calculation that caused you to tax-affect something that in retrospect you shouldn't have and then, of course, the error was compounded by doing the same in '08, '09 and 2010?  And thus, you went back, you subsequently detected a material weakness, ***a pretty substantial tax asset was subsequently initiated and thus the adjustment with regard to your earnings.  But what was the mechanical calculation in year one***?

**BECNEL**: "The mechanical miscalculation was in accounting for these intercompany amounts that ***instead of applying 0% effective rate***, if you will, and tax-affecting the payment at that level, ***it was done at 35%***."

**BECNEL**: "[In 2007] the change was we began to tax-affect certain amounts ***improperly and incorrectly***.  Everything in terms of the analysis suggests nothing other than it was an honest mistake.  It is, ***obviously, a mistake of considerable magnitude***, but it is a matter of, I think, various factors led into it."

138.    On this news, Weatherford's common stock declined $2.38 per share or, 10.92%, to close at $21.14 per share on March 2, 2011, on unusually heavy volume.  After Defendants' shocking announcement, the same analysts that once celebrated Defendants' "growth" story during the Class Period publicly began to challenge management's credibility.  On March 2, 2011, in a research note called *It's All Quite Taxing, Really*, Credit Suisse predicted "***[w]e expect shares to fall hard; and we don't expect to want to step in***."  The same day, Guggenheim

Securities LLC, in a research note called ***Adding Injury to Insult***, highlighted the broad issues the Company's announcement raised about Defendants' "accounting policies," and predicted that Weatherford would "become the poster child in Congress' crusade against 'tax avoidance.'" Similarly, J.P.Morgan suggested that the announcement was "***[n]ot the way to regain investor confidence***" and that, due to the announcement, "FCPA reemerges as a more acute risk."

139.    Defendants' March 8, 2011 Annual Report on Form 10-K included "restated financial information for the years ended December 31, 2009, 2008 and 2007, and the quarterly periods ended March 31, June 30 and September 30, 2010, and all four quarters of 2009 due to errors in the Company's accounting for income taxes.   The Company identified a related ***material weakness*** with respect to its internal control "***over financial reporting for income taxes***."   Defendants also warned that "***we could lose investor confidence*** in the accuracy and completeness of our financial reports, which could have a ***further*** adverse effect on our share price and potentially subject us to additional and potentially costly litigation and governmental inquiries/investigations.…With respect to the restatement of our historical financial statements as a result of the errors in our tax accounts, the ***SEC has sent us questions regarding our Current Report on Form 8-K, filed March 1, 2011***."[10]

140.    In the same Annual Report, Ernst & Young confirmed that, "because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, Weatherford International Ltd. and its subsidiaries ***has not maintained effective internal control over financial reporting as of December 31, 2010***."   Ernst & Young also "expressed an adverse opinion" on the Company's internal controls and financial reporting as a result of Defendants' tax scheme.

---

[10]    The SEC, however, ***also*** sought answers to questions about Defendants' March 2, 2011 conference call statements.

## DEFENDANTS' KNOWINGLY FALSE REPRESENTATIONS CONCERNING WEATHERFORD'S INTERNAL CONTROLS OVER FINANCIAL REPORTING

141.     In addition to disseminating false financial results in SEC filings (¶¶73, 78, 82, 86, 90, 92, 95, 97, 100, 103, 105, 110, 114, 117, 120, 122-23, 126, 131) and conference calls (¶¶74, 79, 83, 88, 93, 96, 98, 107, 112, 115, 119, 128, 133), the Company expressly assured investors in each quarterly Form 10-Q filed during the Class Period that Duroc-Danner and Becnel, as the Company's CEO and CFO respectively, had "carried out an evaluation…of the effectiveness of [Weatherford's] disclosure controls and procedures" and "[b]ased upon that evaluation…concluded [that Weatherford's] disclosure controls and procedures [were] effective as of the end of the period covered by this report."[11]

142.     Separately, Duroc-Danner and Becnel signed sworn SOX Certifications attached to each quarterly report on Form 10-Q for 1Q07-4Q10 representing that:

1.     I have **reviewed** this Quarterly Report on Form 10-Q of Weatherford International Ltd.;

2.     Based on my knowledge, this report **does not contain any untrue statement of a material fact** or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, **fairly present in all material respects the financial condition, results of operations and cash flows** of the registrant as of, and for, the periods presented in this report;

---

[11]     Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.   SEC Rule 13a-15, 17 C.F.R. §240.13a-15; SEC Rule 15d-15(e), 17 C.F.R. §240.15d-15(e).

4.     The registrant's other certifying officer and I are **_responsible_** for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     **_Designed_** such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to **_ensure_** that material information relating to the registrant, including its consolidated subsidiaries, is **_made known to us by others_** within those entities, particularly during the period in which this report is being prepared;

(b)     **_Designed_** such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide **_reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements_** for external purposes in accordance with generally accepted accounting principles;

(c)     **_Evaluated_** the effectiveness of the registrant's disclosure controls and procedures and **_presented in this report_** our conclusions about the **_effectiveness_** of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     **_Disclosed_** in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has **_materially affected, or is reasonably likely to materially affect_**, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     **_All significant deficiencies and material weaknesses_** in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     **_Any fraud, whether or not material_**, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

143.    After the Class Period, Defendants were forced to admit that Weatherford had material weakness in the internal controls surrounding accounting for taxes due to "1) *inadequate* staffing and technical expertise…, 2) *ineffective* review and approval practices…, 3) *inadequate* processes to effectively reconcile income tax amounts, and 4) *inadequate controls* over the preparation of quarterly tax provision."

144.    On March 8, 2011, Ernst & Young was also forced to disclose that "Weatherford…has *not maintained effective internal control over financial reporting* as of December 31, 2010."  Ernst & Young also issued "an adverse opinion" regarding Defendants' controls over Weatherford's financial reporting.  Together, these revelations starkly contradicted Duroc-Danner's and Becnel's prior statements that they had "*designed* such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed *under our supervision*, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is *made known to us* by others within those entities."

145.    Ultimately, after repeatedly telling investors that they *had* "*designed*" internal controls to ferret out and identify problems on Weatherford's books, Defendants admitted that the Company's "processes and procedures *were not designed* to provide for adequate and timely identification and review of various income tax calculations, reconciliations and related supporting documentation required to apply our accounting policies for income taxes *in accordance with…GAAP*."

## ADDITIONAL MOTIVE AND OPPORTUNITY
## TO MISLEAD WEATHERFORD INVESTORS

146.    While Defendants' fraudulent course of conduct was kept secreted from the market, the Insider Defendants: (i) used the Company as a vehicle to enrich themselves, their families and associates at the expense of shareholders; (ii) exploited the artificial inflation in

61

Weatherford's common stock price to consummate the Company's numerous Class Period acquisitions; and (iii) caused Weatherford to consummate four debt offerings to fuel the Company's growth strategy and capex.  In addition, this is not the first time questions have been raised with Defendants' regularly and statutory compliance efforts.

**Weatherford Is a Recidivist Violator of U.S. Laws**

147.   During the Class Period, Weatherford operated in countries sanctioned by the U.S. government, despite the fact that American companies have long been forbidden to operate in such countries.  For example, to operate in ***Sudan***, Weatherford claimed that its Dubai office was the headquarters for Weatherford's Sudan subsidiary (Weatherford Oil Tool Middle East), which was registered in Bermuda and had an Egyptian local director.  After a July 2007 Fortune Magazine news report disclosed Weatherford's Sudanese subsidiary, the Company reported in a July 23, 2007 press release on Form 8-K that:

> We have been notified that the Bureau of Industry & Security and the U.S. Department of Justice are investigating allegations of improper sales of products and services by us ***in sanctioned countries***.  We are cooperating fully with this investigation.   In cooperation with the government, we have retained legal counsel, reporting to our audit committee, to investigate this matter.   The investigation is in its preliminary stages.   We cannot anticipate the timing, outcome or possible financial impact of the investigation.

148.   While the genocide in Darfur raged – Becnel reportedly told Fortune that he believed the U.S. sanctions law meant that "no U.S. people and no U.S. goods can have any dealings with Sudan."   Nevertheless, the Fortune Magazine investigation found that the Company's Sudanese subsidiary used Weatherford's own red logo, and posted photographs of the Company's Houston-based executives on its office walls.  In response to heavy media and investor criticism, on September 10, 2007, the Company finally announced that it would divest itself from any operations in countries sanctioned by the United States, which included its operations in Sudan, Iran and Syria.  Almost three years after the Company's announcement, on

May 28, 2010, the SEC sought clarification from the Company regarding its ineffective "withdrawal process."

149.    Weatherford has also faced scrutiny for its part in Iraq's oil-for-food program. The DOJ and SEC are also investigating Weatherford's compliance with the FCPA in connection with embezzlement in Europe and a larger bribery scheme in West Africa.

**The Insider Defendants Benefitted in Concrete Ways from Their Fraud**

150.    Morningstar Equity Research gives Weatherford a failing "D" grade for its corporate stewardship.   According to Morningstar, Duroc-Danner's compensation "package places Duroc-Danner *in the same league* as CEOs from much larger competitors such as Halliburton [] and Schlumberger [], and it's *more than double what CEOs at peers Smith International [] and BJ Services [] received*.  *We are also bothered* that there were no hurdle rates spelled out for performance or long term compensation.   Another poor compensation practice is that Weatherford uses only earnings before interest and taxes to judge management performance.…*Overall, we believe that Weatherford has poor stewardship practices*."

151.    In 2008, Duroc-Danner's compensation levels even compelled the SEC to seek confirmation regarding *how* the amounts of the discretionary cash awards given to Weatherford's executive officers were determined because, in 2007, Duroc-Danner received a $3 million bonus despite the SEC's view that Weatherford's largesse appeared to violate the Company's own internal compensation guidelines.   Duroc-Danner's total compensation for 2007 was $21,620,430.   In February 2009, Compliance Week included Duroc-Danner in its list of executives who received the *largest* restricted stock awards after he received restricted Weatherford stock with face value of over $9.5 million.

152.    Weatherford's Compensation Committee – which helped determine Duroc-Danner's compensation during the Class Period – included at least one member with strong ties

to Duroc-Danner, William Macaulay.  Although Weatherford's SEC filings state that Macaulay is "independent" as defined by NYSE standards, and satisfies the qualification standards of Internal Revenue Code §162(m) and §16 of the Exchange Act, Macaulay's undisclosed ties to Duroc-Danner suggest otherwise.  Macaulay and Duroc-Danner have served as directors at each other's companies and their family investment vehicles have interests in each other's private business ventures.  For instance, both Macaulay and Duroc-Danner were directors of Dresser, Inc. ("Dresser"), a manufacturer of energy infrastructure and oilfield products and services in Texas.  Dresser was formed in April 2001 when First Reserve Corporation orchestrated a management buyout of Dresser from Halliburton.  Macaulay has, at all relevant times, served as Chairman, Chief Executive Officer, and Managing Director of First Reserve Corporation.  First Reserve Corporation indirectly owned shares of Dresser through private equity funds that it established, managed and controlled.  Further, it appears that First Reserve Corporation had the power to control the election of Dresser directors.

153.    Other Dresser investors include Duroc-Danner's *wife*, Consuelo Duroc-Danner, the Duroc-Danner Family Investments L.P. ("Duroc-Danner LP"), a "family limited partnership for estate planning purposes,"[12] as well as the following Macaulay family trusts: (i) the Macaulay Family 2000 Trust; (ii) the Anne R. Macaulay Trust; and (iii) the Elizabeth R. Macaulay Trust. All of these entities also own Weatherford shares.  ***Anne R. Macaulay and Elizabeth R. Macaulay are William Macaulay's daughters***.

---

[12]    Duroc-Danner routinely transfers his unexercised stock options to Duroc-Danner LP, which is incorporated in Texas.  It has two general partners: BJD-D Capital Management, L.L.C. (Bernard Duroc-Danner's initials), and CLD-D Capital Management, L.L.C. (his wife Consuelo's Duroc-Danner's initials).   The Duroc-Danners are listed as president of their respective LLCs.

154.    In addition to (generously) fixing Duroc-Danner's compensation, Macaulay also approved the following discretionary cash awards for the Insider Defendants during the Class Period: (i) $3,000,000 to Duroc-Danner; (ii) $525,000 to Becnel; and (iii) $300,000 to Abarca. That same year, Duroc-Danner received restricted Weatherford shares worth $9 million, and Becnel received restricted Weatherford shares worth $2.5 million.  In February 2009, the Board approved increases to the 2009 base salaries of: (i) $100,000 for Duroc-Danner; (ii) $65,000 for Becnel; and (iii) $40,000 for Abarca.  The Board also approved discretionary cash awards of $1,750,000 for Duroc-Danner, $525,000 for Becnel and $300,000 for Abarca.

155.    Moreover, in 2009, Weatherford adopted a performance-based long term incentive award program based on the ranking of the Company's total shareholder return relative to certain peer companies.  That same year, Duroc-Danner received a $100,000 raise in his base salary, bringing his target total compensation to the 75th percentile, while Becnel received a $306,500 raise which meant that Becnel's target total compensation was in excess of the 90th percentile in his peer group.

156.    Both Becnel and Duroc-Danner were also eligible for the 2009 Annual Bonus and Management Incentive Plan, which was contingent upon the Company meeting certain targets for the year.  The Compensation Committee awarded 147,232 performance-based restricted share units to Becnel and in April 2010, 530,035 to Duroc-Danner.

157.    In 2011, Weatherford revealed that "a majority of executive compensation should be…tied to the Company's financial and equity performance" and that "[e]arnings per share was the key metric for [Weatherford's named executive officers'] annual cash incentive awards."  Of course, the Company's tax scheme enabled Weatherford to beat Wall Street consensus EPS in various quarters during the Class Period.

158.    The timing of Weatherford's compensation to the Insider Defendants is also highly suspicious (and unseemly).  On February 16, 2011, the day *after* Defendants claimed to the SEC that they first learned of the half-billion dollar, four-year-long tax accounting misstatement, Becnel received a CHF 59,400 raise, James M. Hudgins, ***Vice President for Tax, was given a $50,000 raise***, and the Compensation Committee approved discretionary cash awards of $1.3 million for Duroc-Danner and CHF 500,000 for Becnel.  On February 28, 2011, ***just one day before*** Weatherford announced its need to restate its financial results, Duroc-Danner delivered 39,277 shares back to Weatherford worth $941,076, and Becnel delivered 17,500 shares worth $419,300.  The timing of these transactions is suspicious because they occurred just one day before Defendants' March 1, 2011 announcement, and two weeks *after* an internal audit purportedly alerted Weatherford management that there was a material weakness in the internal controls surrounding the Company's accounting for income taxes.

**Weatherford's Debt Offerings Support Scienter**

159.    As a result of Defendants' intercompany tax accounting fraud, Defendants *successfully* consummated four long-term debt offerings worth over $5.6 billion during the Class Period:

| Offering | Date | Proceeds |
|---|---|---|
| (i) 5.95% senior notes due 2012<br>(ii) 6.35% senior notes due 2017<br>(iii) $300 million of 6.80% senior notes due 2037 | June 2007 | $1.5 billion |
| (i) $500 million of 5.15% Senior Notes due in 2013<br>(ii) $500 million of 6.00% Senior Notes due 2018<br>(iii) $500 million of 7.00% Senior Notes due 2038 | March 2008 | $1.5 billion |
| (i) 9.625% Senior Notes due in 2019<br>(ii) 9.875% Senior Notes due 2039 | January 2009 | $1.25 billion |
| (i) 5.125% Senior Notes due 2020<br>(ii) 6.75% Senior Notes due 2040 | September 2010 | $1.4 billion |

160.    These offerings enabled Defendants to falsely portray Weatherford as a fast-growing industry leader with excellent financial prospects.  For instance, in connection with the Company's January 2009 $1.25 billion debt financing, which generated $500 million *more* than expected from initial reports, on January 6, 2009, Pritchard Capital Partners analyst Mark Brown noted that "[b]eyond the company [Weatherford], the announcement *could also provide some hope that the frozen credit market will open up and provide additional liquidity to the broader universe of energy stocks*."  These offerings also enabled Defendants to raise funds to acquire companies, and maintain the façade of a successful acquisition-based growth strategy when Defendants otherwise would have had grave difficulty doing so.

161.    The Company's runaway capital expenditures combined with the lack of control the Company had over its spending provided a further impetus for the long term debt offerings. For example, in its 2008 Annual Report on Form 10-K, the Company explained that the borrowings were used to fund *capital expenditures* and to fund current year *acquisitions*, and on March 20, 2008, after Standard & Poor's assigned a BBB+ rating to the senior notes issued by Weatherford, Thomson Financial reported that "[t]he proceeds will be used to repay an existing 1.1 [billion dollars] in short-term debt and for general corporate purposes, *including capital expenditures and acquisitions*."

162.    Finally, the debt offerings had a misleadingly positive effect on the Company's overall business prospects and stock price.  For instance, in June 2007, Standard & Poor's credit analyst Jeffery Morrison said that the offerings reflected favorably on the Company's cash flow generation, operating performance and business risk profile.  And, in response to the Company's June 2007 bond offering, Weatherford shares jumped $1.33, or 2.4%, in one day.  Similarly, after the Company's January 2009 offering, MarketWatch published an article entitled *Weatherford*

***Shares Up 11% As It Successfully Floats Debt***, which highlighted Weatherford's strong prospects due to the Company's successful debt offering.

**Weatherford's Class Period Stock-Based Acquisitions Support Scienter**

163.    In July 2007, at a ceremony marking his twentieth anniversary at the Company, Duroc-Danner stated that, "[s]ince I joined the firm's predecessor...and renamed it Weatherford in 1998...we have made more than 270 acquisitions in our quest for growth….The day we stop growth, you won't see me around…***I hate plateaus***."   To fuel the Company's growth, Defendants acquired numerous companies with artificially inflated stock to maintain the illusion that Weatherford was actually enjoying rapid, organic growth.

164.    Weatherford seldom disclosed the true worth of these assets, and did not report all the details of the transactions in their SEC filings or in press releases.  According to CW1, the assets were "***not worth a fraction***" of the indicated value.  As an example of Weatherford's accounting for transactions, their 2009 Form 10-K reported:

> We also acquired various other businesses during the years ended December 31, 2009, 2008 and 2007 for cash consideration of approximately $54 million, $380 million and $253 million, respectively.   In addition, ***other 2009 acquisitions included the issuance of approximately 11 million shares valued at $222 million and other 2008 acquisitions included the issuance of approximately two million shares valued at approximately $65 million***.

A sampling of Weatherford's Class Period acquisitions, as well as the degree to which Defendants obscured the actual value of its acquisitions is reflected, in part, below:

| Acquisition | Date | Price | Consideration |
|---|---|---|---|
| Reservoir Laboratories AS (Norway) | June 28, 2007 | Terms not disclosed | Terms not disclosed |
| NGKS International (Russia) | June 15, 2007 | Terms not disclosed | Terms not disclosed |
| V-Tech | February 2008 | Terms not disclosed | Terms not disclosed |
| International Logging Inc. (USA) | August 2008 | $400 million | $140 million of purchase price allocated to intangible assets. Excess of purchase price over net assets was recorded as goodwill. |

| "Affiliated Latin American companies" (from 2009 Form 10-K) | November 2008 | $160 million | *Issued 6 million artificially inflated shares* worth $65 million. |
| Secure Drilling (UK) | 2009 | Terms not disclosed | Terms not disclosed |
| Oilfield Services Division, TNK-BP (Russia) | July 2009 | $450 million | *Issued 24.3 million artificially inflated shares* at time of closing. |

## WEATHERFORD'S VIOLATION OF GAAP RULES IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC

165.    GAAP are the authoritative standards, interpretations, rules and underlying concepts established and relied on in the United States as the best and most reliable financial reporting and accounting practices.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, provides that annual and interim financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, regardless of accompanying disclosures.  *See* 17 CFR §210.4-01(a)(1) and §210.10-01(a), as to annual and interim financial statements, respectively.  The SEC recognizes the financial reporting and accounting standards of the Financial Accounting Standards Board ("FASB") as GAAP.  *See* SEC Release Nos. 33-8221; 34-47743; FR-70.[13]  SEC Rule 12b-20 requires that periodic reports contain whatever further information is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.  "Financial reporting includes not only financial statements, but also other means of communicating information that relates, directly or indirectly, to the information" in the financial statements.  *See* FASB Statement of Concepts No. 1, ¶7.

---

[13]    Effective July 1, 2009, FASB updated existing GAAP with its Accounting Standards Codification ("ASC").  Accordingly, the SEC recognizes ASC as GAAP.  17 C.F.R. 211, 231 and 241; Release Nos. 33-9062A; 34-60519A; FR-80A.  Weatherford's GAAP violations in periods ended before July 1, 2009 violated the same or similar GAAP provisions under FASB's prior taxonomy.

166.     Throughout the Class Period, Defendants knew, or were deliberately reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and financial filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading as alleged in herein.  In addition to Weatherford's failure to report financial results in its financial statements and its SEC filings in accordance with GAAP, Weatherford also made representations that violated GAAP in its conference calls, press releases and Annual Reports.  Had the true financial position and results of operations of the Company been disclosed during the Class Period, the Company's securities would have traded at prices far below its Class Period levels.

167.     Defendants' statements about Weatherford's financial results were therefore false and misleading when made because the Company's financial statements, and the results reported therein, violated basic fundamental principles and concepts underlying the fairness of GAAP, including:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and others in making rational investment, credit and similar decisions.   (FASB Statement of Concepts No. 1).

- The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors depend on information about past performance to help develop and assess expectations about the enterprise's future performance.  (FASB Statement of Concepts No. 1).

- The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are based at least partly on evaluations of past enterprise performance.   (FASB Statement of Concepts No. 1).

- The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources.  (FASB Statement of Concepts No. 1).

- The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders.  To the extent that management offers public securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (FASB Statement of Concepts No. 1).

- The principle that financial reporting should be reliable, relevant and timely to be useful.  Reliable means that the information represents what it purports to represent.  (FASB Statement of Concepts No. 2).

- The principle of completeness, which means that nothing material is left out of the information that may be necessary to insure that it validly fully represents underlying events and conditions.  (FASB Statement of Concepts No. 2).

- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  (FASB Statement of Concepts No. 2).

- The principle of comparability, that an enterprise's financial information gains greatly in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period.  (FASB Statement of Concepts No. 2).

168.    The Restatement is an admission that Defendants' statements were false and misleading when they were originally issued (APB No. 20, 7-13; SFAS No. 154, 25).  The Company was also in violation of the following principles:

- The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated.  (APB No. 28, ¶10).

- The principle that "financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated.  (FASB Statement of Concepts No. 1, ¶34).

- The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources" was violated.  (FASB Statement of Concepts No. 1, ¶40).

- The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated.  (FASB Statement of Concepts No. 1, ¶42).

- The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated. (FASB Statement of Concepts No. 1, ¶50).

- The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated. (FASB Statement of Concepts No. 2, ¶¶58-59, 62).

- The principle that "completeness, meaning that nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions" was violated. (FASB Statement of Concepts No. 2, ¶79).

- The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. (FASB Statement of Concepts No. 2, ¶95).

169. Defendants' concealment of adverse information during the Class Period detailed above also violated Item 303 of Regulation S-K (17 C.F.R. §229.303).

170. Defendants failed to report as income tax expense about one-third of the amount required under GAAP based on Weatherford's reported book income. Instead, Weatherford artificially reduced its reported tax expense by booking deferred tax assets which has no basis in fact. In doing so, Defendants grossly inflated and misrepresented the Company's measures of income, operating results, source of past cash flows, amount of future cash flows and its shareholder equity and financial condition.

171. For fifteen consecutive fiscal quarters, and four consecutive fiscal years, Defendants materially overstated Weatherford's net income by improperly accruing fictitious tax benefits in conjunction with its elimination of intercompany transactions from its financial statements. To help conceal their income tax provision reporting scheme, Defendants also misrepresented the truth about the Company and its reckless/non-existent accounting and financial reporting controls over income taxes.

172.     Management is responsible for preparing financial statements that comply with GAAP.  Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1, AU §110.03, *Distinction Between Responsibilities of Auditor and Management*; *see also* Sarbanes-Oxley Act of 2002, §302, §401 and §404.   As explained above, in connection therewith, annually and quarterly, Duroc-Danner and Becnel signed and filed with the SEC SOX Certifications to investors acknowledging their financial reporting and disclosure control responsibilities, and representing that, in all material respects, Weatherford's financial information and financial statements, *inter alia*: (i) did not contain any untrue statements; (ii) did not omit any material facts that would cause statements made to be misleading; and (iii) were presented in a fair manner (*i.e.*, in accordance with GAAP).  *Id.*

173.     As set forth in ¶¶141-45, *infra*, Duroc-Danner's and Becnel's SOX Certifications were false when made.   Weatherford was therefore forced to restate ***all*** of the financial statements that Defendants caused the Company to file during the Class Period.  Contrary to their SOX Certifications, Duroc-Danner and Becnel either: (i) failed to evaluate, in good faith, Weatherford's disclosure controls and procedures as claimed; or (ii) knowingly provided false public assurances regarding Weatherford's absent financial reporting and disclosure controls and procedures.

174.     Ultimately, Weatherford falsely reported that its total income tax provision was about $500 million less than the actual amount, $1.2 billion.  This overstated the Company's reported net income over the four-year period by roughly the same $500 million.  The following chart compares some of the false amounts Weatherford reported during the Class Period to the corrected amounts it reported after the Class Period:

| **Weatherford Financial Information, 2007-2010** **As Reported and As Corrected by Weatherford** | | | | |
|---|---|---|---|---|
| $ in millions, rounded | Fiscal Year Ended December 31, | | | |
| | 2007 | 2008 | 2009 | 2010 |
| WFT net income | | | | |
| WFT net income, reported | $1,071 | $1,393[14] | $  254 | $    25 |
| Less: Amount overstated | 130 | 147 | 84 | 132 |
| Actual (corrected) WFT net income | $  941 | $1,246 | $  170 | $ (108) |
| | | | | |
| **Net income: % overstated *or* Net loss: % understated** | **14%** | **12%** | **49%** | **123%** |
| WFT Earnings (Loss) Per Share | | | | |
| WFT Earnings Per Share, reported | $1.54 | $2.00 | $0.35 | $ 0.03 |
| Less: Amount overstated | .19 | .21 | .12 | .18 |
| Actual (correct) WFT Earnings (Loss) Per Share | $1.35 | $1.78 | $0.24 | $(0.15) |
| | | | | |
| **Earnings Per Share: % overstated *or* Loss Per Share: % understated** | **14%** | **12%** | **49%** | **123%** |
| Income tax provision | | | | |
| Income tax provision, reported | $  333 | $  250 | $  20 | $  172 |
| Less: Amount understated | 154 | 123 | 68 | 126 |
| Actual (corrected) income tax provision | $  487 | $  373 | $  87 | $  298 |
| | | | | |
| **Income tax provision: % understated** | **32%** | **33%** | **78%** | **42%** |
| | | | | |
| Effective income tax provision rate | | | | |
| Effective income tax rate, reported | 23% | 15% | 6.5% | 81% |
| Plus: Rate understated | 10% | 8% | 24% | 64% |
| Actual (corrected) effective income tax rate | 33% | 22% | 31% | 146% |
| | | | | |
| **Effective income tax rate: % understated** | **32%** | **34%** | **79%** | **44%** |
| | | | | |
| Cash tax rate (as a % of pre-tax income) | | | | |
| Cash tax rate, reported | 26% | 16% | 130% | 166% |
| Less: Cash tax rate understated | 0% | 0% | 7% | 6% |
| Actual (corrected) cash tax rate | 26% | 16% | 137% | 171% |
| | | | | |
| **Cash tax rate: % understated** | **2%** | **0%** | **5%** | **3%** |

---

[14]     Before the Restatement, Weatherford reported 2008 net income of $1.354 million and EPS of $2.00.  However, in the Restatement, Weatherford claimed it previously reported 2008 net income of $1.393 million and EPS of $2.06.

175.    Defendants now claim that their GAAP violations resulted from a complete lack of accounting control and oversight with respect to about $1.2 billion of tax expenses it correctly reported to and paid to external tax authorities between 2007-2010.  According to Weatherford:

> The principal factors contributing to the material weakness were: 1) inadequate staffing and technical expertise within the company related to taxes, 2) ineffective review and approval practices relating to taxes, 3) inadequate processes to effectively reconcile income tax accounts and 4) inadequate controls over the preparation of quarterly tax provisions.

176.    Defendants' proposed explanation is itself misleading because, throughout the Class Period, the Company touted the Company's tax minimization strategies as a *raison d'être* for investors, and continues to claim it had adequate resources to ***prepare and file*** accurate tax returns and fully ***pay*** its tax obligations throughout this same period.  Further, while most companies take at least months and often years to correct multi-year financial statement errors, Weatherford identified, assessed, quantified and corrected the entire matter in just a few weeks.  This rapid timeline shows that their mistakes were simple and evident that the errors and amounts were known to Defendants, or readily determinable by them, throughout the Class Period.

**Errors in Intercompany Accounts Are Easily Identified and Corrected**

177.    Intercompany accounting errors are typically not material, and improperly consolidating intercompany accounts that are slightly out of balance generally do not cause material financial statement errors.  In this case, however, by the end of 2007, Weatherford's tax manipulations had already caused intercompany tax accounts to be out of balance by $154 million of the total $941 million in consolidated net income.  At the very least, Defendants therefore deliberately disregarded Weatherford's false financials that collectively overstated total subsidiary net income by $154 million (or resulted in consolidated net income that was $154 million higher than expected based on total subsidiary income).

178.    Three years later, in January 2011, the error had increased to $500 million. Despite this, Defendants, including Ernst & Young, issued 2010 financial statements recklessly disregarding these false financial statements.  According to the Company, Defendants became aware of the problem when they inexplicably suddenly discovered a fictitious tax receivable of $308 million for which, conveniently, "documentary support was not available."  As discussed *infra*, these accounting errors did not embody technical violations or arcane concepts, nor did they reflect a difference of opinion among professionals, nor were they estimates or accruals for future events or costs.  Significantly, to date, the Company has provided ***no*** credible explanation for failing to eliminate the intercompany accounts, and, again, there is no "documentary support" to fully explain the entry.

**Defendants Failed to Properly Account for Income Taxes Under GAAP**

179.    Under GAAP, the primary purpose of accounting for income taxes is to present the ***amounts recognized on its tax returns or financial statements***:

10-1,   There are two primary objectives related to accounting for income taxes:

    a.    To recognize the amount of taxes payable or refundable for the current year.

    b.    To recognize deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an entity's financial statements or tax returns.

*See* ASC 740-10-10, Income Taxes, General, Objectives.

180.    For an extended period, the amounts reported in Weatherford's tax returns were accurate, while the amounts reported in its financial statements, that were supposed to reflect these tax returns, were not (implying they were prepared and/or reviewed independently of the actual tax returns).  Tax and financial reporting professionals know that if they do not report one

another's figures accurately on an ongoing basis, the reports they are each responsible for are likely to have material misstatements.

181.    To prevent a parent company from manipulating its financial statements by transacting with itself through subsidiaries, a business with one or more subsidiaries are required to report consolidated financial statements, from which it must remove any impact from intercompany transactions.  Under GAAP:

> 10-1    The purpose of consolidated financial statements is to present, primarily for the benefit of the owners and creditors of the parent, the results of operations and the financial position of a parent and all its subsidiaries as if the consolidated group were a single economic entity.  There is a presumption that consolidated financial statements are more meaningful than separate financial statements and that they are usually necessary for a fair presentation when one of the entities in the consolidated group directly or indirectly has a controlling financial interest in the other entities.

See ASC 810-10-10, Consolidation, General, Objectives.

182.    In a 1991 discussion memorandum on consolidation policy and procedures, FASB wrote:

> Intercompany transactions may occur between a parent and a subsidiary or between subsidiaries of the same parent.  If all subsidiaries that participate in an intercompany transaction are 100 percent owned, the intercompany transaction and unrealized intercompany profit or loss on the transaction are fully eliminated in consolidated statements.  *That fundamental idea* is followed in practice and under the economic unit, parent company, and proportional consolidation concepts.  *There is no theoretical support for any other treatment*.

FASB Discussion Memorandum: Consolidation Policy and Procedures, September 10, 1991.

183.    Consolidating financial statements involves "elimination" (removal) of all intercompany transactions.  This requires removing all balances from all intercompany accounts, including intercompany tax accounts.  As explained further:

> 45-1    In the preparation of consolidated financial statements, intra-entity balances and transactions shall be eliminated.  This includes intra-entity open account balances, security holdings, sales and purchases, interest, dividends, and so forth.  As consolidated financial statements are based on the assumption that

they represent the financial position and operating results of a single economic entity, such statements shall not include gain or loss on transactions among the entities in the consolidated group. Accordingly, any intra-entity profit or loss on assets remaining within the consolidated group shall be eliminated; the concept usually applied for this purpose is gross profit or loss (*see also* paragraph 810-10-45-8:).

*See* ASC 810-10-45, Consolidation, General, Other Presentation Matters.

184.    The SEC provides no exception from the general GAAP rules cited above, and adds a requirement that disclosure is required if intercompany transactions are not eliminated:

In general, there shall be eliminated intercompany items and transactions between persons included in the (a) consolidated financial statements being filed and, as appropriate, (b) unrealized intercompany profits and losses on transactions between persons for which financial statements are being filed and persons the investment in which is presented in such statements by the equity method. ***If such eliminations are not made, a statement of the reasons and the methods of treatment shall be made.***

*See* SEC Regulation S-X, Rule 3A-04, Intercompany Items and Transactions. As pled herein, by failing to maintain control over intercompany accounts, and allowing the error which resulted to reach $500 million, Weatherford grossly violated GAAP and SEC rules for reporting consolidated financial statements.

**Defendants' GAAP Violations Were Material**

185.    SEC Staff Accounting Bulletin No. ("SAB") 114, *Introductory Material*, summarizes GAAP materiality standards. Among other items, SAB 114 says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." *See* SAB 114, Topic 1, §M.1., *Financial Statements; Materiality – Assessing Materiality*. SAB 99 also provides that intentional misstatements, even of immaterial items, may be illegal and constitute fraudulent financial reporting. *See* SAB 114, Topic 1, §M.2., *Financial Statements; Materiality – Immaterial Misstatements That Are Intentional.*

186.    Weatherford's financial misstatements were material on a *quantitative* basis, *i.e.*,
they were numerically large, both in absolute and relative terms, and impacted accounts that
were important to investors as pled herein.   Materiality requires additional *qualitative*
considerations under GAAP.   For example, if a known misstatement would cause a significant
market reaction, the *reaction* should be taken into account in determining the materiality of the
misstatement.   Here, the market's reaction to Defendants' March 1-2, 2011 disclosures, alone,
caused a single day drop of 11% in the Company's stock price.   SAB 114 further states:

> Among the considerations that may well render material a quantitatively small
> misstatement of a financial statement item are
>
> *        *        *

- Whether the misstatement masks a change in earnings or other trends.

- Whether the misstatement hides a failure to meet analysts' consensus expectations for
  the enterprise.

- Whether the misstatement changes a loss into income or vice-versa.

- Whether the misstatement concerns a segment or other portion of the registrant's
  business that has been identified as playing a significant role in the registrant's
  operations or profitability.

*See* SAB 114, Topic 1, §M.1.

187.    Weatherford's misstatements satisfy each of these criteria and thus were material
from both a quantitative and qualitative perspective.   The GAAP violations alleged herein are
clearly material.

**Weatherford's False Interim Reporting**

188.    The rules discussed herein apply equally to annual and interim financial
statements.   In *Accounting Principles and Practices*, GAAP states, "Interim financial
information is essential to provide investors and others with timely information as to the progress
of the enterprise.   The usefulness of such information rests on the relationship that it has to the

annual results of operations.  Accordingly, each interim period should be viewed primarily as an integral part of an annual period."  *See* ASC 270-10-45-1; *see also* SEC Regulation S-X, Article 10, Rule 10-01.  Weatherford's financial statements during the interim periods of 2007-2010 were false for failing to properly report net income and tax amounts in its quarterly results. Weatherford's improper accounting materially misstated Weatherford's quarterly financial statements, in violation of GAAP and SEC requirements for interim financial reporting.  *See id.*

**During the Class Period, Weatherford *Intentionally* Issued Financial Statements with Material Errors**

189.    During the Class Period, Defendants made undisclosed, purportedly "immaterial" errors in its financial statements, which it knowingly failed to correct until after the Class Period. These errors were as large as $32 million.  At the time, the effect of not correcting these errors was to ***overstate*** reported Class Period income.  Then, Defendants reversed course, deciding that these same errors were, in fact, material.  At ***that*** time, correcting the errors ***reduced*** the impact of the Restatement, dollar for dollar.  In other words, Defendants' conduct was based on the effect of the error, rather than the amount of the error.

190.    After the Class Period, Defendants admitted that, in fact, the uncorrected errors during the Class Period ***were*** material and corrected these errors in the Restatement, which is not permitted for immaterial items:

> Out-Of-Period Adjustments:
>
> We also recorded other adjustments to our tax provision to correct for certain errors and items recorded in the improper period.  These adjustments were not recorded previously as we concluded that they were not material to the respective periods.  These other adjustments resulted in a decrease to our total tax provision in 2009 of $32 million, which is primarily comprised of an adjustment to the cumulative difference between book and tax basis of fixed assets and intangibles and an adjustment related to differences between accrued tax expense and tax expense per the filed tax returns.  Our total 2008 tax provision was increased by $17 million, which is primarily comprised of an adjustment related to differences between accrued tax expense and tax expense per the filed tax returns.

In addition, we recorded other adjustments to correct for previously identified immaterial errors affecting operating income that were recorded in improper periods. These adjustments were not recorded previously as we concluded that these adjustments were not material to the respective periods. In 2008, operating income was reduced by $23 million, primarily related to an inventory reserve adjustment in North America. In 2009, operating income was reduced by $16 million primarily as a result of recognizing foreign payroll tax expense in the Middle East/North Africa and operating costs associated with an equity method joint venture in the Former Soviet Union ('FSU'). We have adjusted income tax expense for the tax effect of these adjustments. These adjustments had no impact to operating cash flows during 2008. During 2009, these adjustments resulted in a decrease to operating cash flows of $6 million and a corresponding increase to investing cash flows of the same amount.

191.   The SEC says that intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting:

2. Immaterial misstatements that are intentional

\*        \*        \*

Question: In the staff's view, may a registrant make intentional immaterial misstatements in its financial statements?

Interpretive Response: No. In certain circumstances, intentional immaterial misstatements are unlawful.

\*        \*        \*

In assessing whether a misstatement results in a violation of a registrant's obligation to keep books and records that are accurate 'in reasonable detail,' registrants and their auditors should consider, in addition to the factors discussed above concerning an evaluation of a misstatement's potential materiality, the factors set forth below.

\*        \*        \*

How the misstatement arose. It is unlikely that it is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements – even immaterial ones – as part of an ongoing effort directed by or known to senior management for the purposes of 'managing' earnings.

See SEC Staff Accounting Bulletin No. 114, Topic 1M2: Financial Statements, *Materiality, Immaterial Misstatements That Are Intentional.*

## ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

192.    In Accounting and Auditing Enforcement Releases, the SEC has addressed the overstatement of income that can be achieved by manipulating intercompany accounts that are out of balance.  In 2002, the SEC reiterated its position that, in its investigations of restated financial statements, it often finds that the persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, ***inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter***.
>
> *       *       *
>
> The Restatement and Restatement Report Are ***Highly Probative Evidence*** for a Claim of Securities Fraud Under Section 10b and Rule 10b-5.
>
> *       *       *
>
> *See, e.g., Telxon Corp. Secs. Litig.*, [citation omitted] (when ruling on defendants' motion to dismiss action under PSLRA, court held that company defendant was not in a position to dispute that it misstated material facts in its financial disclosures because company admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to the litigation). [citation omitted] Restated financial statements are probative of these two issues because under GAAP and GAAS they cannot be filed unless the original financial statements contained material errors under GAAP.  [internal reference omitted] Thus, under GAAP, restated financial statements must constitute an admission of past errors.

193.    To report financial results on a consolidated basis, Weatherford's CEO and CFO certified that they had controls in place to inform them when Weatherford's intercompany accounts were out of balance.  This control, which did not exist or failed badly at Weatherford, was critical to the Insider Defendants' SOX Certifications that the Company's internal controls were operating effectively throughout the Class Period.

194.   According to the Company, one or more subsidiaries repeatedly recorded in its intercompany accounts income tax assets or reductions to income tax expense that were purportedly obtained from the parent or another subsidiary.  Regardless of the propriety of this entry, as an intercompany transaction, if the counterparty did not make a reciprocal offsetting entry to intercompany accounts, the intercompany accounts would immediately be thrown out of balance and could not be eliminated – or would create an obvious error in the amount of the erroneous deferred tax asset or benefit recorded.

### ERNST & YOUNG'S FRAUDULENT CONDUCT AND MATERIAL REPRESENTATIONS AND OMISSIONS

195.   Weatherford engaged Ernst & Young's Houston office to examine and report on Weatherford's financial statements for FYs 2007-2010, to perform review services on Weatherford's interim FY07 through FY10 results, and provide consulting, tax and other services related to Weatherford's SEC filings, including comfort letters, consents and comment letters.  Ernst & Young audited Weatherford's financial statements for 2007-2010, and its unqualified opinion was included in Weatherford's Annual Reports for 2007, 2008, 2009 and 2010.  As a result of the far-reaching scope of services Ernst & Young provided, its personnel were intimately familiar with Weatherford's business, including Weatherford's accounting for taxes and intercompany transactions.

196.   Further, as a result of its longstanding relationship with Weatherford, and the myriad services it rendered to the Company, Ernst & Young personnel were often present at the Company's Houston operations.  Ernst & Young had continual access to, and knowledge of, Weatherford's internal and confidential financial and business information through conversations with Weatherford employees, management, executive officers and through review of Weatherford's nonpublic documents.   Additionally, Ernst & Young personnel had the

opportunity to observe and review Weatherford's business and accounting practices, and to test Weatherford's internal and publicly reported financial statements, as well as Weatherford's internal control systems and structures.

197.    As one of the largest audit and accounting firms in the world, Ernst & Young is well aware of the methods, procedures and practices required to conduct a proper audit in accordance with GAAS.  Also, Ernst & Young knew of the audit risks inherent at Weatherford and in the industries in which Weatherford operated because of the comprehensive services it provided to Weatherford and its experience with many other clients in the industry.   In connection with Weatherford's operations, Ernst & Young had virtually limitless access to information concerning the Company's true operations.

198.    Ernst & Young intentionally or recklessly allowed Weatherford to file financial statements that did not comply with GAAP.  With respect to Weatherford's financial statements for fiscal years ended December 31, 2007, 2008, 2009 and quarters from 1Q07 through 4Q10, Ernst & Young falsely certified and reviewed Weatherford's financial results – which overstated net income and stockholders' equity by $500 million – including the consolidated results of the Company's subsidiaries.

199.    As Weatherford's purportedly independent auditor, Ernst & Young was obligated to audit Weatherford's financial statements in accordance with GAAS.  Statements of Auditing Standards were written by the Auditing Standards Board of the American Institute of Certified Public Accountants as the authoritative interpretation of GAAS.  Pursuant to Rule 3200T, the PCAOB of the SEC adopted Statements of Auditing Standards Nos. 1-95 and has since added Auditing Standards Nos. 1-15.

200.    As the SEC has repeatedly emphasized, it is vitally important that independent accountants such as Ernst & Young perform meaningful audits because:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital.  Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.

Relationships Between Registrants and Independent Accountants, SEC Accounting Series Release No. 296, 1981 SEC LEXIS 858 (Aug. 20, 1981).  During the Class Period, Ernst & Young falsely represented that:

(a)    Weatherford maintained effective internal control over financial reporting as of December 31, 2007, 2008 and 2009;

(b)    Weatherford's financial statements for the three years 2007-2009 and fifteen quarters in 2007-2010 were presented in accordance with GAAP; and

(c)    Ernst & Young's audits of Weatherford's financial statements had been performed in accordance with GAAS.

201.    Ernst & Young participated in the wrongdoing alleged herein to retain Weatherford as a client and to protect the continuous stream of multi-million dollar fees it expected to receive from Weatherford.  Ernst & Young enjoyed lucrative business relationships with Weatherford's senior management, for which it has received millions of dollars in fees for auditing, consulting and tax services.  During the Class Period, Ernst & Young generated over *$30 million* in fees, ranging from $6.7 million to $8.6 million per year.  These fees were particularly important to the partners in Ernst & Young's Houston office as their income and bonuses were dependent on the continued stream of business from Weatherford.

85

**Ernst & Young's False Statements as to Weatherford's Financial Statements**

202.    Ernst & Young falsely represented that Weatherford's financial statements covered by the Restatement were presented in accordance with GAAP, and that Ernst & Young's audits and reviews of Weatherford's financial statements had been performed in accordance with GAAS.[15]    Ernst & Young also consented to the incorporation of its false reports on Weatherford's financial statements in Weatherford's Annual Reports on Forms 10-K for 2007, 2008 and 2009, and performed quarterly reviews of Weatherford's 1Q10, 2Q10 and 3Q10 financial results which were also filed with the SEC.

203.    For Weatherford's financial statements for fiscal years ended December 31, 2007-2010, Ernst & Young falsely certified as follows:

> We [] have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the ***consolidated balance sheets*** of Weatherford International Ltd. and subsidiaries as of December 31, 2009 and 2008, and the related ***consolidated statements of income, shareholders' equity, and cash flows*** for each of the three years in the period ended December 31, 2009 of Weatherford International Ltd. ***and subsidiaries*** and our report dated March 1, 2010 expressed an unqualified opinion thereon.
>
> *            *            *
>
> In our opinion, the financial statements referred to above ***present fairly, in all material respects***, the consolidated financial position of Weatherford International Ltd. and subsidiaries at December 31, 2009 and 2008, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2009, in conformity with U.S. [GAAP].   Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, ***presents fairly, in all material respects,*** the information set forth therein.

204.    Ernst & Young also represented to the SEC and investors that it had audited Weatherford's internal controls over financial reporting, including "***non-U.S. tax compliance,***

---

[15]    As alleged herein, Ernst & Young violated GAAS Standard Nos. 1-3, and GAAS Standard of Field Work Nos. 2-3.

*planning and U.S./non-U.S. tax-related consultation*."   During each year during the Class

Period, Ernst & Young provided certifications on internal controls nearly identical to the

following:

> We also have audited, in accordance with the standards of the Public Company
> Accounting Oversight Board (United States), Weatherford International Ltd.'s
> **internal control over financial reporting** as of December 31, 2009, based on
> criteria established in Internal Control – Integrated Framework issued by the
> Committee of Sponsoring Organizations of the Treadway Commission and our
> report dated March 1, 2010 **expressed an unqualified opinion thereon**.

205.   Ernst & Young's audit reports were materially false and misleading because Ernst

& Young knew or recklessly disregarded that Weatherford's financial statements did not present

fairly, in all material respects, the consolidated financial results, cash flows and financial position

of Weatherford for those periods.   In particular, Ernst & Young knew or recklessly disregarded

that: (i) Weatherford falsely inflated its net income, net earnings, equity and assets by failing to

report adequate tax expense; (ii) Weatherford's internal control over financial reporting for taxes

contained material weaknesses; and (iii) Weatherford's financial statements violated GAAP.

**Ernst & Young Ignored the Audit Evidence It Gathered**

206.   As set forth in AU §326, Evidential Matter, GAAS requires auditors to obtain

sufficient competent evidential matter through inspection, observation, inquiries and

confirmations to afford a reasonable basis for an opinion regarding the financial statements under

audit:

> In evaluating evidential matter, the auditor considers whether specific audit
> objectives have been achieved.   The independent auditor should be thorough in
> his or her search for evidential matter and unbiased in its evaluation.   In designing
> audit procedures to obtain competent evidential matter, he or she should recognize
> the possibility that the financial statements may not be fairly presented in
> conformity with generally accepted accounting principles or a comprehensive
> basis of accounting other than generally accepted accounting principles.   In
> developing his or her opinion, the auditor should consider relevant evidential
> matter regardless of whether it appears to corroborate or to contradict the
> assertions in the financial statements.   To the extent the auditor remains in

87

substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).

207.    Ernst & Young's responsibility, as Weatherford's independent auditor, was to obtain "[s]ufficient appropriate evidential matter…to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles."  AU §§110, 150.

208.    In violation of GAAS, and contrary to the representations in its reports on Weatherford's financial statements, Ernst & Young did not obtain sufficient, competent, evidential matter to support Weatherford's financial results, tax compliance and accounting for income taxes.

**Ernst & Young Failed to Design Its Audit to Identify the Alleged Improprieties**

209.    As one of the largest audit firms in the world, Ernst & Young was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit.  Also, Ernst & Young knew of the audit risks inherent at Weatherford and in the industries in which Weatherford operated because of the comprehensive services it provided to Weatherford for over a decade, and its experience with many other clients in the oilfield services industry.   In connection with Weatherford's operations, Ernst & Young had virtually limitless access to information concerning the Company's true operations as follows:

Ernst & Young had been Weatherford's auditor since 2001;

Ernst & Young was present at Weatherford's headquarters and divisions frequently during the Class Period;

Ernst & Young provided Weatherford with substantial non-audit and tax services to Weatherford; and

Ernst & Young had frequent conversations with Weatherford management and employees about the Company's operations and financial statements.

210.    In violation of GAAS, Ernst & Young abandoned its role as an independent auditor by recklessly disregarding each of the indications of improper financial reporting and accounting as set forth herein.  Ernst & Young did not insist upon adjustments to Weatherford's audited financial statements even though, pursuant to GAAS, Ernst & Young should have issued a qualified or adverse report, or insisted that Weatherford comply with GAAP.

211.    Ernst & Young was required to perform its audit in conformity with the Statement of Accounting Standard ("SAS") No. 82, "Consideration of Fraud in a Financial Statement Audit," which includes auditing for misstatements arising from the misappropriation of assets. Ernst & Young failed to comply with SAS No. 82 in its audit of Weatherford's financial statements.  During the course of its audit of Weatherford's financial statements during the Class Period, Ernst & Young knew of or recklessly disregarded the irregularities which caused Weatherford's earnings to be misstated for four years.  The very risk of fraud was an easily identifiable and reportable condition which should have been reported to Weatherford's Audit Committee and senior management in 2007.

212.    Ernst & Young's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of four years, leading to false and misstated financial statements.  Despite Ernst & Young's "clean" audit reports during the Class Period, Weatherford overstated its net income by approximately $500 million.   This overstatement involved periods that Weatherford's financial results had been audited by Ernst & Young, and for which Ernst & Young had issued unqualified opinions.

**Ernst & Young Recklessly Ignored Numerous Obvious Red Flags**

213.     In addition to Ernst & Young's motive and opportunity to rubber stamp Weatherford's books and tax strategies to maintain its lucrative financial arrangements with the Company, it also recklessly disregarded numerous red flags concerning Weatherford's financial results and tax reporting, including the following:

(1)     The Sudden and Inexplicable Drop in Weatherford's Tax Rate:  Ernst & Young disregarded the sharp and unexplained drop in Weatherford's effective tax rate starting in 2007. Ernst & Young knew that Weatherford's effective tax rate (which is directly correlated to earnings) had been on a steady increase leading up to the Class Period.  After Defendants implemented their tax accounting manipulations, which Weatherford admitted "manifested itself in 2007," the Company's effective quarterly tax rate dropped sharply.

(2)     The Magnitude of the Fictitious $500 Million in Tax Entries:  Weatherford's net income was inflated by approximately $500 million in fictitious, unsupported and unsubstantiated intercompany tax entries.  According to the Company, the fraudulent $308 million tax "asset" that "manifested itself in 2007" was not supported by ***any documentation*** whatsoever.  If there was no documentation, there was also no support for the entry, and no reasonable basis for Ernst & Young to certify the entry on Weatherford's books.  The magnitude of the fictitious tax "assets" was far too large for Ernst & Young to miss if, as it told investors, it had conducted a legitimate "audit' of the Company's books.  In addition, the Restatement revealed that Weatherford's tax rate during the Class Period was overstated by as much as 10-15% during certain quarters and its net income was overstated by as much as 188%.

(3)     The Frequency and Consistency of the Fictitious Tax Entries:  Weatherford's tax and financial manipulations continued for four consecutive years.  Ernst & Young audited or reviewed each and every quarter and year-end covered by the Restatement.  Defendants'

consistent accounting manipulation over *15 consecutive quarters* was a glaring red flag that Ernst & Young recklessly disregarded during its quarterly "reviews" and yearly audits of Weatherford's financial results.

(4)    Weatherford's Falsified Tax Rate Was Much Lower Than its Rivals and Made the Difference Between Meeting and Missing Weatherford's EPS Projections:  Weatherford's tax manipulations enabled the Company to meet EPS projections to the penny in some quarters, to beat expectations in other quarters, and to conceal earnings misses that were much worse than represented.  Weatherford emphasized its lower effective tax rates as a reason for the increases to the Company's EPS.  Analysts also repeatedly asked Duroc-Danner and Becnel about how the Company was generating such a low tax rate, much lower than its top peer rivals.  The consistent use of tax manipulations to increase EPS every quarter was another suspicious red flag that Ernst & Young disregarded.

(5)    Ernst & Young Certified Weatherford's Foreign Tax Planning and "Compliance" Issues:  In addition to its traditional audit and financial function, Ernst & Young's audit duties and fees related to "work done by tax professionals in connection with the audit and quarterly reviews and accounting consultations" at Weatherford.  Ernst & Young's "[t]ax fees consist of *non-U.S. tax compliance, planning and U.S./non-U.S. tax-related consultation*."  Ernst & Young had direct access to, and a duty to monitor, the tax items at the heart of the Restatement as part of its audit and consulting services.

(6)    Weatherford's History of One-Time Accounting Charges and Illegal Activities: Ernst & Young knew that Weatherford had a long history of suspicious internal accounting activities, including booking millions of dollars in one-time "non-recurring" charges every quarter, some of which related to government investigations of FCPA violations, bribery and

illegal business activity in U.S. sanctioned countries.  As J.P.Morgan analyst Michael LaMotte stated during Weatherford's July 20, 2009, conference call, "at some point the nonrecurring becomes recurring, and we are looking at *six quarters now and some $100 million*."  The consistency of the Company's one-time charges was yet another red flag that Ernst & Young deliberately disregarded.

      (7)    <u>Weatherford's Discrepancies Between Cash Tax Rates and Reported Tax Rates</u>: Ernst & Young was aware of the suspicious and massive discrepancy between Weatherford's reported "cash tax rate" and its "effective tax rate" for financial reporting purposes.  As Duroc-Danner admitted during the March 2, 2011 conference call, the cash tax rate (*i.e.*, the amount of cash paid for taxes as a percentage of income) and the effective tax rate should be in balance.  A simple comparison of the cash tax rate and the effective tax rate results yields the discrepancy. During the entirety of the Class Period, Weatherford's reported cash tax rate was approximately 21%.  Yet, the Company's effective tax rate was significantly lower than its cash tax rate.  This was a red flag that Weatherford was deliberately understating its tax rate for financial reporting purposes, but being careful with its tax returns and tax filings to avoid IRS and foreign tax agency scrutiny.  After the Class Period, Duroc-Danner himself represented that the Restatement "really has nothing to do with the actual tax filing in the jurisdiction, so there is [sic] no penalties or there is not actually tax jurisdictions involved."  This admission, if true, confirms that Ernst & Young was aware, or was reckless in disregarding, the gap between Weatherford's cash tax rate and effective tax rate.

      (8)    <u>Ernst & Young Had Access to Weatherford's Monthly "M5" Master Spreadsheet of Intercompany Reconciliations</u>:  Reconciliations of all intercompany transactions were centralized in Weatherford's corporate headquarters, and Weatherford created a monthly master

spreadsheet called "the M5 form" which detailed all intercompany receivables and payables. Ernst & Young's access to this information, and its purportedly detailed audits, quarterly reviews and certifications of Weatherford's internal controls over tax and financial reporting under the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") confirms its knowledge or reckless disregard of the Company's $500 million in fictitious net income and earnings.  The existence of the M5 spreadsheet, combined with Weatherford's detailed cash tax reporting and the massive $308 million entries that "manifested" itself in 2007 and lingered for four years, confirms that Ernst & Young had access to, and disregarded, the hundreds of millions of fictitious intercompany transactions that led to the Restatement.

(9)    Blatant Contradictions Between Ernst & Young's Representations Regarding Internal Controls and Weatherford's Restatement Disclosures and Admissions:  The Restatement admitted the complete absence of any tax, financial or accounting controls at Weatherford during the Class Period.  This directly contradicts Ernst & Young's certifications that it "audit[ed]," "test[ed] and evaluat[ed]" and "assess[ed] the risk" over any potential material weaknesses, and that the Company's internal controls over financial reporting were effective in "*all material respects*."

## Ernst & Young's Misrepresentations Regarding Weatherford's Internal Controls Over Financial Reporting

214.    Throughout the Class Period, Ernst & Young certified Weatherford's internal controls over financial reporting under various well-established standards.  In the ***footnotes*** to Weatherford's various Proxy Statements justifying Ernst & Young's $6-8 million yearly fees, Defendants noted that its fees related to Ernst & Young's "***audit of the effectiveness of the Company's internal controls over financial reporting***."  In Weatherford's 2009 Annual Report,

Ernst & Young provided a formal signed certification that its audit complied with the PCAOB as follows:

> We conducted our audit in accordance with the standards of the [PCAOB] (United States). Those standards require that we **plan and perform the audit** to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included **obtaining an understanding of internal control over financial reporting, assessing the risk** that a material weakness exists, **testing and evaluating** the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> *      *      *
>
> In our opinion, Weatherford International Ltd. and subsidiaries **maintained, in all material respects, effective internal control over financial reporting** as of December 31, 2009 based on the COSO criteria.

215. Ernst & Young also certified Weatherford's internal controls, under the detailed framework issued by the COSO criteria as follows:

> We have **audited** Weatherford['s] **internal control over financial reporting** as of December 31, 2009, **based on criteria** established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria).

216. The COSO criteria provide a detailed roadmap for auditors, including the identification of red flags, appropriate policies and procedures and comprehensive audit planning and review of internal controls necessary for reliable financial reporting. Accordingly, if Ernst & Young conducted the audit it claimed it had pursuant to COSO, it had actual knowledge that the Company had virtually no internal controls over financial reporting for taxes, as Weatherford admitted in the Restatement. If Ernst & Young did not conduct a COSO audit, as it represented to investors that it had during the Class Period, its certifications were knowingly false.

217. The inconsistency between the Restatement and Ernst & Young's Class Period representations regarding the Company's internal controls is stark. If Ernst & Young had

conducted a legitimate audit as it certified to investors that it did (and as it was paid $6-8 million to do), it knew or should have known that Weatherford had no internal controls whatsoever over accounting for intercompany tax expense.

**Ernst & Young's Motive and Opportunity**

218.    Ernst & Young's Houston's office's ties to Weatherford and Weatherford's executives are virtually familial.  As Weatherford's so-called "independent" auditor and tax advisor since 2001, Ernst & Young possessed intimate knowledge of the Company's books, financial results, operations, tax strategies and internal controls over financial reporting.  The relationship was highly lucrative for Ernst & Young as its audit, tax and consulting arrangement generated over *$30 million* in aggregate fees during the Class Period.

219.    Weatherford's SEC filings also included the following footnotes for the compensation charts which described Ernst & Young's specific duties and responsibilities and a specific breakdown of the purpose and scope of the fees, including "tax fees."

(1)    Audit fees consist of professional services rendered for the audit of the Company's annual financial statements, ***the audit of the effectiveness of the Company's internal controls over financial reporting*** and the reviews of the Company's quarterly financial statements.  This category also includes fees for issuance of comfort letters, consents, assistance with and review of documents filed with the SEC, statutory audit fees, ***work done by tax professionals in connection with the audit and quarterly reviews and accounting consultations*** and research work necessary to comply with the standards of the Public Company Accounting Oversight Board (United States).  Fees are presented in the period to which they relate versus the period in which they were billed.

(2)    Audit-related fees include consultations concerning financial accounting and reporting matters not required by statute or regulation as well as fees for employee benefit plan audits.

(3)    ***Tax fees consist of non-U.S. tax compliance, planning and U.S./non-U.S. tax-related consultation.***

(4)    Other services performed include regulatory compliance services and certain other advisory services and do not include any fees for financial information systems design and implementation.

220.     In addition to Ernst & Young's lucrative and longstanding financial arrangements with Weatherford, a steady stream of Weatherford's most senior executives maintain close personal ties to Ernst & Young due to a seemingly revolving door between Weatherford and its purported "independent" auditor.

221.     According to Weatherford's 2009 Proxy Statement, "[p]rior to joining the Company, Jessica Abarca worked for ***Ernst & Young LLP*** from 1993 until 1996."   In fact, Abarca was a "Senior Auditor" for Ernst & Young during that time.

222.     Steven Wilberts was Weatherford's former Director of Internal Audit from 2007-2010.  Prior to joining Weatherford, Wilberts was an auditor for Ernst & Young in its "Oil and Energy Industry" division for three years (1997-2000).

223.     James Hudgins was Weatherford's former "Director of Tax" from 1999 until February 2009 (two years into the fraud), and later promoted to the Company's "Vice President – Tax" beginning in February 2009. According to SEC filings, prior to joining Weatherford, Hudgins "worked for Ernst & Young LLP."

224.     Lisa Rodriguez was Becnel's predecessor as CFO, Senior Vice President and Principal Financial and Accounting Officer of Weatherford from June 2002 until she left the Company on November 3, 2006. According to SEC filings, Rodriguez worked at Ernst & Young prior to joining Weatherford.

225.     John H. Briscoe replaced Abarca in 2011 as Weatherford's Vice President and Chief Accounting Officer.   Prior to joining Weatherford, Briscoe was Vice President and Controller of Transocean Ltd. and also was an Audit Manager at ***Ernst & Young***.

226.     During 2008, a full year into Weatherford's fraudulent tax and earnings scheme, Duroc-Danner was the "***recipient of Ernst & Young's 2008 Entrepreneur of the Year in***

96

*Energy, Chemicals and Mining category*.”  Duroc-Danner received the Ernst & Young award at the Entrepreneur of the Year Gala in Palm Springs, California.  According to Ernst & Young’s biography of Duroc-Danner “[b]eing even more single-minded than most entrepreneurs, *growth was the only thing Dr. Bernard Duroc-Danner really liked*.”  The same year Ernst & Young bestowed its honor (reward) upon Duroc-Danner, Weatherford’s net income was overstated by 11% and its dilated earnings per share by 12%.  The same year, Ernst & Young raked in $6.7 million in fees from Weatherford for audit, tax and consulting services.  Ernst & Young also participated in Weatherford’s shareholder meetings.  Each and every year, Weatherford’s Board recommended that Weatherford’s shareholders ratify Ernst & Young as the Company’s auditor.

227.    Ernst & Young has a history of audit failure that has cost investors hundreds of millions of dollars.  Ernst & Young has been sanctioned in administrative proceedings before the SEC for its failure to comply with auditor independence rules and “improper professional conduct” with respect to its audit of PeopleSoft Inc.  On April 16, 2004, Chief Administrative Law Judge Brenda P. Murray found, among other things, that:

> [T]he evidence shows that EY [Ernst & Young] has an ***utter disdain for the Commission’s rules and regulations on auditor independence***.
>
> *         *         *
>
> Despite EY’s strong denials, the evidence shows that the firm paid only perfunctory attention to the rules on auditor independence in business dealings with a client, and that EY reliance on a ‘culture of consulting’ to achieve compliance with the rules on auditor independence was a sham.  EY has offered no promises of future compliance.
>
> *         *         *
>
> Here considerable evidence shows that EY partners acted recklessly and negligently in committing willful and deliberate violations of well-established rules that govern auditor independence standards in connection with business relationships with an audit client.  EY’s misconduct was blatant and occurred after the Commission and a court accepted EY’s representations that it would observe the very same auditor independence rules, that it now claims are too

vague to be followed. There is nothing in this record that shows that EY is willing to accept the auditor independence rules applicable to business relationships with audit clients.

228.     More recently, in August 2011, the PCAOB disciplined two Ernst & Young auditors for allegedly providing misleading documents and information to PCAOB inspectors and *for altering and backdating audit working papers*.  One of the auditors was fined $50,000 and barred from associating with any audit firm registered with the PCAOB for three years – its longest such bar ever.  PCAOB chairman James Doty was quoted as saying, "[t]hese actions threatened to undermine the integrity of the PCAOB inspection processes, and the ability of the board to discharge its mandate to inspect the auditors of public companies."  These are just some recent examples in a series of scandals involving Ernst & Young over the years and they are pertinent to show, under Federal Rule of Evidence 404(b), the knowledge and absence of mistake on Ernst & Young's part here.

## CLASS ACTION ALLEGATIONS

229.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Weatherford's securities between April 25, 2007 and March 1, 2011, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

230.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Weatherford's securities were actively traded on NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Weatherford shares were traded

publicly during the Class Period on the NYSE and as of October 25, 2010, Weatherford had 741,424,789 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Weatherford or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

231.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

232.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

233.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Weatherford; and

- To what extent the members of the Class have sustained damages and the proper measure of damages.

234.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

99

**LOSS CAUSATION**

235.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

236.    Throughout the Class Period, Defendants engaged in a fraudulent course of conduct that artificially inflated Weatherford's stock price and operated as a fraud or deceit on Class Period purchasers of Weatherford securities.  Defendants achieved this façade of success, growth, responsibility and strong future business prospects by misrepresenting Weatherford's net earnings and effective income tax rate and other key financial information about the Company. Defendants' false and misleading statements and material omissions had their intended effect, causing Weatherford's stock to trade at artificially inflated prices throughout the Class Period, reaching as high as $49.59 per share on June 30, 2008.

237.    The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' scheme and their efforts to artificially inflate the Company's stock price and the subsequent significant decline in the value of Weatherford's stock price as the relevant truth was revealed in a series of partial adverse disclosures.  When Defendants' prior misrepresentations were disclosed and became apparent to the market, Weatherford's stock price fell as the prior inflation came out of Weatherford's stock price.  By the time the market had fully digested these disclosures, Weatherford's common stock closed at $21.14 per share on March 2, 2011.

238.    Defendants' false and misleading representations and omissions caused and maintained the artificial inflation in Weatherford's stock price throughout the Class Period until the facts about the Company's true financial condition were revealed to the market.  The timing and magnitude of Weatherford's securities price declines, as detailed herein, negate any

inference that the loss suffered by Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

239.    On an April 20, 2009 earnings call, the Company announced that it had increased its 2009 capex estimate from $1.2 billion to $1.4 billion, a 16% increase over the initially budgeted amount.  This disclosure partially corrected Weatherford's prior assurances about its ability to monitor capex and more broadly suggested that management did not have a grasp on the Company's operations. As a result of the partial corrective disclosure, by the end of that trading day, April 20, 2009, the Company's stock price had declined approximately 4% to close at $14.17.

240.    On January 26, 2010, the Company admitted that it again had been unable to meet its revised capex projections and that it expended $1.5 billion on capex during FY09, 25% over the initial estimate.  In response, Weatherford's stock declined from a close of $17.73 per share on January 25, 2010, to close at $16.39 per share on January 26, 2010.  This loss represented a single-day decline of nearly 8%.

241.    On March 1, 2011, Weatherford issued a press release announcing that it was restating its previously reported financial results for the years ended December 31, 2007, 2008, and 2009 and the first three quarters of 2010.  Weatherford also cautioned investors not to rely on the restated reports.  According to the Company's press release, the Restatement was necessary to correct "errors in [the Company's] accounting for income taxes."  Specifically, Weatherford reduced its previously reported net income by approximately $500 million – of which $460 million "relate[d] to an error in determining the tax consequences of intercompany amounts over multiple years."

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE MARKET DOCTRINE)

242.     The market for Weatherford's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Weatherford's securities traded at artificially inflated prices during the Class Period. On June 30, 2008, the closing price of the Company's common stock reached a Class Period high of $49.59 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Weatherford's securities and market information relating to Weatherford, and have been damaged thereby.

243.     During the Class Period, the artificial inflation of Weatherford's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Weatherford's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Weatherford and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

244.     At all relevant times, the market for Weatherford's securities was an efficient market for the following reasons, among others:

(a)     Weatherford stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Weatherford filed periodic public reports with the SEC and the NYSE;

(c)     Weatherford regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Weatherford was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

245.    As a result of the foregoing, the market for Weatherford's securities promptly digested current information regarding Weatherford from all publicly available sources and reflected such information in Weatherford's stock price.   Under these circumstances, all purchasers of Weatherford's securities during the Class Period suffered similar injury through their purchase of Weatherford's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

246.    The statutory safe harbor does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking

statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Weatherford who knew that the statement was false when made.

**FIRST CLAIM**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

247.   Plaintiff repeat and reallege each and every allegation contained above as if fully set forth herein.

248.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Weatherford's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

249.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Weatherford's securities in violation of §10(b) of the

Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

250.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Weatherford's financial well-being and prospects, as specified herein.

251.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Weatherford's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Weatherford and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

252.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Weatherford's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Weatherford's securities during the Class Period at artificially high prices and were damaged thereby.

253.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Weatherford was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Weatherford securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

254.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**SECOND CLAIM**
**Violations of Section 20(a) of the Exchange Act**
**Against the Insider Defendants**

255.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

256.    The Insider Defendants acted as controlling persons of Weatherford within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Insider Defendants were provided with or had unlimited

access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

257.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

258.    As set forth above, Weatherford and the Insider Defendants each violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Insider Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable, injunctive and other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 26, 2011

Respectfully submitted,

KESSLER TOPAZ
MELTZER & CHECK, LLP

RAMZI ABADOU

ELI R. GREENSTEIN
STACEY M. KAPLAN
ERIK D. PETERSON
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
(415) 400-3001 (fax)

- and -

STUART L. BERMAN
ALESSANDRA C. PHILLIPS
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
(610) 667-7056 (fax)

*Lead Counsel*

LAW OFFICES OF CURTIS V. TRINKO
CURTIS V. TRINKO
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: (212) 490-9550
(212) 986-0158 (fax)

*Liaison Counsel*

## CERTIFICATION OF MAUREEN B. KILLKELLY IN SUPPORT OF AMERICAN FEDERATION OF MUSICIANS & EMPLOYERS' PENSION FUND'S MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF COUNSEL

American Federation of Musicians & Employers' Pension Fund ("AFME" or "Plaintiff")

declares, as to the claims asserted under the federal securities laws, that:

1.      AFME did not purchase the security that is the subject of this action at the

direction of Plaintiff's counsel or in order to participate in any private action.

2.      AFME is willing to serve as a representative party on behalf of the class,

including providing testimony at deposition and trial, if necessary.

3.      Attached in Schedule A are Plaintiff's transactions in Weatherford International

Ltd. (NYSE: WFT) securities during the Class Period.

4.      AFME has full power and authority to bring suit to recover for investment losses

suffered as a result of its investments.

5.      AFME has fully reviewed the facts and allegations of a complaint filed in this

action and has authorized the filing of the motion for appointment as lead plaintiff on its behalf

in this action.

6.      I, Maureen B. Killkelly, Executive Director, am authorized to make legal

decisions on behalf of AFME.

7.      AFME intends to actively monitor and vigorously pursue this action for the

benefit of the Class.

8.      AFME will endeavor to provide fair and adequate representation and work

directly with Class counsel to ensure that the largest recovery for the Class consistent with good

faith and meritorious judgment is obtained.

1

9.      AFME has not served or sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  6th   day of   May   , 2011.

                        AMERICAN FEDERATION OF MUSICIANS
                        & EMPLOYERS' PENSION FUND

            By:     _____
                    Maureen B. Killkelly
                    Executive Director

2

**SCHEDULE A**

| Security | Buy/Sell | Date | Quantity | Price |
|----------|----------|------|----------|-------|
| Com Stk | Buy | 10/26/2007 | 10,800 | $33.32 |
| Com Stk | Buy | 11/29/2007 | 3,648 | $31.85 |
| Com Stk | Buy | 11/29/2007 | 3,694 | $31.94 |
| Com Stk | Buy | 11/30/2007 | 9,108 | $31.87 |
| Com Stk | Buy | 11/30/2007 | 3,270 | $31.97 |
| Com Stk | Buy | 12/3/2007 | 600 | $31.69 |
| Com Stk | Buy | 1/25/2008 | 7,000 | $30.77 |
| Com Stk | Buy | 1/25/2008 | 3,920 | $31.25 |
| Com Stk | Buy | 1/25/2008 | 1,220 | $31.33 |
| Com Stk | Buy | 2/8/2008 | 600 | $30.77 |
| Com Stk | Buy | 2/8/2008 | 4,800 | $30.81 |
| Com Stk | Buy | 2/25/2008 | 2,800 | $33.99 |
| Com Stk | Buy | 5/27/2008 | 4,780 | $42.64 |
| Com Stk | Buy | 6/12/2008 | 64,065 | $43.98 |
| Com Stk | Buy | 6/16/2008 | 1,700 | $44.90 |
| Com Stk | Buy | 6/18/2008 | 2,400 | $45.75 |
| Com Stk | Buy | 6/20/2008 | 1,600 | $45.65 |
| Com Stk | Buy | 7/7/2008 | 8,600 | $43.70 |
| Com Stk | Buy | 7/7/2008 | 500 | $44.29 |
| Com Stk | Buy | 7/11/2008 | 3,150 | $40.75 |
| Com Stk | Buy | 7/11/2008 | 7,060 | $41.30 |
| Com Stk | Buy | 8/12/2008 | 5,500 | $36.88 |
| Com Stk | Buy | 8/12/2008 | 2,697 | $36.90 |
| Com Stk | Buy | 8/13/2008 | 3,083 | $38.37 |
| Com Stk | Buy | 10/3/2008 | 4,430 | $20.22 |
| Com Stk | Buy | 10/3/2008 | 5,790 | $21.27 |
| Com Stk | Buy | 10/3/2008 | 3,480 | $21.66 |
| Com Stk | Buy | 4/24/2009 | 6,302 | $16.76 |
| Com Stk | Buy | 4/24/2009 | 10,646 | $17.30 |
| Com Stk | Buy | 4/24/2009 | 14,627 | $17.49 |
| Com Stk | Buy | 4/27/2009 | 5,883 | $16.44 |
| Com Stk | Buy | 4/27/2009 | 5,148 | $16.48 |
| Com Stk | Buy | 4/27/2009 | 13,706 | $16.52 |
| Com Stk | Buy | 4/28/2009 | 1,471 | $15.86 |
| Com Stk | Buy | 4/28/2009 | 5,148 | $16.02 |
| Com Stk | Buy | 4/28/2009 | 735 | $16.20 |

| Com Stk | Buy | 4/29/2009 | 2,000 | $16.57 |
| Com Stk | Buy | 4/29/2009 | 8,295 | $16.71 |
| Com Stk | Buy | 4/29/2009 | 11,766 | $16.89 |
| Com Stk | Buy | 4/29/2009 | 7,353 | $16.99 |
| Com Stk | Buy | 5/1/2009 | 8,590 | $16.85 |
| Com Stk | Buy | 5/1/2009 | 19,700 | $16.97 |
| Com Stk | Buy | 5/1/2009 | 2,870 | $17.00 |
| Com Stk | Buy | 5/1/2009 | 6,790 | $17.01 |
| Com Stk | Buy | 5/4/2009 | 8,600 | $17.96 |
| Com Stk | Buy | 5/6/2009 | 8,300 | $19.02 |
| Com Stk | Buy | 5/8/2009 | 4,800 | $19.06 |
| Com Stk | Buy | 6/29/2009 | 21,000 | $20.26 |
| Com Stk | Buy | 7/28/2009 | 7,700 | $18.04 |
| Com Stk | Buy | 8/19/2009 | 5,900 | $19.64 |
| Com Stk | Buy | 7/8/2010 | 5,100 | $14.28 |
| Com Stk | Buy | 10/19/2010 | 2,100 | $17.36 |
| Com Stk | Buy | 11/15/2010 | 1,300 | $19.63 |
| Com Stk | Buy | 11/16/2010 | 600 | $18.85 |
| Com Stk | Sell | 12/28/2007 | 5,800 | $35.59 |
| Com Stk | Sell | 3/28/2008 | 8,800 | $35.32 |
| Com Stk | Sell | 4/21/2008 | 3,600 | $41.76 |
| Com Stk | Sell | 4/28/2008 | 5,600 | $40.65 |
| Com Stk | Sell | 6/4/2008 | 5,300 | $44.65 |
| Com Stk | Sell | 6/18/2008 | 1,350 | $46.30 |
| Com Stk | Sell | 10/10/2008 | 8,100 | $12.40 |
| Com Stk | Sell | 10/23/2008 | 4,600 | $13.36 |
| Com Stk | Sell | 11/21/2008 | 6,684 | $10.01 |
| Com Stk | Sell | 12/3/2008 | 7,400 | $9.61 |
| Com Stk | Sell | 12/4/2008 | 5,260 | $8.67 |
| Com Stk | Sell | 12/4/2008 | 12,500 | $8.71 |
| Com Stk | Sell | 12/4/2008 | 4,144 | $8.76 |
| Com Stk | Sell | 12/4/2008 | 2,630 | $8.87 |
| Com Stk | Sell | 12/4/2008 | 4,700 | $9.04 |
| Com Stk | Sell | 12/4/2008 | 3,800 | $9.05 |
| Com Stk | Sell | 12/4/2008 | 6,366 | $9.30 |
| Com Stk | Sell | 12/4/2008 | 2,934 | $9.30 |
| Com Stk | Sell | 12/5/2008 | 11,178 | $7.98 |
| Com Stk | Sell | 12/5/2008 | 3,288 | $8.35 |
| Com Stk | Sell | 12/5/2008 | 13,204 | $8.45 |
| Com Stk | Sell | 12/5/2008 | 15,246 | $8.52 |
| Com Stk | Sell | 2/17/2009 | 28,641 | $9.42 |

4

| | | | | |
|---|---|---|---|---|
| Com Stk | Sell | 2/17/2009 | 8,210 | $9.43 |
| Com Stk | Sell | 2/17/2009 | 1,337 | $9.65 |
| Com Stk | Sell | 2/17/2009 | 15,123 | $9.76 |
| Com Stk | Sell | 7/24/2009 | 8,897 | $19.25 |
| Com Stk | Sell | 7/24/2009 | 4,844 | $19.26 |
| Com Stk | Sell | 7/27/2009 | 6,848 | $18.52 |
| Com Stk | Sell | 7/27/2009 | 3,536 | $18.79 |
| Com Stk | Sell | 7/27/2009 | 225 | $18.86 |
| Com Stk | Sell | 7/28/2009 | 8,840 | $18.06 |
| Com Stk | Sell | 9/21/2009 | 6,480 | $22.39 |
| Com Stk | Sell | 9/21/2009 | 2,812 | $22.41 |
| Com Stk | Sell | 9/22/2009 | 2,303 | $22.58 |
| Com Stk | Sell | 9/22/2009 | 3,070 | $22.64 |
| Com Stk | Sell | 9/22/2009 | 8,318 | $22.72 |
| Com Stk | Sell | 9/22/2009 | 5,757 | $22.86 |
| Com Stk | Sell | 9/23/2009 | 3,070 | $22.16 |
| Com Stk | Sell | 10/8/2009 | 28,700 | $19.20 |
| Com Stk | Sell | 10/19/2009 | 19,100 | $19.90 |
| Com Stk | Sell | 10/19/2009 | 3,500 | $19.93 |
| Com Stk | Sell | 10/20/2009 | 18,503 | $19.96 |
| Com Stk | Sell | 10/21/2009 | 25,627 | $19.75 |
| Com Stk | Sell | 11/3/2009 | 4,400 | $17.40 |
| Com Stk | Sell | 11/3/2009 | 6,500 | $17.45 |
| Com Stk | Sell | 11/3/2009 | 9,900 | $17.64 |
| Com Stk | Sell | 11/3/2009 | 6,100 | $17.96 |
| Com Stk | Sell | 7/13/2010 | 5,100 | $14.45 |
| Com Stk | Sell | 10/1/2010 | 19,300 | $17.31 |
| Com Stk | Sell | 11/19/2010 | 1,900 | $19.92 |

Opening Balance of 76,100 shares.

Shares have been adjusted to reflect the 2:1 stock split that occurred on May 27, 2008.

## DECLARATION OF SERVICE BY E-MAIL AND MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 580 California Street, Suite 1750, San Francisco, CA 94104.

2.      That on August 26, 2011, declarant served the AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS via e-mail and by depositing a true copy thereof in a United States mailbox at San Francisco, California in a sealed envelope with postage thereon fully prepaid and addressed to the following parties:

> Lionel Z. Glancy
> Michael Goldberg
> Robert V. Prongay
> Jala Amsellen
> GLANCY BINKOW & GOLDBERG LLP
> 1801 Avenue of the Stars, Suite 311
> Los Angeles, CA 90067
> 310/201-9150
> lglancy@glancylaw.com
>
> Howard G. Smith *
> SMITH & SMITH
> 3070 Bristol Pike, Suite 112
> Bensalem, PA 19020
> 215/638-4848
>
> *Counsel for Plaintiff Mike Dobina*

Robert John Malionek
LATHAM & WATKINS, LLP
885 Third Avenue, Suite 1000
New York, NY 10022
212/906-1816
robert.malionek@lw.com

Peter A. Wald
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
415/391-0600
peter.wald@lw.com

Kevin H. Metz
Sarah A. Greenfield
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
202/637-2338
kevin.metz@lw.com
Sarah.greenfield@lw.com

*Counsel for Defendants Weatherford International Ltd., Bernard J. Duroc-Danner, Andrew P. Becnel, Jessica Abarca and Charles E. Geer, Jr.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 26, 2011, at San Francisco, California.

CYNTHIA SHEPPARD

*Denotes service only via U.S. Mail on August 26, 2011.