UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MIKE DOBINA,

                Plaintiff,


       -against-                              11 Civ. 1646 (LAK)


WEATHERFORD INTERNATIONAL LTD., et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


      Appearances:

Curtis Victor Trinko, Esq.

Eli R. Greenstein
Erik D. Peterson
Ramzi Abadou
Stacey M. Kaplan
KESSLER TOPAZ MELTZER & CHECK, LLP

*Attorneys for Lead Plaintiff American Federation for Musicians and Employers Pension Fund*

Robert J. Malionek
Kevin H. Metz
Peter A. Wald
Sarah A. Greenfield
LATHAM & WATKINS, LLP
*Attorneys for Defendants Weatherford International Ltd., Bernard J. Duroc-Danner, Andrew P. Becnel, Jessica Abarca, and Charles E. Geer, Jr.*

Stanley J. Parzen
MAYER BROWN LLP
*Attorneys for Defendant Ernst & Young LLP*

1

LEWIS A. KAPLAN, *District Judge.*

This action arises out of statements regarding the internal controls and accounting practices of Weatherford International Ltd. ("Weatherford" or the "Company"), after Weatherford announced in 2011 that it had understated its tax expenses from 2007 through 2010 by over $500 million. Lead plaintiff American Federation of Musicians and Employer's Pension Fund ("AFME") alleges that Weatherford and certain of its officers, as well as its auditor Ernst & Young LLP ("Ernst & Young" or "E & Y"), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")[1] and Rule 10b-5 thereunder[2] by knowingly issuing materially false statements regarding the Company's tax accounting for the relevant time period and omitting to state facts necessary to make the statements that were made not misleading.

This matter is now before the Court on defendants' motions to dismiss the complaint for failure to state a claim and on AFME's motion for leave to supplement the amended complaint (the "AC").

*Facts*

I.      *Parties*

        A.      *Lead Plaintiff*

                AFME is "one of the largest pension funds in the entertainment industry," with "over

---

[1]      *See* 15 U.S.C. §§ 78j(b), 78t.

[2]      *See* 17 C.F.R. § 240.10b–5.

$1 billion dollars in assets under management."[3] It purchased Weatherford common stock during the class period.[4]

B.      *Defendants*

The defendants are the Company, Ernst & Young, and several individuals associated with the Company (the "Individual Defendants").[5]

Weatherford is an "international provider of equipment and services used in the drilling, completion and production of oil and natural gas wells."[6]   Ernst & Young is a certified public accounting firm that Weatherford hired to provide independent audits, accounting and management consulting services, tax services, and review of Weatherford's SEC filings.[7]

The Individual Defendants are Ms. Jessica Abarca and Messrs. Bernard Duroc-Danner, Andrew Becnel, and Charles Geer, Jr.[8]   Duroc-Danner is Weatherford's chief executive

---

[3]     DI 12, at 8.

[4]     *See* AC ¶ 38.  The class period is defined as April 25, 2007 (when the Company's first quarter 2007 financial results were released) through March 1, 2011.  *See* DI 12, at 2.

[5]     Weatherford and the Individual Defendants are referred to collectively as the "Weatherford Defendants."

[6]     AC ¶ 39.

[7]     *Id.* ¶ 40.

[8]     *See id.* ¶ 1.

officer, president, and chairman.[9]  Becnel was the Company's senior vice president and chief

financial officer.[10]  Geer was Weatherford's vice president and principal accounting officer.[11]

Abarca was the Company's chief accounting officer and vice president of accounting.[12]

## II.   The Amended Complaint

The AC focuses on Weatherford's alleged understatement of tax expenses in its

financial statements for the years 2007, 2008, 2009, and the first three quarters of 2010.[13]  It alleges

that, through "a simple and crude tax accounting fraud," the Company's effective tax rate dropped

---

[9]

*See id.* ¶ 42.  Duroc-Danner has been chief executive officer, president, and chairman since 1998.  *See id.*  He signed Weatherford's 2007, 2008, and 2009 Form 10-Ks, as well as its first, second and third quarter Form 10-Qs for 2007, its first, second, and third quarter Form 10-Qs for 2008, its first, second, and third quarter Form 10-Qs for 2009, and its first, second, and third quarter Form 10-Qs for 2010.  *See id.* ¶ 43.  He signed also a June 9, 2009 Form 8-K, and participated in "every earnings conference call with analysts during the Class Period."  *Id.*

[10]

*See id.* ¶ 44.  Becnel became vice president of finance in 2005, and chief financial officer in 2006.  *See id.*  He signed Weatherford's 2007, 2008, and 2009 Form 10-Ks, a 2009 Form 10-K/A, a March 1, 2011 Form 12b-25, "Forms 10-Q for ever quarter covered by the Restatement," and "Current Reports on Forms 8-K covered by the Restatement."  *Id.* ¶ 45.  He is alleged also to have "participated on every conference call with analysts during the Class Period."  *Id.*

[11]

*See id.* ¶ 46.   His alleged "sudden departure from the Company was announced on March 16, 2011."  *Id.* ¶ 1.  He signed Weatherford's second quarter Form 10-Q for 2010, as well as a Form 10-Q/A for this same quarter in 2010, and its third quarter Form 10-Q for 2010.  *Id.* ¶ 46.  "Geer also participated in the Company's March 2, 2011 'material weakness' conference call with analysts."  *Id.*

[12]

*See id.* ¶ 47.  Abarca signed Weatherford's 2007, 2008, and 2009 Form 10-Ks, as well as its first, second, and third quarter Form 10-Qs for 2007, its first, second, and third quarter Form 10-Qs for 2008, its first, second, and third quarter Form 10-Qs for 2009, and its first quarter 10-Q for 2010.  *See id.*

[13]

*See id.* ¶ 24.

4

"sharply" in 2007 and that the Company reported "artificially low and rapidly declining effective tax rates—one of the lowest, if not the lowest, in the industry" through the rest of the class period.[14]

According to the AC, the lower rate was of particular interest to analysts and investors. The Weatherford Defendants are alleged to have "closely monitored Weatherford's effective income tax rate, and specifically touted it in numerous SEC filings and analyst conference calls."[15] For example, when asked during an April 2007 call about the surprisingly low tax rate, Becnel stated "'[y]es, that was good work from our tax group in terms of planning.'"[16] The Company's 2008 and 2009 annual reports stated that "the decreases in the Company's effective tax rates were 'due to benefits realized from the refinement of our international tax structure and changes in our geographic earnings mix.'"[17] As a result of the lower tax rates, a number of analysts upgraded their earnings estimates for Weatherford, with one July 2007 report stating that its higher estimates were "'primarily a function of a lower effective tax rate.'"[18]

This apparently lower rate proved illusory. On March 1, 2011, the Company announced that it would restate its earnings for 2007 through the third quarter of 2010. It stated that it had identified in February 2011 a "'material weakness in internal control over financial reporting

---

[14]      *Id.* ¶¶ 5–7.

[15]      *Id.* ¶ 8; *see id.* ¶¶ 73–76.

[16]      *Id.*

[17]      *Id.* ¶ 17.

[18]      *Id.* ¶ 10; *see id.* ¶¶ 73–76.

for income taxes.'"[19]  In particular, it said that the "Company's processes, procedures, and controls related to financial reporting were not effective to ensure that amounts related to current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, the current and deferred income tax expense and related footnote disclosures were accurate."[20]

According to the statement, the Company conducted additional testing after identifying the material weakness and, in the process, identified tax receivable balances for which, as the Company later explained to the SEC, "documentary support was not available."[21]  The Company stated that it subsequently determined that those receivables had been recorded in error due to "a tax benefit incorrectly being applied to the elimination of intercompany dividends."[22]  It said that the "error manifested itself in 2007 and went undetected in that year and each subsequent year."[23]  It clarified that it had not erred in its actual cash payment of taxes to the Internal Revenue Service, but rather in its accounting for tax expense in its financial statements.[24]  The Company

---

[19]

  *Id.* ¶ 135.  As the Company explained elsewhere, "'[m]aterial weakness is a term of art.  It is a deficiency or combination of deficiencies in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the financial statements would not be prevented or detected on a timely basis.'" *Id.* ¶ 136 (alterations omitted).

[20]

  *Id.* ¶ 134.

[21]

  DI 68, Ex. 8 at 2.

[22]

  *Id.*; *see* AC ¶ 137 (quoting Becnel's statements on March 2, 2011 conference call that the error arose from "'tax-affecting'" an inter-company transaction at a 35% level rather than at a 0% effective tax rate, thereby leading to the creation of a "'substantial tax asset'").

[23]

  DI 68, Ex. 9 at 2.

[24]

  *See id.*

6

ultimately concluded that it had understated its 2007–2010 tax expense by approximately $500 million—$460 million due to these intercompany transactions and $40 million relating to foreign tax assets.[25]  Thus, the Company's tax expense actually was $1.2 billion rather than the previously-reported $700 million.[26]  A March 8, 2011 annual report provided restated financial information and included an opinion by Ernst & Young, which stated that Weatherford had "'not maintained effective internal control over financial reporting as of December 31, 2010.'"[27]  The AC alleges that Weatherford's stock price declined nearly 11 percent on the day following the announcement, thereby eliminating $1.8 billion from Weatherford's market capitalization.[28]

The AC asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b–5 thereunder.  It alleges that the Weatherford Defendants committed securities fraud through false statements and omissions falling into two principal categories: (1) those arising directly from the understatement of tax expense and (2) those pertaining to Weatherford's maintenance of internal controls over its financial reporting.  In addition, the AC alleges that Ernst & Young committed securities fraud when it provided, throughout the class period, (1) its unqualified opinion regarding the fair presentation of Weatherford's financial position and its compliance with generally accepted accounting principles ("GAAP") (2) its unqualified opinion regarding the effectiveness of Weatherford's internal controls and (3) its statements that it complied with generally accepted

---

[25]   *See id.*

[26]   DI 68, Ex. 9 at 5.

[27]   AC ¶ 140.

[28]   *See id.* ¶ 24.

auditing standards ("GAAS") in reaching these conclusions.

*Discussion*

## I.   *Legal Standard*

In deciding a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.[29]  In order to survive such a motion, the complaint  "'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[30]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[31]

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege facts sufficient "to establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."[32]

A complaint asserting a Section 10(b) claim must satisfy also the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").[33]

---

[29]
     *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 107 (2d Cir. 2012).

[30]
     *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[31]
     *Iqbal*, 556 U.S. at 678.

[32]
     *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) [hereinafter "*ECA*"] (internal quotation marks omitted).

[33]
     *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4(b).

8

Under Rule 9(b), "averments of fraud [must] be stated with particularity" and a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[34]

In addition, the PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."[35]  The requisite state of mind is an intent to "'deceive, manipulate, or defraud.'"[36]  In this circuit, allegations of recklessness – "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" – are sufficient.[37]

In evaluating whether a complaint alleges facts giving rise to a "strong inference of *scienter*," courts must consider all the facts alleged, inferences favoring plaintiffs rationally drawn from the facts, and "plausible, nonculpable explanations for the defendant's conduct."[38]  The "inference of *scienter* must be 'more than merely plausible or reasonable—it must be cogent and

---

[34]

> *Anschutz*, 690 F.3d at 108 (internal quotation marks and alterations omitted); *see also* 15 U.S.C. § 78u–4(b)(1) (providing that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed").

[35]

> 15 U.S.C. § 78u–4(b)(2)(A); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

[36]

> *ECA*, 553 F.3d at 198  (quoting *Tellabs*, 551 U.S. at 313).

[37]

> *Id.* (internal quotation marks and alterations omitted).

[38]

> *Tellabs*, 551 U.S. at 324.

at least as compelling as any opposing inference of nonfraudulent intent.'"[39]  Generally, the plaintiffs must allege facts sufficient to show that each defendant "personally knew of, or participated in, the fraud."[40]  That is, the plaintiff must allege that each defendant had the requisite *scienter*.[41]

A complaint may satisfy the *scienter* requirement "by alleging facts to show either (1) that defendants had the motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."[42]

In order sufficiently to allege "motive and opportunity," plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud."[43]  Our Circuit has made clear that goals "possessed by virtually all corporate insiders" are insufficient to allege motive for Section 10(b) purposes.[44]  Such common goals include "the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation."[45]

---

[39]

      *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 314).

[40]

      *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (emphasis omitted).

[41]

      *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005) (hereinafter "*BISYS*").

[42]

      *ECA*, 553 F.3d at 198.

[43]

      *Id.* (internal quotation marks omitted).

[44]

      *South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted).

[45]

      *Id.*

If plaintiffs have not alleged motive and opportunity sufficiently, they may rely upon the "strong circumstantial evidence" prong, "though the strength of the circumstantial allegations must be correspondingly greater if there is no motive."[46]  A complaint alleges strong circumstantial evidence of *scienter* when it alleges that defendants (1) "benefitted in a concrete and personal way from the purported fraud," (2) "engaged in deliberately illegal behavior," (3) "knew facts or had access to information suggesting that their public statements were not accurate," or (4) "failed to check information they had a duty to monitor."[47]

## II.    *Analysis*

### A.    *Weatherford Defendants*

#### 1.    *Motive and Opportunity*

AFME contends that the AC adequately pleads that the Weatherford Defendants had both a motive and the opportunity to commit fraud.  The contention is unavailing.

The AC points first to the Individual Defendants' discretionary bonuses tied to performance targets and their large compensation packages.[48]  Such motives, however, are "possessed by virtually all corporate insiders" and thus are insufficient to give rise to the requisite strong inference of *scienter*.[49]  Similarly unavailing are the AC's allegations that the fraud helped

---

[46]

      *ECA*, 553 F.3d at 199 (internal quotation marks omitted).

[47]

      *Id.*; *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *see Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) [hereinafter ("*Teamsters*")].

[48]

      *See* AC ¶¶ 22–23, 151–58.

[49]

      *South Cherry Street*, 573 F.3d at 109 (internal quotation marks omitted).

the Company meet earnings targets or sustain the appearance of profitability.[50]

The Second Circuit has recognized that individual stock sales by corporate insiders will provide the requisite motive.[51]  But the AC fails to allege that any such sales occurred here.  It states only that certain of the individual defendants—Duroc-Danner and Becnel—"delivered tens of thousands of their personally-held Weatherford shares back to Weatherford" one day before the Company announced that it would be issuing the financial restatement.[52]  It noticeably does not state, however, that either Duroc-Danner or Becnel actually sold stock at that time.  The inadequacy of the pleading is highlighted by the defendants' assertion that these were "shareholder-approved[] tax withholding transactions in which the executives surrendered a portion of their stock grants (but retained [and acquired] a much larger part) on the dates those grants vested in order to cover their withholding obligations."[53]  AFME's briefing does not earnestly contest defendants' assertion and states only that resolving this argument would be "improvident at this early stage."[54]  But the Court need not determine whether defendants' proffered explanation is correct or accurate.  The basic point is that plaintiff has failed adequately to allege that these deliveries were sales of stock, that they resulted in profits or avoided losses, or even that they had the net effect of reducing defendants' overall holdings in Weatherford stock.  The lack of such allegations precludes any strong inference

---

[50] See AC ¶¶ 10, 11, 28; *South Cherry Street,* 573 F.3d at 109.

[51] See ECA, 553 F.3d at 198.

[52] AC ¶ 23; s*ee id.* ¶ 158.

[53] DI 69, at 9 n.9.

[54] DI 71, at 25.

of *scienter* based on these deliveries.

In light of the inadequacy of these grounds for motive, AFME focuses principally on its theory that the fraud inflated Weatherford's stock price and thus permitted it to fund its "aggressive growth strategy" while avoiding becoming an acquisition target in its own right.[55]  The AC points to a "sampling" of seven acquisitions Weatherford conducted from 2007 through 2009 and further refers to Weatherford's 2009 annual report, which stated that the Company funded its 2008 and 2009 acquisitions through the issuance of $287 million in stock.[56]

The theory is rejected easily with regard to the Individual Defendants because plaintiff "nowhere allege[s] that defendants engaged in these transactions to secure personal gain" as opposed to carrying out their "financial responsibilities to the Company."[57]  Moreover, "[e]ven if the complaint is read to say that defendants artificially inflated [Weatherford's] stock price to increase their personal compensation (by undertaking the cited transactions or otherwise), the complaint would still fail to allege the requisite motive" because such an incentive is common to

---

[55]     AC ¶ 67 (internal quotation marks omitted); *see id.* ¶¶ 30 n.6, 68–70, 163–64.

[56]     *Id.* ¶ 164.

[57]     *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (internal quotation marks omitted). The only allegations in the AC coming close to such a charge are those of a confidential witness, CW1, who purportedly stated that in order to "earn brownie points," Becnel "bent accounting rules when Weatherford went on an acquisition spree."  AC ¶ 56 (internal quotation marks omitted).  In the absence of other facts supporting the relevant point, a complaint must describe confidential witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.  The complaint's description of CW1 simply as a "Senior Financial Executive," AC ¶ 54, provides an insufficient basis to conclude that CW1 would be privy to Becnel's inner motivations.  *See BISYS*, 397 F. Supp. 2d at 442 (deeming inadequate similarly general descriptions of various confidential witnesses).

all insiders.[58]

More challenging is the question of whether the corporate defendant—Weatherford itself—may be inferred to have had the requisite motive due to its interest in acquiring other companies. While "artificial inflation of stock prices in order to acquire another company . . . 'in some circumstances' [may] be sufficient for scienter,"[59] the "desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired or to acquire another" and therefore generally is insufficient.[60] Whether an interest in acquisitions is sufficient is an "extremely contextual" inquiry that demands an allegation of a "unique connection between the fraud and the acquisition."[61]

The Circuit has provided little guidance as to what this "unique connection" must be, but has suggested that it is sufficient when the "misstatements directly relat[e] to the acquisition."[62] The Court concludes that this requirement demands more than alleging simply that the Company

---

[58]
    *Rombach*, 355 F.3d at 177; *see BISYS,* 397 F. Supp. 2d at 446 (rejecting motive based on acquisition spree as to individual defendants for same reason).

[59]
    *ECA*, 553 F.3d at 201 n.6 (quoting *Rothman v. Gregor*, 220 F.3d 81, 92–94 (2d Cir. 2000)).

[60]
    *Id.* at 201 (internal quotation marks omitted) (citing *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001)).

[61]
    *Id.* at 201 n.6 (internal quotation marks omitted).

[62]
    *See id.* (citing *Cohen v. Koenig*, 25 F.3d 1168, 1170–71, 1173–74 (2d Cir. 1994)); *see also Rothman*, 220 F.3d at 93 (relying on *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 262, 270 (2d Cir. 1993), in which our Circuit addressed misstatement that directly concerned company's search for strategic partners and its nondisclosure of its consideration of alternative stock offering).

14

acquired companies during the class period with the use of stock.[63]

There is an important reason to apply exacting scrutiny to any claim of motive through company acquisitions. A plaintiff who alleges motive and opportunity necessarily has satisfied the pleading requirements for *scienter*, even without any allegation that a statement that later proved to have been false was made with an indication of knowledge or recklessness.[64] This helps explain why our Circuit refuses to consider allegations of even lavish executive compensation as sufficiently alleging motive despite the fact that one certainly could imagine that a number of executives might commit fraud in order to maintain their positions and therefore their considerable annual pay packages. The point is not whether such pay packages provide, in at least some sense of the word, "motive" to commit fraud, but rather, whether the mere fact that an executive is paid well provides a motive sufficient to permit a case to go to discovery without any further allegations that would support an inference of *scienter*. Our Circuit has concluded, and the PSLRA has

---

[63]

      The Court recognizes that in *Rothman v. Gregor*, 220 F.3d 81, our Circuit observed that a stock-based acquisition contemporaneous with, but apparently otherwise unrelated to, the misstatements "reenforce[d] the adequacy of the complaint's allegation of *scienter*." *Id.* at 94. But *Rothman* already had concluded that the *scienter* element was alleged adequately through sufficient circumstantial evidence of recklessness. Moreover, *Rothman* now must be read in the context of *ECA*, which emphasizes the importance of the "unique connection" between the fraud and the acquisition.

      *ECA* undermines also plaintiff's reliance on a prior decision, *In re Interpublic Securities Litigation*, No. 02 Civ 6527, 2003 WL 21250682 (S.D.N.Y. May 29, 2003), for the proposition that a sustained growth-by-acquisition strategy not otherwise connected to an alleged fraud provides sufficient motive.

[64]

      *See ECA*, 553 F.3d at 198 (recognizing that the requisite scienter can be alleged with facts showing "*either* (1) that defendants had the motive and opportunity to commit fraud, *or* (2) strong circumstantial evidence of conscious misbehavior or recklessness" (emphasis added)).

reinforced, that relying on such motives "possessed by virtually all corporate insiders"[65] would be improper because it would require "virtually every company in the United States that experiences a downturn in stock price . . . to defend securities fraud actions."[66]

        Likewise, while an acquisition program funded by stock issuances in a certain sense might provide a "motive" to inflate the stock price, it is not sufficient to allege *scienter*.  Accepting AFME's position would allow a plaintiff to proceed to discovery whenever it can allege that a company that is growing through the issuance of equity made a statement that ultimately proved to have been materially false but helped to raise the company's share price.  That conclusion is inconsistent with the PSLRA and our Circuit's requirements of a "unique connection" between the fraud and the acquisition, and this Court declines to accept it.[67]

---

[65]

        *South Cherry Street*, 573 F.3d at 109 (internal quotation marks omitted).

[66]

        *ECA*, 553 F.3d at 201 (internal quotation marks omitted).

[67]

        The Court notes a potential further ground for finding motive insufficient here—any such motive to raise the stock price in order to fund acquisitions more cheaply would inure to the benefit of all shareholders, and thus would not demonstrate intent to defraud Weatherford shareholders.  *See Kalnit*, 264 F.3d at 141 (observing, in case in which company was target of acquisition, that "any intent to defraud [the acquirer] cannot be conflated with an intent to defraud the shareholders" because "achieving a superior merger benefitted all shareholders"); *cf. ECA*, 553 F.3d at 203 ("Even if [defendant] was actively engaged in duping other institutions for the purposes of gaining at the expense of those institutions, it would not constitute a motive for [the defendant] to defraud its own investors.").

        *Kalnit* and *ECA* appear to be in some tension with *Rothman* on this point, because it would seem that any time an inflated stock price permits cheaper acquisition proposals, the lower price paid would inure to the benefit of all shareholders.  Because the allegations are insufficient for other reasons, the Court need not resolve any apparent tension among these cases.

2.    *Circumstantial Evidence of Recklessness*

As discussed above, plaintiff alleges two different kinds of false statements by the Weatherford Defendants: (1) those relating to the quality of Weatherford's internal controls and (2) those relating to the understated tax expense.[68]

a.    *Internal Controls*

In every Form 10-Q and 10-K filed during the class period, certain defendants made statements regarding the effectiveness of Weatherford's internal controls.  In particular, Duroc-Danner and Becnel individually certified that they were "'responsible for establishing and maintaining disclosure controls and procedures . . . and internal control for financial reporting'" for Weatherford and have, among other things, "'[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles'" and "'disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of

---

[68]    The AC and plaintiff's briefing leaves somewhat unclear whether plaintiff alleges a third category of false statements regarding the Company's projected capital expenditures ("capex").  *Compare* AC ¶ 18 (alleging that "[a]nother adverse consequence of Weatherford's lack of internal controls related to the Company's capital expenditures . . . which far exceeded its stated budgets" and alleging that the Company repeatedly revised its capex projections) *with* DI 71, at 24 n.21 (plaintiff's opposition brief contending that it has not "'abandoned' its capex allegations").  The Court does not understand the AC's few paragraphs discussing capex statements to set forth an independent Section 10(b) claim on this ground.  In any event, the Court agrees with the Weatherford Defendants that any such claim should be dismissed because plaintiff fails to allege the false statements with particularity and fails to raise any inference that the projections were made with the requisite *scienter*.

directors . . . [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information.'"[69]  These attestations continued quarterly as late as November 1, 2010, in Weatherford's 10-Q for the third quarter of 2010.[70]

By contrast, the Company's March 2011 restatement identifying the "material weakness" detailed significant gaps in its internal controls as follows:

> "The Company's processes, procedures and controls related to financial reporting were not effective to ensure that amounts related to current taxes payable, certain deferred tax assets and liabilities, reserves for uncertain tax positions, the current and deferred income tax expense and related footnote disclosures were accurate. Specifically, our processes and procedures were not designed to provide for adequate and timely identification and review of various income tax calculations, reconciliations, and related supporting documentation required to apply our accounting policies for income taxes in accordance with US GAAP.
>
> "The principal factors contributing to the material weakness were: 1) inadequate

---

[69]  AC ¶ 142.  The Company itself made statements also in each report about the effectiveness of its internal controls, relying on the certifications of Duroc-Danner and Becnel.  In particular, it stated,

"[W]e carried out an evaluation, under the supervision and with the participation of management, including [Becnel] and [Duroc-Danner], of the effectiveness of our disclosure controls and procedures . . . .  Based upon that evaluation, our CEO and CFO have concluded our disclosure controls and procedures are effective as of the end of the period covered by this report to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that information relating to us . . . required to be disclosed is accumulated and communicated to management, including the CEO and CFO, to allow timely decisions regarding required disclosure."

DI 65, Ex. 15 at 39.

[70]  See DI 65, Ex. 17.

staffing and technical expertise within the company related to taxes, 2) ineffective review and approval practices relating to taxes, 3) inadequate processes to effectively reconcile income tax accounts and 4) inadequate controls over the preparation of quarterly tax provisions."[71]

Although the March 2011 restatement specifically stated only that Weatherford's internal control over financial reporting for income taxes was not effective "as of December 31, 2010"[72] (i.e., the end of that particular reporting period), in light of the Company's attestations through the class period that its internal controls had not changed[73] and the fact that the $500 million tax expense understatement persisted from 2007 through 2010, one reasonably may infer that Weatherford's internal controls in fact were inadequate throughout the class period.

The question, of course, is whether the AC adequately pleads that Becnel and Duroc-Danner made their certifications either knowing they were false or with reckless disregard for their truth.[74] The Court is mindful of the fact that the certifications involve a certain amount of subjectivity, e.g., regarding whether Weatherford's internal controls provide "'reasonable assurance'" about the reliability of financial reporting.[75] This Court previously has recognized how the subjectivity of statements in the securities fraud context bears on whether a plaintiff adequately

---

[71]

DI 68, Ex. 4.

[72]

*Id.*

[73]

*See, e.g.*, DI 65, Ex. 15 at 39.

[74]

*See South Cherry Street*, 573 F.3d at 109.

[75]

AC ¶ 142.

has  alleged *scienter*.[76]  But subjectivity will not completely immunize a statement from review under Section 10(b).  Indeed, a plaintiff can plead a claim adequately based even on a statement of opinion if it alleges facts sufficient to "permit a conclusion that [the defendant] either did not in fact hold that opinion or knew that it had no reasonable basis for it."[77]

The Court concludes that AFME has alleged *scienter* adequately with regard to Becnel's statements about internal controls.  In reaching this conclusion, the Court relies on several key factors.

First, the personal participation of Becnel in designing and evaluating the internal controls is relevant to the inquiry.  The certifications state that Becnel, along with Duroc-Danner, was "'responsible for establishing and maintaining'" those controls and "'designed'" or caused such controls to be designed under his supervision.[78]  Moreover, Becnel participated in and supervised each of the Company's quarterly evaluations of its internal controls.[79]  Where a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of *scienter*.[80]

---

[76]

See *In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 300–03 (S.D.N.Y. 2011) [hereinafter "*Lehman*"].

[77]

*Id.* at 302.

[78]

AC ¶ 142.

[79]

*See, e.g.*, DI 65, Ex. 15 at 39.

[80]

See *Plymouth Cnty..Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 382–83 (E.D.N.Y. 2008) (supporting finding of *scienter* with allegations that directors were personally involved in transactions at issue); *Buxbaum v. Deutsch Bank A.G.*, No. 98 Civ. 8460, 2000 WL 33912712, *19 (S.D.N.Y. Mar. 7, 2000) (similar).

Second, the discrepancies between the admissions of the March 2011 restatement and the repeated certifications that continued from the beginning of the class period until as late as November 2010 are stark. In March 2011, the Company admitted "inadequate staffing and technical expertise," "ineffective review and approval practices," "inadequate processes to effectively reconcile income tax accounts" and "inadequate controls over the preparation of quarterly tax provisions."[81]   Given Becnel's personal participation in designing and evaluating the internal controls, he presumably had extensive knowledge about precisely these matters. The inference that he lacked a reasonable basis for his certifications is plausible in the circumstances.

Third, the AC alleges that Becnel was aware of at least some problems with internal controls in the tax department during the class period. The AC refers to CW2, a "senior-level audit executive" who worked in Weatherford's internal audit department from approximately 2000 to 2010.[82] CW2 allegedly states that taxes "were 'always an area of concern'" and a "'constant' issue." CW2 reported that taxes were the only department with unexplained audit delays that "'genuinely concerned'" CW2.  He or she allegedly informed Abarca and Becnel about these delays, but they are said to have believed "'that is just the nature of taxes and the Tax Department.'"  Moreover, "[a]ccording to CW2, on several occasions, Tax Department audits turned up multiple control deficiencies, including at least one 'significant deficiency' in 2009, that were expressly raised with

---

[81]
       DI 68, Ex. 4.

[82]
       AC ¶ 57.  The Court is not persuaded by defendants' contention that the AC insufficiently describes CW2 in order for these allegations to be considered.  The complaint's description of CW2 as a senior-level executive in the internal audit department during most of the class period and its allegation that CW2 attended recurring quarterly Audit Committee meetings supports the probability that he or she would have been aware of problems regarding Weatherford's internal controls in taxation.  *See BISYS*, 397 F. Supp. 2d at 442 (holding adequate similarly specific descriptions of various confidential witnesses).

Becnel, Abarca, and the Audit Committee."[83]  All deficiencies were entered into "Exception Logs" which were summarized and presented in Audit Committee meetings that Becnel and Abarca regularly attended.[84]  CW2 stated that one of the reasons for his/her departure from Weatherford was increasing concern that "the Tax Department issues were not being addressed," and CW2 was "not surprised to learn of Weatherford's Restatement."[85]

Finally, to the extent the Tax Department posed unique issues, the fact that taxes were "key to measuring [Weatherford's] financial performance and [were] a subject about which investors and analysts often inquired" further "reinforces the inference of *scienter*."[86]

Defendants' opening brief paid almost no attention to the internal controls statements, contending principally that the alleged statements of CW2 regarding internal audit delays are not relevant.  The Court is unpersuaded.  Given that part of Weatherford's challenged statements regarded the effectiveness of internal controls to allow "timely"[87] decisions regarding disclosure and that part of the ultimately revealed problem was that Weatherford's "processes and procedures were not designed to provide for adequate and *timely* identification and review,"[88] one reasonably may

---

[83]

AC ¶ 58.

[84]

*Id.*

[85]

*Id.* ¶ 59.

[86]

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2012) (summary order).

[87]

DI 65, Ex. 15 at 39.

[88]

DI 68, Ex. 4.

infer that Becnel's certifications were recklessly made in light of the audit delays raised by CW2 and dismissed by Becnel.  Moreover, the defendants' awareness of delays that might have been indicative of the "inadequate staffing and technical expertise" and dismissal of issues that pertained solely to the Tax Department may be also indicative of recklessness.

Defendants challenge also CW2's alleged statements about control deficiencies on the ground that the AC does not allege that those deficiencies related in any way to the $500 million restatement.  But that is entirely beside the point when determining whether Becnel's general statements regarding internal controls—which were separate from its understatement of tax expense—were made recklessly.  The AC's allegations permit the conclusion that Becnel knew about but failed to resolve meaningful control deficiencies at times when Becnel was certifying that the internal controls were effective.  While discovery ultimately may undermine the probative value of the supposed deficiencies referenced by CW2, the complaint is sufficient in this respect to survive a motion to dismiss.

In short, in light of the personal involvement of Becnel in designing and evaluating Weatherford's internal controls, the stark realities about the inadequacies of the internal controls that were revealed in the March 2011 restatement, the audit delays and control deficiencies expressly raised to him during the class period, and the fact that the Tax Department uniquely was experiencing problems even while he knew that its functions were of specific importance to the Company, the AC sufficiently alleges *scienter* with regard to his statements.[89]  The inference that his certifications were made with reckless disregard for the truth is at least as compelling as any

---

[89]     *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 392–95 (S.D.N.Y. 2007) (concluding that complaint adequately alleged *scienter* with respect to company's internal controls certifications).

opposing, nonculpable inference.[90]

The Court concludes further that the AC adequately alleges *scienter* with regard to Weatherford.[91]  While the above allegations are sufficient to give rise to the requisite strong inference of *scienter* as to Becnel, the Court concludes that the AC does not sufficiently allege *scienter* with respect to any of the other individual defendants.  Although Abarca was present also at the Audit Committee meetings, the AC does not allege with particularity her role in designing the internal controls.  The AC is insufficient also with respect to Duroc-Danner because it fails to allege that he was aware of any issues with internal controls at all during the class period.  The AC contains no allegations about Geer on this issue whatsoever.

### b.    Understatement of Tax Expense

Next, the AC alleges false statements that relate specifically to the understatement of tax expense, including the Company's reports on Forms 10-K and 10-Q.  It alleges that these

---

[90]

    The authorities relied on by defendants in its reply do not undermine this conclusion.  In *Coronel v. Quanta Capital Holdings*, No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009), the court rejected only the plaintiffs' use of internal control weakness as a basis for inferring *scienter* regarding the filing of false earnings statements, not as an independently actionable securities fraud claim.  Moreover, it relied on the fact that the company's control weaknesses did not lead to any financial restatements.  That is not this case.

    Similarly unavailing is *In re Interpublic Securities Litigation*, 2003 WL 21250682.  In concluding that the plaintiffs did not adequately plead *scienter*, the court relied on the fact that the company had never admitted that it failed to have the proper procedures in place, a far cry from this case.  Nor was there any indication that executives in *Interpublic* had received any information about internal control problems while the company was certifying that the controls were adequate.

[91]

    *See Teamsters*, 531 F.3d at 195 ("[T]he most straightforward way to raise [a strong inference of *scienter*] for a corporate defendant will be to plead it for an individual defendant.").

reports "materially overstated the Company's net income, net earnings, effective income tax rate and purported growth."[92]   Relatedly, because the company's accounting for the tax receivables, which resulted in the understatement of tax expense, did not conform to GAAP, the AC alleges that the Weatherford defendants falsely asserted that the Company's financial results were prepared in accordance with GAAP.[93]  This category of false statements finally includes numerous statements made in conference calls by the Weatherford defendants indicating that their positive financial results were due to successful strategies and competitive tax advantages rather than "improper manipulation of the Company's income tax expense."[94]

To the extent plaintiff appears to allege an intentional scheme whereby defendants "crudely manipulated the Company's effective tax rate expense by a few percentage points each quarter and fiscal year to generate enough earnings to meet or beat the Company's targets in key periods," its allegations are insufficient.[95]  The complaint is entirely devoid of factual allegations that could make plausible, let alone compelling, the inference that defendants actively manipulated the tax receivable asset in order to beat Wall Street estimates or otherwise inflate earnings by a desired amount.  Nor does the AC provide a sufficient basis to support even its allegations that the fictitious tax asset was intentionally introduced by defendants onto Weatherford's books.[96]

---

[92]     AC ¶ 77.

[93]      *See id.*

[94]      *Id.*

[95]      *Id* ¶ 65.

[96]      *Id.* ¶ 5 (alleging that "the Insider Defendants devised a competitive edge that its rivals could not match, a simple and crude tax accounting fraud designed to inflate Weatherford's net

But that is not the end of the story.  Plaintiff need not make such grandiose allegations to plead *scienter* adequately.  Rather, plaintiff needs to allege facts plausibly giving rise to an inference of recklessness, "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[97]

Plaintiff puts forward several bases on which to found such an inference of recklessness, including (1) the magnitude of the restatement, (2) the focus of defendants and investors on the effective tax rate, (3) the quality of internal controls, and (4) access to information.[98]

The Court is not persuaded by the AC's attempt to allege *scienter* regarding the understatement of tax expense based on an access to information theory.[99]  Our Circuit has held that "'where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'"[100]  The allegations of the AC do not go beyond a "broad reference to raw data" that the Circuit has concluded is insufficient to allege access to information as a basis for *scienter*.[101]  Although AFME points to the assertions of CW3 that

---

[97]   income and net [earnings per share] to create an overall false facade of financial success during an otherwise very difficult period for the Company").

*ECA*, 553 F.3d at 198 (internal quotation marks and alterations omitted).

[98]   To the extent plaintiff relies on CW1 from the AC for another basis to allege *scienter*, *see* AC ¶¶ 54–56, this Court above has already concluded CW1 was not sufficiently described to be deemed credible.

[99]   AC ¶¶ 48–53.

[100]   *Teamsters*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309) (alterations omitted).

[101]   *Id.*

Weatherford maintained a monthly spreadsheet detailing intercompany receivables and payables, the AC notably stops short of actually alleging that the spreadsheet contained sufficient information to demonstrate that the tax expenses were in error.[102]   Nor does the AC allege that any of the defendants actually were provided this spreadsheet.[103]

Similarly unpersuasive is the alleged lack of internal controls.  While Weatherford's poor internal controls may give rise to liability with respect to the defendants' statements *about* internal controls, the weak internal controls provide little if any circumstantial support that the statements that the understated tax expense were made with *scienter*.  Simply put, "[w]eak accounting controls may pave the way for fraud.  They do not themselves constitute fraud."[104]

This leaves plaintiff's central points—that the magnitude of the understatement and the defendants' and investors' considerable focus on Weatherford's tax rates demonstrate that the defendants were at least reckless with regard to the truth of their statements.

The Second Circuit has held that the magnitude, at least in certain circumstances, can be relevant to the *scienter* inquiry.[105]   To the extent that the invalid tax assets created a large footprint on Weatherford's finances without any supporting documentation, the size of the error may

---

[102]

AC ¶ 60.

[103]

*Id.*

[104]

*BISYS*, 397 F. Supp. 2d at 450.

[105]

*See Rothman*, 220 F.3d at 92 (invoking magnitude of write-off to render less credible inference advanced by defendants and thus to conclude that plaintiff adequately alleged *scienter*); *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 76–77 (2d Cir. 2001) (similar); *see also Defer LP v. Raymond James Financial, Inc.*, 654 F. Supp. 2d 204, 219 (S.D.N.Y. 2009) (recognizing that "the magnitude of the alleged fraud does provide some circumstantial evidence of *scienter*" (internal quotation marks omitted)).

provide some support for *scienter*.[106]   Moreover, these assets reduced Weatherford's stated tax expense enormously—Weatherford's stated expense from 2007–2010 was 21 percent, but after the restatement it proved actually to have been 34 percent.[107]   How substantial that understatement was to Weatherford's prospects and outlook is highlighted by the many analyst conference calls and SEC filings in which defendants touted their lower tax rates.   As the AC alleges, analysts showed considerable interest to defendants in even a few percentage point change in the effective tax rate.[108]   Moreover, the defendants often provided specific guidance about the effective tax rate they expected to achieve, down to the percentage point, in analyst calls  along with their reasons behind that belief, generally owing to "'tax planning'" and the Company's "'geographic earnings mix.'"[109]   The AC

---

[106]

When the magnitude of an error is relevant to *scienter* depends on the circumstances.  For example, if a widget manufacturer announces that it will be writing off significant inventory assets due to a previously undisclosed defect in a particular model of widgets, the size of the restatement may say very little, if anything, about *scienter* regarding the failure to disclose the defect earlier.  The probability that corporate officers would have discovered the defect earlier might be unaffected by whether the inventory was worth $10 million or $100 million.

Conversely, if a widget manufacturer states repeatedly that it had annual sales of $100 million when in actuality its sales were only $10 million, the magnitude of that error should provide some support for an inference of *scienter*, because such a significant discrepancy would be unlikely to go unnoticed.

[107]

AC ¶ 5.

[108]

*Id.* ¶ 74 (analyst noting he was surprised by the lower rate of 24% versus an expected 27%, and Becnel stating "'[y]es, that was good work from our tax group in terms of planning. We had some benefits that rolled in that will appreciate over the – that we will recognize over the rest of the year in terms of those planning implementations.  And also it will depend . . . on where we are making our money.  But we feel very good about that.'").

[109]

*Id.* ¶ 88; *see id.* ¶ 107 (when asked about the reasons for a lower 15.5 percent rate—which ultimately proved to be a 32 percent rate after the restatement—Becnel stating "'That we can answer.  If you look at distribution of earnings by geographic segment and the different rates both what I would call the statutory versus effective rates that we have been able to achieve and incremental tax planning that we undertook during the quarter in connection

further notes that the difference between the reported tax rate and the actual tax rate would often be even more significant in specific quarters.  For example, in the third quarter of 2010, the Company reported a 5 percent tax rate, which ultimately was restated to 35 percent.[110]  Other quarters saw significant tax benefits, when the restated tax rate was a meaningful net cost.[111]

Nevertheless, "it is clear that the size of the fraud alone does not create an inference of *scienter*,"[112] and what is noticeably missing from the AC is any allegation that the Weatherford defendants had any contemporaneous basis to believe that the information they related was incorrect that would be sufficient to allege the requisite "conscious recklessness."[113]  In an attempt to bridge the gap in this regard, plaintiff relies considerably on the "core operations" theory adopted by several courts in this district.  That theory states that "[k]nowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued."[114]  The theory finds its roots in *Cosmas v. Hassett*, a

---

with our move to Geneva, all of those helped.  Obviously we feel a lot more confident about putting our thumb on exactly where we will be by the end of the year in terms of earnings given the prognosis that [Duroc-Danner] just went through, and so I feel a lot more confident in that [tax] rate than where we were heading into Q1'").

[110]
 *See id.* ¶ 127.

[111]
 *See id.* ¶¶ 116, 122.

[112]
 *BISYS*, 397 F. Supp. 2d at 447 (internal quotation marks omitted).

[113]
 *South Cherry Street*, 573 F.3d at 109 (internal quotation marks omitted).

[114]
 *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004).

case in which knowledge about new Chinese import restrictions was imputed to corporate officers when sales to China constituted a "significant part of [the company's] business."[115]  As a number of courts have noted, however, it remains an open question whether the theory has survived the passage of the PSLRA.[116]

That debate need not be settled here.  The Court assumes, in light of the importance of tax rates to Weatherford's financials, that the proper determination of these rates constituted "core operations" that would have permitted a plausible inference that the defendants knew about the falsity or knew facts that made the risk of such falsity obvious.

But the fact that the Court *may* make such an inference does not mean that such an inference necessarily would be the most compelling under *Tellabs*.  The Court is required to consider "plausible, nonculpable explanations for the defendant's conduct" and, in order to sustain the complaint, must conclude that the inference of *scienter* is "at least as compelling as any opposing inference one could draw from the facts alleged."[117]  Here, the allegations of the AC support the plausible inference that the Company made an error in its tax accounting treatment in 2007 that persisted on its books, compounding over time, and leading to incorrect financial reporting that propagated up to management.  That is, it is a plausible inference that management's statements

---

[115]

886 F.2d 8, 13 (2d Cir. 1989).

[116]

*See Bd. of Trustees of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 871 (S.D.N.Y. 2011) (surveying caselaw in the district) *aff'd Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (summary order) ("*Cosmas* was decided prior to the enactment of the PSLRA, and we have not yet expressly addressed whether, and in what form, the core operations doctrine survives as a viable theory of *scienter*").

[117]

*Tellabs*, 551 U.S. at 324.

about the Company's tax expense were "the result of merely careless mistakes at the management level based on false information fed it from below."[118]  In the absence of any allegations of suspicious circumstances or of knowledge of facts that made the risk of such error obvious, the Court concludes that this nonculpable inference is more compelling than the inference proffered by AFME.  Thus, the AC fails adequately to allege *scienter* with regard to the understatement of tax expense.

B.    *Ernst & Young*

AFME challenges three categories of statements made by Ernst & Young in reports  appended to each of Weatherford's annual 10-K reports for 2007, 2008, and 2009: (1) its statements regarding the effectiveness of Weatherford's internal controls,[119] (2) its statements regarding Weatherford's compliance with GAAP,[120] and (3) its statements regarding its own compliance with the auditing standards of the PCAOB, which has adopted GAAS, in arriving at its

---

[118]

       *Teamsters*, 531 F.3d at 197 (internal quotation marks omitted).  Note that this category of statements is distinguishable in this regard from the statements about internal controls.  While the inference is quite compelling here that the error simply originated at a lower level and percolated up to management, that inference is much less plausible with respect to internal controls that were or should have been designed by upper management.

[119]

       *See, e.g.*, 2009 10-K, DI 68, Ex. 7 at 39 ("In our opinion, Weatherford International Ltd. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009 based on the COSO criteria [laying out standards for evaluating internal controls].").

[120]

       *See, e.g.*, *id.* at 40 ("In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Weatherford International Ltd. and subsidiaries at December 31, 2009 and 2008, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2009, in conformity with U.S. generally accepted accounting principles.").

opinions about Weatherford's internal controls[121] and GAAP compliance.[122]

　　　　　With regard to the third category, E & Y's statements about GAAS compliance, the AC points to several General Standards ("GS"), interpretive Statements on Auditing Standards ("AU"), and Standards of Fieldwork that allegedly are part of GAAS and that E & Y allegedly violated.[123]   AFME focuses particularly on GAAS standards regarding the gathering of sufficient evidential matter.  In particular, AU Section 326 provides that the auditor "'should be thorough in his or her search for evidential matter,'"[124] and AU Section 110 states that "'[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.'"[125]

---

[121]

　　　　　*See, e.g.*, *id.* at 39 ("We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.").

[122]

　　　　　*See, e.g.*, *id.* at 40 ("We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.").

[123]

　　　　　*See* AC ¶ 202 n.15 (indicating allegations of violations of GS Nos. 1–3 and Standards of Field Work Nos. 2–3).

[124]

　　　　　*Id.* ¶ 206.

[125]

　　　　　*Id.* ¶ 207.

AFME contends that each of these three categories of statements was false and that E & Y made such false statements with the requisite *scienter*.

### 1.    *Motive and Opportunity*

Plaintiff first posits that it sufficiently has alleged facts giving rise to a strong inference of *scienter* under the motive and opportunity approach on three types of allegations. The first regard the fees that Ernst & Young received from Weatherford.[126] The second are based on supposed close ties between the two entities – the AC focuses particularly on former employees of Ernst & Young who later worked for Weatherford, including individual defendant Abarca.[127] The third set of allegations focus on administrative sanctions and discipline that Ernst & Young and its employees have faced in other, independent circumstances.[128] None of these allegations suffices.

The AC alleges only that Ernst & Young "generated over $30 million in aggregate fees" from Weatherford during the class period.[129] It nowhere alleges that these fees were not commensurate with work performed or otherwise were paid inappropriately. This does not sufficiently allege motive, as "[i]t would defy common sense to hold that the motive element . . . would be satisfied merely by alleging the receipt of normal compensation for professional services

---

[126]

       *See id.* ¶¶ 201, 218, 220.

[127]

       *See id.* ¶¶ 220–26.

[128]

       *See id.* ¶¶ 227–28.

[129]

       *Id.* ¶ 218.

rendered."[130]

The "revolving door" allegations are similarly unsuccessful. The Court assumes for present purposes that there was, in fact, a "steady stream" of Weatherford employees and executives with "close personal ties" to Ernst & Young.[131] Even so, the AC fails to allege why this gave Ernst & Young a motive to commit the alleged fraud. The Weatherford employees whose departure dates from Ernst & Young are given are alleged to have left the auditor in 1996 and 2000,[132] some seven years before the class period. In any event, the AC fails to allege why the fact that certain Weatherford employees once worked for Ernst & Young has any bearing on either party's motive or opportunity to commit the fraud alleged in this case. Simply listing common employees of both companies, without more, is not enough.[133]

Finally, the AC provides two paragraphs of allegations of prior wrongs it asserts Ernst & Young committed.[134] These prior sanctions and disciplinary measures—which occurred in circumstances entirely independent of the circumstances of this case—have no bearing on whether Ernst & Young had a motive to perpetuate fraud in this case.

---

[130]

*Friedman v. Ariz. World Nurseries*, 730 F. Supp. 521, 532 (S.D.N.Y. 1990), *aff'd* 927 F.2d 594 (2d Cir. 1991); *see Ganino v. Citizen Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("General allegations that the defendants acted in their economic self-interest are not enough.").

[131]

AC ¶ 220.

[132]

*See id.* ¶¶ 221, 222.

[133]

*See Vogel v. Sands Bros. & Co.*, 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001) (holding that alleging a "close relationship" without more did not allow the court to infer *scienter*).

[134]

*See* AC ¶¶ 227, 228.

### 2.     Circumstantial Evidence of Recklessness

Alternatively, AFME contends that it has alleged the requisite *scienter* through sufficient circumstantial evidence of conscious misbehavior or recklessness.

In conducting this inquiry, the Court is mindful of the "demanding" standard imposed by this Circuit to plead auditor *scienter* in a securities fraud case.[135]  In particular, for "recklessness on the part of a non-fiduciary accountant to satisfy securities fraud *scienter*, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care" and "approximat[ing] an actual intent to aid in the fraud being perpetrated by the audited company."[136]  Moreover, our Circuit has said that "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability."[137]

---

[135]

   *Lehman*, 799 F. Supp. 2d at 302 (internal quotation marks omitted).

[136]

   *Rothman*, 220 F.3d at 98 (internal quotation marks omitted); *accord South Cherry Street*, 573 F.3d at 110.  This said, auditor "'*scienter* can be established by a showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it.'"  *Rothman*, 220 F.3d at 98 (quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979)).  This is because, although the Circuit requires approximate "intent," the plaintiff need not allege that the auditor actually "wanted" the fraud to happen; rather, it is sufficient to consider "what could the defendant reasonably foresee as a potential result of his action."  *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. 2000) (internal quotation marks omitted).  Thus, because "E & Y is not an accounting dilettante" and "knows well that its opinions and certifications are afforded great weight . . . . it is sufficient for a plaintiff to allege and prove that a defendant could have foreseen the consequences of his action but forged ahead nonetheless."  *Id.*; *accord Gould v. Winstar Communications, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012).

[137]

   *Novak*, 216 F.3d at 309; *see Gould*, 692 F.3d at 159 (suggesting at summary judgment stage that "mere failure to uncover the accounting fraud" is insufficient).

Typically, auditor *scienter* in this Circuit turns on alleging that the auditor "repeatedly failed to scrutinize serious signs of fraud."[138]  Such allegations of "red flags," when coupled with allegations of accounting violations, may permit a complaint to survive a motion to dismiss.[139]  But "an unseen red flag cannot be heeded" and "flags are not red merely because the plaintiff calls them red."[140]  Rather, the red flags, taken collectively, must demonstrate "obvious signs of fraud, or that the danger of fraud was so obvious that [the defendant] must have been aware of it."[141]

Moreover, where, as here, statements by an auditor are couched as opinions, this Court has previously recognized that the bar is raised even higher to allege the requisite *scienter*. In particular, to allege that an opinion is false (and *a fortiori*, to allege that it is false with *scienter*), the complaint must "set forth facts sufficient to warrant a finding that the auditor did not actually hold the opinion it expressed or that it knew that it had no reasonable basis for holding it."[142]

The Court takes each category of alleged misstatements in turn.

---

[138]

    *Gould*, 692 F.3d at 160.

[139]

    *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 573 (S.D.N.Y. 2011).

[140]

    *Id.*

[141]

    *South Cherry Street*, 573 F.3d at 112; *see Tellabs*, 551 U.S. at 322–23 ("The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of *scienter*, not whether any individual allegation, scrutinized in isolation, meets that standard" (emphasis in original)).

[142]

    *Lehman*, 799 F. Supp. 2d at 303.

a.      *GAAP Compliance*

AFME relies on what it characterizes as nine red flags to support an inference of *scienter* regarding E & Y's opinions about Weatherford's GAAP compliance: (1) the sudden drop in Weatherford's tax rate in 2007, (2) the magnitude of the error as ultimately revealed in 2010, (3) the frequency and consistency of the tax entries, (4) the fact that Weatherford's apparent tax rate was much lower than that of its rivals and permitted Weatherford to beat earnings forecasts, (5) the fact that E & Y received fees for "non-U.S. tax compliance, planning and U.S./non-U.S. tax related consultation," (6) Weatherford's prior history of accounting improprieties, (7) the discrepancy between Weatherford's cash tax rate and reported tax rate, (8) E & Y's access to a spreadsheet containing intercompany reconciliations and (9) the discrepancy between E & Y's representations about internal controls and Weatherford's March 2011 admissions.[143]  The Court is not persuaded that these allegations are sufficient to satisfy the demanding standard for pleading *scienter* as against an auditor.

First, several of these were not red flags at all.   That E & Y received fees from Weatherford for U.S. "tax related consultation" says substantially nothing about what E & Y would have known from 2007–2010 about this particular aspect of Weatherford's taxes beyond its general role as auditor.  Nor is Weatherford's March 2011 revelation of its poor internal controls a red flag that would have been seen by E & Y in 2007–2010.

Second, at least one of these purported red flags is insufficiently connected to E & Y.  The AC fails to allege that E & Y knew about Weatherford's competitors' tax rates or that the tax rates were responsible for beating earnings forecasts.

---

[143]      AC ¶ 213.

Third, some of these red flags just are not sufficiently colorful.  As discussed previously, the AC fails to explain with particularity whether and how the spreadsheet providing "intercompany reconciliations" would have revealed the understatement of tax expense.[144]  Nor does Weatherford's general history of one-time accounting charges provide any meaningful grounds to contend that E & Y was reckless for failing to uncover this particular misstatement.

Finally, to the extent that the supposed red flag merely constituted better performance by Weatherford, the Circuit has rejected the notion that a rapid increase in profitability is a sign of fraud sufficient to plead *scienter*.[145]

The remaining purported red flags amount not so much to any meaningful contemporaneous knowledge that E & Y had showing the existence of any misstatements, but rather that the size and nature of the fraud was such that E & Y should have found it.  That is, the AC is "replete with allegations that [E & Y] would have learned the truth as to those aspects of [Weatherford's taxes] if [E & Y] had performed the due diligence it promised."[146]  This is not enough.

---

144
> The AC contains also many more general statements about E & Y's "access" due to its longstanding role as an auditor of Weatherford since 2001, non-audit work, frequent conversations with management, etc.  *See* AC ¶ 209.  "None of these allegations shows anything more than that [E & Y] was [Weatherford's] auditor, a fact which is wholly insufficient to show [E & Y's] *scienter*."  *In re Doral Fin Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008).

145
> *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269–70 (2d Cir.1996)

146
> *South Cherry Street*, 573 F.3d at 112 (internal quotation marks omitted).  Moreover, E & Y's opinion letter makes clear that its audit operates on a "test basis" and therefore did not analyze every single transaction.  DI 68, Ex. 7 at 40.  Thus, AFME's allegation that E & Y failed to uncover the error is insufficient to allege that the audit was improperly conducted.

b.      *Internal Controls*

The allegations regarding internal controls fare no better.  The only purported red flag that AFME alleges regarding internal controls is the tension between E & Y's opinion that the internal controls were effective and Weatherford's subsequent conclusion that they were not.  But that is not a red flag because Weatherford's conclusion was made known only after E & Y's representations.  Unlike in the case of Becnel, the AC contains no allegations suggesting that E & Y ever had been made aware of issues with internal tax controls.

AFME's stronger argument is that, in light of the considerable deficiencies in internal controls revealed by the Company, any reasonable audit following the criteria that E & Y affirmed that it had used would have revealed the deficiencies.  But the AC's allegations in this regard are only conclusory, providing no factual detail as to how application of the criteria would necessarily have uncovered the problems with internal controls.[147]  The Court thus concludes that the more compelling inference is that the audit was no more than negligent, if indeed it was that, in failing to identify the problems.[148]

---

[147]      *See* AC ¶ 216 ("The COSO criteria provide a detailed roadmap for auditors, including the identification of red flags, appropriate policies and procedures and comprehensive audit planning and review of internal controls necessary for reliable financial reporting. Accordingly, if Ernst & Young conducted the audit it claimed it had pursuant to COSO, it had actual knowledge that the Company had virtually no internal controls over financial reporting for taxes, as Weatherford admitted in the Restatement.  If Ernst & Young did not conduct a COSO audit, as it represented to investors that it had during the Class Period, its certifications were knowingly false.")

[148]      The Court further recognizes that the Circuit has said that "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." *Novak*, 216 F.3d at 309 (citing *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir. 1982)).  Plaintiff contends that the principle is inapposite since the passage of the Sarbanes-Oxley Act which mandates specific reviews and certifications regarding internal controls. The Court need not rely on the broad principle enunciated by *Novak* and *Decker* to conclude

### c.   GAAS Compliance

Finally, E & Y's statements regarding its compliance with GAAS is disposed easily. Whether in alleging that E & Y violated its duties of "due professional care," "professional skepticism," or gathering sufficient evidential matter, or otherwise, the claims fall for essentially the same reasons as described above.   Indeed, the burden is doubly high in this context; not only must AFME allege that E & Y failed to do an adequate audit, but it must allege also that E & Y was at least reckless in believing that its audit was adequate.   There is nothing in the AC that even begins to suggest anything about E & Y's state of mind with regard to how it conducted the audit, and thus the claim fails.

### C.   Section 20(a)

Section 20(a) of the Exchange Act makes liable those who directly or indirectly control a person who is liable for a primary violation of the statute.[149]  As this Court previously has held, a plaintiff need not plead culpable participation by the control person in order to state a legally sufficient claim.[150]  Nor need the allegations of control be pleaded with particularity.[151]

The Court concludes that in addition to stating a claim against Becnel and

---

that plaintiff has failed to allege any reckless conduct here.

[149]

*See* 15 U.S.C. § 78t(a).

[150]

*See In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007); *BISYS*, 397 F. Supp. 2d at 450.

[151]

*Id.*

Weatherford as primary violators, the AC states a claim against Duroc-Danner, Abarca, and Geer under Section 20(a).  As chief executive officer, Duroc-Danner clearly had "the power to direct or cause the direction of the management and policies" of Weatherford.[152]  The same is true for Abarca and Geer, who were Weatherford's chief accounting officer and principal accounting officer, respectively, and signed some of the statements at issue.[153]

> ### D.    Motion to Supplement

AFME moves to supplement the complaint to add factual content that purportedly came to light only after the filing of the amended complaint.

A motion to supplement a complaint pursuant to Rule 15(d) is governed by the same standard as a motion to amend under Rule 15(a).[154]  It differs only in that it refers to a request to add allegations about an event or events that occurred after the original pleading was filed, as compared to a motion to amend, which covers events that occurred before the filing of the pleading but which were not included in the complaint.[155]

A motion to supplement generally should be "permitted when the supplemental facts

---

[152]    S.E.C. v. First Jersey Sec. Inc., 101 F.3d 1450, 1472–73 (2d Cir. 1996) (internal quotation marks omitted).

[153]    See AC ¶¶ 46–47.

[154]    See Quaratino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir. 1995); Instinet Inc. v. Ariel (UK) Ltd., No. 08 Civ. 7141, 2011 WL 4444086, at *2 n.1 (S.D.N.Y. Sept. 26, 2011).

[155]    See FED. R. CIV. P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.").

connect it to the original pleading."[156]  Such a motion should not be granted, however, where it would cause "undue delay, . . . undue prejudice to the party to be served with the proposed pleading, or [would be] futil[e]."[157]

At a hearing before this Court on January 17, 2012, counsel for lead plaintiff AFME indicated that they preferred to "go forward"[158] with the amended complaint as drafted, and declined the opportunity offered by this Court to amend their complaint.  Lead Plaintiff has twice attempted to add to the allegations of the AC since this date, first requesting to amend and then filing a motion to supplement it, both in spite of the fact that they are seeking to alter the very complaint on which they unequivocally elected to stand.[159]

Be that as it may, AFME asserts that its present motion to supplement the AC should be granted because events have occurred after the date the AC was filed that add substantively to the allegations asserted therein.[160]  AFME seeks to supplement with allegations regarding (1) the "remov[al]" of Becnel, as well as the Company's vice president of tax, (2) a U.S. Department of Justice investigation that was announced on March 15, 2012, and which the motion asserts is looking "into the facts alleged in the [AC]," and (3) a second financial restatement issued by the

---

[156]

 *Quaratino*, 71 F.3d at 66.

[157]

 *Id.*

[158]

 DI 83, at 2.

[159]

 *See* DI 86; DI 89.

[160]

 As certain of the defendants note, it appears that plaintiff's supplemental amended complaint contains also changes that are not simply alterations reflecting events that "happened after" the AC was filed.  *See* DI 94, at 6 n.2.

Company in 2012, which "admitted tax misstatements . . . [of] another $185 million."[161]  In addition, AFME asks the Court to take judicial notice of related materials.

        The motion is denied as futile.  None of the proposed additions in any way affects the resolution of this case.  First, that Becnel and another executive were removed well over a year after a restatement in which the Company was forced to acknowledge, at a minimum, a $500 million mistake, is not probative of *scienter*.[162]  Second, while the existence of government investigations may sometimes be probative of *scienter* with regard to post-investigation conduct, there is no basis to conclude that a DOJ investigation initiated over a year after the events in question is probative of anything.[163]  Finally, the 2012 restatement appears to have increased the size of the losses, but changes nothing of substance with regard to the claims in this case.

## Conclusion

        Accordingly, Ernst & Young's motion to dismiss the AC [DI 63] is granted.  The Weatherford Defendants' motion to dismiss the AC [DI 67] is granted in all respects, except that it is denied with respect to (1) the Section 10(b) claims against Becnel and Weatherford regarding statements about the quality of internal controls and (2) corresponding Section 20(a) claims against

---

[161]
      DI 90, at 4, 8.

[162]
      *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (finding that officer resignations did not support inference of scienter absent "highly unusual or suspicious circumstances").  It would hardly be unusual or suspicious that two executives would be removed as a result of this significant restatement, even assuming it was an honest mistake.

[163]
      *See Teamsters Allied Benefit Funds v. McGraw*, No. 09 Civ 140, 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010) (noting that government investigations only allege scienter for misconduct occurring after the investigation).

43

Duroc-Danner, Abarca, and Geer.  AFME's motion for leave to supplement the complaint [DI 90]

is denied, and its requests for judicial notice [DI 90; DI 101] are denied as moot.

SO ORDERED.

Dated:          November 7, 2012

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)