IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE WEATHERFORD INTERNATIONAL SECURITIES LITIGATION | 11-CV-1646 (LAK) (JCF) <br><br> CLASS ACTION |

REPLY OF JEFF BROWN TO PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF MOTION FOR FINAL APPROVAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 7.29.2014

## TABLE OF CONTENTS

I. ARGUMENT .................................................................................................. 1

    A. Plaintiffs overstate the complexity of the work done and downplay the contribution made by the SEC, the DOJ and other third parties in developing their case .................................. 1

        1. *Information obtained regarding investigations by government attorneys* .................................................................. 1
        2. *Reliance on Wall Street Analysts. Brown should have also mentioned how much Class Counsel's attorneys relied on the work of stock analysts in developing the case* ........................... 3
        3. *Mass media, including television and magazines, also provided information for Class Counsel* .................................. 5
        4. *The Contributions of Confidential Witnesses* ............................ 6

    B. Plaintiffs acknowledge Staff Attorneys did the bulk of the legal work and have not provided information on how much Staff Attorneys are paid .................................................................. 7

    C. Requiring discovery of objectors as to unrelated litigation is improper .......................................................................................... 9

II. CONCLUSION ............................................................................................ 10

# TABLE OF AUTHORITIES

## CASES

*Boynton v. Headwaters, Inc.*
2009 WL 3103161, No. 1-02-111-JPM-egb, at *1 (W.D. Tenn. Jan. 30, 2009) ............... 10

*Cox v. American Cast Iron Pipe Co.*
784 F.2d 1546, 1556-56 (11th Cir. 1986) ............................................................... 10

*Pallister v. Blue Cross and Blue Shield of Montana*
285 P.3d 562, 568 (Mont. 2012) ............................................................................ 10

## STATUTES AND OTHER AUTHORITY

Federal Rules of Civil Procedure Rule 23(e)(5) ................................................. 9

American Bar Association Opinion 07-446 ....................................................... 11

## I.   ARGUMENT

### A. Plaintiffs overstate the complexity of the work done and downplay the contribution made by the SEC, the DOJ and other third parties in developing their case.

"These assertions are meritless" complain Plaintiffs, in response to our argument that Class Counsel overstates the complexity of the legal work and minimizes the role work done by the SEC and the DOJ played in developing the case. In response to these arguments Class Counsel makes three points: (1) the accounting and restatement claims were "especially complex", (2) the mere fact that a restatement occurred was no guarantee Plaintiffs would succeed in proving (or even pleading) scienter—i.e. that the accounting corrections resulted from fraudulent intent, and (3) the suggestion that Lead Counsel "relied heavily on work done by government attorneys" is unfounded. See section (A)(4) infra for our response to the first point. As to the second point, plaintiffs did not succeed in proving or pleading scienter, as the only remaining claims relate to internal control misstatements. Reply, page 8, citing Dkt. 254 at ¶29.

Regarding their reliance on the work of government attorneys, consider the factual record in the amended complaint – the only real factual information available to class members. It is relevant to rely on the summary in the Amended Complaint, because the litigation has not progressed beyond the pleading stage. Although apparently a revised amended complaint was being developed when the case settled, this revised complaint has not been provided for class member review. The facts alleged indicate the bulk of the substantive allegations are derived from a variety of third parties; class counsel's confidential witnesses provided little substantive information. Information provided by third parties is considered below.

### 1. *Information obtained regarding investigations by government attorneys.*

Class Counsel suggest the only thing the SEC did was send one letter to Defendant. See Reply, page 9.

> "Moreover, *the mere fact that the SEC wrote Weatherford a letter* asking about the restatement in March 2011—and failed to take action in the three years since—did not provide any meaningful advantage for Plaintiffs in alleging or proving fraud claims."

1

However the Amended Complaint indicates that Class Counsel relied much more heavily on work by government attorneys than they let on. The relevant paragraph refers to the Company's revelation that the Bureau of Industry & Security and the U.S. Department of Justice ("DOJ") were investigating allegations of improper sales of products and services by the Company in countries sanctioned by the United States. As noted in the Complaint:

> This investigation led the Company "to direct [its] foreign subsidiaries to discontinue doing business in countries that are subject to U.S. comprehensive economic and trade sanctions, specifically Cuba, Iran, and Sudan as well as Syria." On May 28, 2010, however, almost three years after Defendants represented that Weatherford would withdraw from operating in these countries, the SEC was compelled to send Becnel a letter noting its concern that Weatherford had yet to complete its "withdrawal process" from the same countries Defendants told investors they had divested from three years earlier. The SEC also requested "information regarding [Weatherford's] past, current, and anticipated contacts with Cuba, Iran, Sudan, and Syria…for the last three fiscal years and the subsequent period." This investigation is ongoing."

Complaint, Pages 10-11, paragraph 20. Summaries of additional work done by the SEC includes:

> Para. 21. During the Class Period, the Company also disclosed that the SEC and the DOJ were investigating the Company's involvement in the United Nations' Iraq oil-for-food program, and the Company's 2007 Annual Report (filed February 21, 2008), revealed a DOJ investigation into "the embezzlement of approximately $175,000 at a European subsidiary and the possible improper use of these funds, including possible payments to government officials in Europe in violation of the Foreign Corrupt Practices Act ["FCPA"]." The Company itself has recently admitted that it had "uncovered potential violations of U.S. law in connection with activities in West Africa," which the Company and Insider Defendants earlier trumpeted as a significant source of increasing growth. These "activities" included bribing foreign officials to unfairly and unlawfully gain market share over its competitors in various countries. These investigations, too, are ongoing.
>
> Para. 22. Weatherford's shoddy regulatory compliance record and conscious disregard for the law did not, however, dissuade the Insider Defendants from personally showering themselves with unjustified riches during the Class Period.

2

On June 26, 2008, *the SEC sent Duroc-Danner a letter regarding the Company's February 21, 2008 Form 10-K and April 28, 2008 Proxy Statement on Schedule 14-A*, seeking confirmation that "in your 2008 executive compensation disclosure, you will provide a discussion and analysis of how you determined the amounts of the discretionary cash awards given to your executive officers as 'incentives for each executive officers' continuing and future service and performance even though you failed to meet your performance targets." In other words, the SEC wanted to know why Duroc-Danner had inexplicably received a $3 million bonus in 2008 (which put him above the 75th percentile in his peer group), even though the bonus appeared inconsistent with the Company's own stated compensation policies.

More detailed information regarding some of the SEC and DOJ investigations is found in the body of the Complaint (See, e.g., pages 62-63).

> **2. Reliance on Wall Street Analysts. Brown should have also mentioned how much Class Counsel's attorneys relied on the work of stock analysts in developing the case.**

The Complaint refers to SEC letters and the company's responses to those letters. The Complaint also refers throughout to information obtained from conference calls with analysts and stock analyst reports. Here are just a few examples of the Complaint's heavy reliance on the work of Wall Street analysts:

> Complaint, Para. 6. As a **Morgan Stanley analyst noted** after the Class Period, the average tax rate for two of the Company's U.S.-based competitors (i.e., Halliburton and Baker Hughes Inc.) was substantially higher (i.e., 31%-32%) during the four-year period covered by Weatherford's Restatement. For example, during an April 25, 2007 **analyst conference call** for Weatherford's (false) 1Q07 reported financial results, **Jim Crandell of Lehman Brothers Holdings Inc. ("Lehman Brothers") asked** Becnel (CFO) about the Company's surprisingly low tax rate for that quarter: "what surprised me was the lower tax rate of 24%, and the expectation it will continue. Can you talk to that a minute?"2 Without hesitation, Becnel (CFO) bluntly represented that "[y]es, that was good work from our tax group in terms of planning."
>
> Para. 10. . . .During the Company's March 2, 2011, "material weakness" conference call with analysts, Becnel was forced to admit that "[t]his mistake, the embarrassment of which is difficult, if not impossible to quantify, highlight that

3

we have work to do on strengthening the process piece." On the same call, Becnel also let it slip that the Company had not only "incorrectly" accounted for taxes, but had done so "improperly." Becnel's mea culpa, however, failed to assuage a by-then justifiably jittery market which abandoned Weatherford in droves with a massive sell-off of the Company's securities. Analysts also explicitly questioned Defendants' credibility. For instance, immediately following Becnel's mea culpa, **Simmons & Company International analyst Bill Herbert noted that the disclosure repeated problems with the Company's financial reporting**, stating "it opens an old wound attendant to the reliability and quality of earnings." Similarly, on March 2, 2011, **J.P. Morgan issued a report entitled, Weatherford International: New Set of Problems as Taxes Restated – ALERT, warning that "there have always been questions regarding the integration of [the Company's acquisitions and capital spending]," and that "[t]oday's announcement serves to amplify those concerns."** Page 25-26,

Para. 29. For instance, on March 3, 2011, Standard & Poor's Financial Services LLC ("Standard & Poor") noted that: The errors indicate that the company had historically underreported aggregate income tax expenses by roughly 40% and inflated aggregate net income by more than 20% over the four year-period. In addition, the $500 million error represents a loss of future anticipated cash flows....We also note that over the past several years, the company has consistently reported a number of one-time charges, leading us to an increased level of concern related to the company's accounting and financial reporting. Page 16,

Para. 30. The same day **an FBR Capital Markets analyst report** bluntly called the Restatement a "blow to management's credibility," and **the Houston Chronicle confirmed** that "[t]he largest error was a 2007 accounting decision that erroneously booked certain items as tax receivables Weatherford expected from some of the countries where it operates....The company said its tax rate likely will increase to as much as 30 percent from the 20 percent projected previously."6 On March 4, 2011, **The Street's Eric Rosenbaum added** even more color to Defendants' disclosures: The real kicker here for analysts and investors frustrated by the Weatherford announcement is that it comes four years after Weatherford International relocated to its headquarters to Switzerland in an effort to create a more efficient multinational tax structure. Weatherford not only revealed that its lack of internal controls missed a big accounting error in 2007, but that the company let the error linger for four years. It's not just that the accounting flap will require four years worth of financial restatements, either, but that it will result in a higher tax rate, potentially higher than Weatherford's tax rate had been when it decided to reincorporate in Switzerland.

Para. 31. Mr. Rosenbaum's article also quoted an unnamed stock analyst who had decided to stop covering Weatherford altogether as follows: [T]o me it often felt

4

> like management was trying to twist things. I'm not a big fan of one-off charges and management did that a lot and seemed aggressive in accounting. I felt that if I had done some more scrubbing of financials I would have found things....In a sector where fundamentals are good, the fundamentals are good for everyone and I've learned to stay away from companies that are always trying explain away earnings misses with financial items.

The complaint's quarter-by-quarter analysis of securities law violations (Page 32, Para. 71 et seq.) appears to be largely developed from review of analyst reports and the company's conference calls with analysts. Without minimizing the skill required to synthesize this information, the bulk of the serious analytical work on Weatherford's financial results was done by third parties. An understanding of the actual work performed is important in evaluating the attorneys' fees.

### 3. *Mass media, including television and magazines, also provided information for Class Counsel*

References to publicly available news reports are also frequent. Class Counsel cite to financial news sources in the discussion of Weatherford's financial results (see, e.g., Para. 30, quoted supra). More mainstream news sources also provided information for Class Counsel. CBS News 60 Minutes program provided the following information:

> The March 27, 2011 CBS News 60 Minutes segment called A Look at the World's New Corporate Tax Havens (with Lesley Stahl reporting) revealed that, while Weatherford had earlier advised investors and others that the Company had, in fact, relocated to Switzerland, the Company's presence in Zug, Switzerland consisted of little more than a nondescript mail drop.

Fortune Magazine also provided some information to Class Counsel.

> Para. 147 – 149. [A] July 2007 Fortune Magazine news report disclosed Weatherford's Sudanese subsidiary . . .148. While the genocide in Darfur raged – Becnel reportedly told Fortune that he believed the U.S. sanctions law meant that "no U.S. people and no U.S. goods can have any dealings with Sudan." Nevertheless, the Fortune Magazine investigation found that the Company's Sudanese subsidiary used Weatherford's own red logo, and posted photographs of the Company's Houston-based executives on its office walls. . . . In response to

5

heavy media and investor criticism, on September 10, 2007, the Company finally announced that it would divest itself from any operations in countries sanctioned by the United States, which included its operations in Sudan, Iran and Syria.

Plaintiffs downplay the contributions made by government attorneys, analysts, and even newscasts in developing their case. A look at the new information uncovered because of their investigations casts further doubt on their assertions regarding the quality and complexity of their legal work.

### 4. *The Contributions of Confidential Witnesses.*

In contrast to the detailed analysis provided by the Wall Street analysts quoted above, information provided by confidential witnesses seems largely anecdotal. The Complaint refers to three confidential witnesses. Information summarizing the role these witnesses played at Weatherford, and the information these witnesses provided Class Counsel is found in paragraphs 54-60 of the Complaint, on pages 25 – 28.

Confidential Witness 1 was a senior financial executive at Weatherford during part of the Class Period; his allegations appeared to center on management style and turnover based on employees being fired at a whim. Little technical information appears to have been provided by this witness. CW2 was a senior level audit executive. This witness provided information that Weatherford's taxes were "always an area of concern," and the Tax Department was a "constant" issue. This witness pointed out that tax reports were frequently late and turned up multiple control deficiencies, and pointed out that one significant deficiency occurred in 2009.

The Information provided by CW1 is mentioned on page 13, paragraph 28 ("According to CW1, Becnel was "aware at all times" that he was "playing with the [tax] rules," and Becnel used the complexity of intercompany transactions to "push the boundaries" of tax accounting. According to CW1, Becnel used Weatherford's offshore tax structure to justify "playing" with the Company's taxes, which CW1 described as a "time bomb that could blow up at anytime.") , and page 68, paragraph 164 ("According to CW1, the assets were "not worth a fraction" of the indicated value."). Both of these comments were repeated in the section summarizing the

information provided by this witness in paragraphs 54 – 56.

The contributions of CW2 are summarized:

> Complaint, Para. 59 "CW2 stated that one of the reasons he/she ultimately left Weatherford in 2010 was because he/she became increasingly concerned that the Tax Department issues were not being addressed. CW2 stated that he/she was not surprised to learn of Weatherford's Restatement after he/she left the Company."

The contributions of CW3 are summarized in the next paragraph:

> Complaint, Para. 60. CW3 was a Weatherford Treasury Analyst from 2005 until August 2008. CW3's duties included reporting cash amounts from intercompany transactions from Company subsidiaries that were deposited into one main intercompany bank account. CW3 prepared monthly spreadsheets detailing subsidiary deposits that were sent via e-mail to the Company's Accounting Department. According to CW3, Weatherford corporate "centralized everything," including reconciliations of all intercompany transactions. CW3 stated that Weatherford created a monthly master spreadsheet called "the M5 form" that detailed all intercompany receivables and payables. The existence of these spreadsheets confirms that Defendants, including Ernst & Young, had access to, but recklessly disregarded, the Company's fictitious intercompany transactions.

The information provided by the confidential witnesses appears to be anecdotal and reveals little complex or technical information. Review of the Amended Complaint suggests that attorneys associated with Class Counsel, whether associates, partners, or staff attorneys uncovered little information not already publicly disclosed, either by the Company itself or other information sources.

### B. Plaintiffs acknowledge Staff Attorneys did the bulk of the legal work and have not provided information on how much Staff Attorneys are paid

Class counsel assert that the accounting and restatement claims were "especially complex" (Reply, page 8), while acknowledging a large part of the work was done by staff attorneys.[1] Claiming we had trivialized the work of these staff attorneys, Class Counsel asserts

---

[1] Objector acknowledges mistakenly referring to contract attorneys in the header to this section, although the more detailed analysis of the lodestar reports provided by counsel, refers to "staff" attorneys rather than "contract" attorneys. Heading B3 should read "The bulk of the legal work was done by low paid

7

these attorneys were integral members of the team and contributed substantially to the positive outcome of the litigation. This may be true. Regardless of the quality of their work, the fees claimed for these attorneys should be looked at with skepticism.[2] As noted in our objection, total billing for staff attorneys amounts to $5,224,164.25, or 41% of Lead Counsel's lodestar. The hourly rate billed for these attorneys is between $375 and $395 per hour; staff attorneys hours billed (13,480.35) account for 52.8 % of Kessler Topaz' total hours spent on the litigation.

We respectfully have argued that Class Counsel should not claim such a high lodestar for the work done by the staff attorneys. The hourly rate should bear some relationship to the compensation these attorneys receive. Class Counsel boast these staff attorneys receive salaries and benefits – but they have not provided information on their salaries. Staff attorneys are second class citizens in law firms, who typically receive salaries less than half that paid to associate attorneys (and a tiny fraction of the compensation received by partners at large class action litigation firms). The hourly rate paid to these staff attorneys may be even less than that paid to contract attorneys, as some premium is usually paid to contract attorneys to make up for the lack of benefits and unemployment insurance.

Assuming Kessler Topaz pays its staff attorneys salaries of $60,000 per year – a generous assumption based on a cursory survey of publicly available salary information for comparable firms – the hourly compensation for those attorneys is only $28.85 per hour (based on a 52 week year and 40 hour work week). If these attorneys are exempt attorneys not paid for overtime work, the hourly rate may be much lower. Even assuming these staff attorneys are paid $90,000 per year, the lodestar claimed for them is probably over ten times the amount they are paid for their work.

---

STAFF attorneys" rather than contract attorneys. Despite this error, this objectors' point – that most of the hours were done by lower paid attorneys – is correct.

[2] Class Counsel seek to trivialize our argument by pointing out that in another case Brown noted that less than 10% of the work was done by staff attorneys. The facts in that case were different; Brown's analysis of other litigation is not relevant here. The facts and work involved in every case are different, and will reflect the stage of the proceedings, as well as a variety of other factors. The fact that partners did 90% of the work in one case, while less than 16% in another case – are both worthy of note, and Brown is and was correct in bringing both circumstances to the court's attention.

8

The objection argues that the lodestar cross check should be based on reasonable attorney rates – and it is not reasonable to include a ten-fold markup in the lodestar information presented to the court. In evaluating lodestar amounts the actual value of these legal services should be submitted – a rough proxy for their value is what these attorneys get paid.

We also stand by our objection that Plaintiffs' assertions regarding the complexity and difficulty of their legal work is undermined because so much of the work was done by staff attorneys. If these attorneys truly possessed high level accounting and tax expertise, enabling them to do the sort of sophisticated work Class Counsel boast of, they would probably not *en masse* be working as lowly staff attorneys.

Although Class Counsel may have done more work than suggested by the Amended Complaint, the Complaint provides the only tool available to class members to analyze their investigative work. The analysis above indicates that much of the legal work involved reviewing, summarizing and synthesizing analyst calls, analyst reports, SEC and DOJ correspondence and news reports. The quality of this work may have been high, but the rates charged seem inflated. The court should carefully review class counsel's lodestar and related attorney fee request.

### C. Requiring discovery of objectors as to unrelated litigation is improper

Brown did not provide the information requested in the Class Notice regarding prior objections filed in the last five years. This information is not relevant to the issues raised in Brown's objection, and requesting this information interferes with Brown's right to object. Rule 23(e)(5) of the Federal Rules of Civil Procedure governs settlement procedures in class action litigation. That rule provides that "Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval." Brown is a class member, that is all he must show to object to the settlement. The court erred in approving objection requirements that interfere with the right to object.

Objectors play a vital role in the review of class action settlements. "Objectors can encourage scrutiny of a proposed settlement and identify areas that need improvement. They can

9

provide important information regarding the fairness, adequacy, and reasonableness of the settlement terms." *Pallister v. Blue Cross and Blue Shield of Montana*, 285 P.3d 562, 568 (Mont. 2012).

The court should be mindful that discovery of absent class members contravenes Rule 23's purposes and should only rarely be permitted. *See, e.g., Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1556-56 (11th Cir. 1986). "Courts have allowed discovery to be taken from unnamed class members . . . when the information requested is relevant to the decision of common questions, the discovery is tendered in good faith and not unduly burdensome or harassing, the discovery does not require expert, technical or legal assistance to respond, and is not available from the representative parties." *Boynton v. Headwaters, Inc.*, 2009 WL 3103161, No. 1-02-111-JPM-egb, at *1 (W.D. Tenn. Jan. 30, 2009).

## II. CONCLUSION

Class Counsel seek to trivialize Brown's objection as "substantively meritless", with "boiler-plate objections", saying this "assembly-line objection adds nothing." The objection was based on a detailed analysis of the record, including the complaint, motion for final approval and attorneys' fees memorandum. The suggestion our objection was "boiler plate" is directly contradicted by the assertion that arguments in this objection contradict arguments in another objection. The arguments referred to are factual arguments; facts differ from case to case.

///

///

///

The court's must look carefully at *cy pres* provisions to ensure they are designed to benefit the class rather than being a vehicle for the attorneys to inflate their fees is a constant in class action litigation. The need to scrutinize the attorney fee awards, which requires analysis of the type of work done and the fees claimed for that work, is also constant.[3]

Dated:  July 17, 2014          By: _____
                                    Jeff M. Brown
                                    750 S. Dixie Highway
                                    Boca Raton, FL 33432
                                    Phone: (561) 395-5000
                                    Email: efiling@lavallebrown.com

Copies to:

**Clerk of the Court** (Original)
Clerk of the Court
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
500 Pearl Street
New York, NY 10007

**Lead Counsel** (Copy)
Eli R. Greenstein, Esq.
KESSLER TOPAZ MELTZER & CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104

**Defendants' Counsel** (Copy)
Peter A. Wald, Esq.
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

---

[3] I have sought and obtained assistance from an attorney in preparing this reply. See ABA Opinion 07-446. I do not seek any advantage by submitting this reply myself.

11