# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE WEATHERFORD INTERNATIONAL SECURITIES LITIGATION | 11-CV-1646 (LAK) (JCF) <br><br> <u>CLASS ACTION</u> |

## NOTICE REGARDING NEW AUTHORITY AND SUPPLEMENT TO OBJECTION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 10/10/14



OCT 10 2014
PRO SE OFFICE

Objector Jeff Brown respectfully submits notice of two recent decisions relevant to the fairness of the proposed settlement. *Redman v. Radio Shack Corp*., No. 14-1470, 2014 WL 4654477 (7th Cir. Sept. 19, 2014), a decision issued recently in the United States Court of Appeals Seventh Circuit, is attached as Exhibit A; and *Rose v. Bank of America*, No. 11-cv-02390 (N.D. Cal. Aug. 29, 2014) (Doc. 108, Final Approval Order) is attached as Exhibit B.

Brown argued the attorneys' fees should be based on the monetary compensation achieved for the class as required by the PSLRA. Redman is not a PSLRA case, but the court held that attorneys' fees should not be a percentage of settlement and administration expenses. Justice Posner explained:

> "Unfortunately the magistrate judge in approving the settlement in RadioShack failed to analyze the issues properly. Let's begin with the value of the award to the class members. The judge accepted the settlors' contention that the defendant's entire expenditures should be aggregated in determining the size of the settlement."

*Redman*, at *5. Based on this flawed approach, the percentage fee request in *Redman* seemed reasonable. Posner noted "it was this aggregation that reduced the award of attorneys' fees to class counsel to a respectable-seeming 25 percent." The Seventh Circuit held that the entirety of administration costs should not be included to determine class counsel's percentage fee request:

> But the roughly $2.2 million in administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.

*Id.* Justice Posner reasoned that including settlement administration and notice costs in the fee award calculation creates a "perverse incentive; for higher administrative expenses make class counsel's proposed fee appear smaller in relation to the total settlement than if those costs

1

were lower." *Id.* This eliminates any incentive class counsel might have to economize on expenses.

The second decision, *Rose v. Bank of America*, No. 11-cv-02390 (N.D. Cal. Aug. 29, 2014) underscores that contemporaneous billing records are crucial the a fairness review. In *Rose*, analysis of the information submitted to support the lodestar, led the court to reduce class counsel's fee award by approximately $5.5 million (from more than $8 million requested, to less than $2.5 million). The court determined class counsel's work was duplicative in two phases, mediation and settlement, and case investigation. The objection filed in the above captioned matter pointed out certain issues raised by the information class counsel submitted with their fee motion. Here the court should carefully review the submitted lodestar information and make an independent determination on the reasonableness of the request. The rate charged for contract attorney work is inflated and the lodestar should be adjusted accordingly.

Dated: October 10, 2014                    By: _____

Jeff M. Brown
750 S. Dixie Highway
Boca Raton, FL 33432
Phone: (561) 395-5000
Email: efiling@lavallebrown.com

I hereby certify that on October 10, 2015, I mailed copies of the above to each of the following via U.S. Mail, postage prepaid.

**Lead Counsel**
Eli R. Greenstein, Esq.
KESSLER TOPAZ MELTZER & CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104

**Defendants' Counsel**
Peter A. Wald, Esq.
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

2

EXHIBIT A

Redman v. RadioShack Corp., --- F.3d ---- (2014)

2014 WL 4654477
Only the Westlaw citation is currently
available.
United States Court of Appeals,
Seventh Circuit.

Scott D.H. REDMAN, individually and on
behalf of all others similarly situated, et al.,
Plaintiffs–Appellees,
v.
RADIOSHACK CORPORATION,
Defendant–Appellee.
Appeal of Michael Rosman, et al., Objectors.
Sulejman Nicaj, Plaintiff–Appellant,
v.
Shoe Carnival, Incorporated, Defendant–
Appellee.

Nos. 14–1470, 14–1471, 14–1658, 14–1320. |
Argued Sept. 8, 2014. | Decided Sept. 19, 2014.

**Synopsis**
**Background:** In first of two cases subsequently
consolidated for decision on appeal, customer
brought purported class action against consumer
electronics retailer, alleging that retailer, after
having been found to have left the expiration date on
customers' electronically printed receipts in
violation of a parallel state statute, 175 Ohio App.3d
257, 886 N.E.2d 286, failed to take adequate
precautions against repeating the violation, in
violation of the Fair and Accurate Credit
Transactions Act (FACTA). The United States
District Court for the Northern District of Illinois,
Maria G. Valdez, United States Magistrate Judge,
granted customer's motion for final approval of
settlement agreement, 2014 WL 497438, and class
members who objected to the "coupon settlement"
appealed. In second case, customers brought
purported class action against footwear retailer,
asserting that it violated FACTA by leaving on
customer receipts the month in which a debit or
credit card expired. The United States District Court
for the Northern District of Illinois, Thomas M.
Durkin, J., 2014 WL 184772, granted retailer's
motion for judgment on the pleadings and dismissed
the action with prejudice. Customers appealed.

**Holdings:** The Court of Appeals, Posner, Circuit
Judge, held that:

[1] approval of the settlement in the first case was not
warranted;

[2] consumer electronics retailer's knowledge of the
risk of error, coupled with its failure to take any
precaution against it, even though a completely
adequate protection would have cost nothing, were
indicative of a "willful" violation of FACTA; and

[3] FACTA contained sufficient ambiguity regarding
the expiration date to justify the district court's
determination that footwear retailer did not
"willfully" violate the statute.

Judgment in first case reversed and case remanded;
judgment in second case affirmed.

West Headnotes (22)

[1]   **Consumer Credit**
       ⟨⟩

       92BConsumer Credit

       Idea behind the Fair and Accurate Credit
       Transactions Act (FACTA) requiring
       deletion of the expiration date from an
       electronically printed credit or debit card
       receipt is that, should the cardholder
       happen to lose the receipt of a transaction,
       the less information the receipt contains
       the less likely is an identity thief who
       happens to come upon the receipt to be
       able to figure out the cardholder's full
       account information and thus be able to
       make purchases that the seller will think
       were made by the legitimate cardholder.
       Fair and Accurate Credit Transactions Act
       of 2003, § 113(g), 15 U.S.C.A. § 1681c(g).

       Cases that cite this headnote

[2]   **Consumer Credit**
       ⟨⟩

Redman v. RadioShack Corp., --- F.3d ---- (2014)

92BConsumer Credit

If a violation of the Fair and Accurate Credit Transactions Act (FACTA) is willful, a consumer whose receipt contains as a result of the violation data that should have been deleted, but who sustains no harm because no one stole his identity as a result of the violation, is nevertheless entitled to "statutory damages," as distinct from compensatory or punitive damages, of between $100 and $1,000. Fair Credit Reporting Act, § 616(a)(1)(A), 15 U.S.C.A. § 1681n(a)(1)(A).

Cases that cite this headnote

[3]    **Damages**
       ⟷

       115Damages

       Statutory damages are in effect bounties, that is, means of inducing private persons to enforce a regulatory law.

       Cases that cite this headnote

[4]    **Consumer Credit**
       ⟷

       92BConsumer Credit

       Consumer harmed by a violation of the Fair and Accurate Credit Transactions Act (FACTA) can obtain actual damages by showing that the violation was the result of negligence; he need not prove willfulness. Fair Credit Reporting Act, § 617, 15 U.S.C.A. § 1681o.

       Cases that cite this headnote

[5]    **Negligence**
       ⟷

       272Negligence

To act "willfully" is, for purposes of civil law, to engage in conduct that creates an unjustifiably high risk of harm that is either known or so obvious that it should be known, or, in other words, to engage in reckless conduct, but reckless conduct in the civil sense.

Cases that cite this headnote

[6]    **Criminal Law**
       ⟷

       110Criminal Law

       "Criminal recklessness" is generally held to require knowledge of a serious risk to another person, coupled with failure to avert the risk though it could easily have been averted; in contrast, in civil cases at common law, it is enough that the risk, besides being serious and eminently avoidable, is obvious, and it need not be known to the defendant.

       Cases that cite this headnote

[7]    **Compromise and Settlement**
       ⟷

       89Compromise and Settlement

       Although a trial judge's instinct, in this country's adversarial system of legal justice, is to approve a settlement, trusting the parties to have negotiated to a just result as an alternative to bearing the risks and costs of litigation, the law requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action.

       Cases that cite this headnote

[8]    **Compromise and Settlement**
       ⟷

Redman v. RadioShack Corp., --- F.3d ---- (2014)

89Compromise and Settlement

Given the potential conflict of interest between class counsel and class members, a judge asked to approve the settlement of a class action is not to assume the passive role that is appropriate when there is genuine adverseness between the parties.

Cases that cite this headnote

[9]    **Compromise and Settlement**
       ⊘⇌

       89Compromise and Settlement

       Judge asked to approve the settlement of a class action must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorney fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members.

       Cases that cite this headnote

[10]   **Compromise and Settlement**
       ⊘⇌

       89Compromise and Settlement

       Approval of class action settlement of customers' claims against retailer for allegedly including expiration dates of debit and credit cards on electronically printed receipts in violation of Fair and Accurate Credit Transactions Act (FACTA) was not warranted; although, after aggregation of retailer's entire expenditures, class counsel's fees of approximately $1 million appeared to be a respectable-seeming 25% of the settlement, roughly $2.2 million in administrative costs that were part of settlement but not part of value received by class members should not have been included in calculating division of spoils between class counsel and class members,

no attempt was made by magistrate judge or parties to estimate actual value of nominal $830,000 worth of coupons to be received by class members, and even assuming that 83,000 $10 six-month coupons were worth $830,000 to them, class counsel would be receiving equivalent of a 55% contingent fee for "an extremely modest harvest." Fair and Accurate Credit Transactions Act of 2003, § 113(g), 15 U.S.C.A. § 1681c(g).

Cases that cite this headnote

[11]   **Compromise and Settlement**
       ⊘⇌

       89Compromise and Settlement

       In determining whether to approve class action settlement, the ratio that is relevant to assessing the reasonableness of the attorney fees that the parties agreed to is the ratio of (1) the fee, to (2) the fee plus what the class members received.

       Cases that cite this headnote

[12]   **Compromise and Settlement**
       ⊘⇌

       89Compromise and Settlement

       For purposes of evaluating the reasonableness of attorney fees, in determining whether to approve a class action settlement, attorney fees do not ride an escalator called risk into the financial stratosphere.

       Cases that cite this headnote

[13]   **Compromise and Settlement**
       ⊘⇌

       89Compromise and Settlement

Redman v. RadioShack Corp., --- F.3d ---- (2014)

In determining the reasonableness of the attorney fees agreed to in a proposed class action settlement, the central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation.

Cases that cite this headnote

[14]     **Compromise and Settlement**
         ⟜

         89 Compromise and Settlement

         In determining what share of the class action settlement pot should go to class counsel, hours expended on the case cannot be given controlling weight; rather, the amount of the class settlement allocable to class counsel should depend critically on the value of class counsel's work to the class.

         Cases that cite this headnote

[15]     **Compromise and Settlement**
         ⟜

         89 Compromise and Settlement

         Term "coupon," as used in the section of the Class Action Fairness Act (CAFA) governing coupon settlements, is not defined narrowly as a discount off the full price of an item, but includes vouchers that can be used to buy an entire product. 28 U.S.C.A. § 1712.

         Cases that cite this headnote

[16]     **Compromise and Settlement**
         ⟜

         89 Compromise and Settlement

         "Clear-sailing clause" is a clause in a class

action settlement in which the defendant agrees not to contest class counsel's request for attorney fees.

Cases that cite this headnote

[17]     **Compromise and Settlement**
         ⟜

         89 Compromise and Settlement

         Although clear-sailing clauses, that is, clauses in class action settlements in which the defendant agrees not to contest class counsel's request for attorney fees, have not been held to be unlawful per se, in cases involving a non-cash settlement award to the class, such clauses should be subjected to intense critical scrutiny by the district court.

         Cases that cite this headnote

[18]     **Federal Civil Procedure**
         ⟜

         170A Federal Civil Procedure

         Class counsel's failure to file motion for attorney fees until after expiration of deadline set by the court for objections to proposed settlement violated the rule governing attorney fees and nontaxable costs in class actions. Fed.Rules Civ.Proc.Rule 23(h), 28 U.S.C.A.

         Cases that cite this headnote

[19]     **Federal Civil Procedure**
         ⟜

         170A Federal Civil Procedure

         Named plaintiffs are the representatives of the class, and fiduciaries of its members, and as such are charged with monitoring the lawyers who prosecute the case on

Redman v. RadioShack Corp., --- F.3d ---- (2014)

behalf of the class, that is, class counsel.
Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

Cases that cite this headnote

[20]     **Federal Civil Procedure**
         ☞

         170AFederal Civil Procedure

         In a class action, there ought to be a
         genuine arm's-length relationship between
         class counsel and the named plaintiffs,
         uninfluenced by family ties or friendships.
         Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

         Cases that cite this headnote

[21]     **Consumer Credit**
         ☞

         92BConsumer Credit

         Where retailer had been found in an earlier
         lawsuit to have left the expiration date on
         electronically printed debit or credit card
         receipts in violation of a parallel state
         statute, retailer's knowledge of the risk of
         error coupled with its failure to take any
         precautions against that risk, even though
         a completely adequate precaution would
         have cost it nothing, were indicative of a
         "willful" violation of the Fair and
         Accurate Credit Transactions Act
         (FACTA). Fair and Accurate Credit
         Transactions Act of 2003, § 113(g)(1), (2),
         15 U.S.C.A. § 1681c(g)(1), (2).

         Cases that cite this headnote

[22]     **Consumer Credit**
         ☞

         92BConsumer Credit

         Even if retailer violated the Fair and
         Accurate Credit Transactions Act

(FACTA) by leaving on electronically
printed customer receipts the month in
which a debit or credit card expired, and
omitting only the year of the expiration
date, FACTA contained sufficient
ambiguity regarding the expiration date to
justify district court's determination that
retailer did not "willfully" violate
FACTA; term "expiration date" is not
defined in the statute, term could mean the
month, day, if other than the last day of the
month, and year in which a card expires,
and though there would have been no
purpose in allowing a seller to leave
expiration month on receipt, and hence a
persuasive argument for interpreting
"expiration date" to mean "expiration date
or any part thereof," retailer's contrary
interpretation was plausible, as it was
arguable that if either the day, month, or
year were left out, there was no "expiration
date" on receipt, but just a fragment of
such a date. Fair and Accurate Credit
Transactions Act of 2003, § 113(g)(1), (2),
15 U.S.C.A. § 1681c(g)(1), (2).

Cases that cite this headnote

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 11 C 6741—Maria G. Valdez, Magistrate
Judge.
Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division. No.
13 C 7793—Thomas M. Durkin, Judge.

Before WOOD, Chief Judge, and POSNER and
HAMILTON, Circuit Judges.

**Opinion**

POSNER, Circuit Judge.

*1[1] We have consolidated for decision appeals in
two class actions filed under the Fair and Accurate
Credit Transactions Act ("FACTA"), 15 U.S.C. §
1681c(g). The Act provides, so far as relates to these
cases, that "no person that accepts credit cards or
debit cards for the transaction of business shall print
[electronically, as distinct from by handwriting or

by an imprint or copy of the card] more than the last 5 digits of the card number *or the expiration date* upon any receipt provided to the cardholder at the point of the sale or transaction." §§ 1681c(g)(1), (2) (emphasis added). The present cases concern the expiration date. The idea behind requiring its deletion is that, should the cardholder happen to lose the receipt of a transaction, the less information the receipt contains the less likely is an identity thief who happens to come upon the receipt to be able to figure out the cardholder's full account information and thus be able to make purchases that the seller will think were made by the legitimate cardholder.

A typical credit card has 16 digits and an expiration date that is the last day of a designated month and year. Even if the identity thief has all 16 digits, without the expiration date he may be unable to use the card. He can of course guess at the expiration date—the date is unlikely to be more than a few years in the future and there are only 12 months in a year; so if he guesses 60 times he's very likely to hit the jackpot. But if he guesses wrong the first few times that he places an order, the card issuer may well get suspicious and refuse to authorize his next order. See, e.g., D. Lee, "Nine Reasons Your Credit Card Was Declined," *Fox Business,* May 21, 2013, ww w.foxbusiness.com/personal-finance/2013/05/21/ nine-reasons-your-credit-card-was-declined/ (visited Sept. 12, 2014, as were the other websites cited in this opinion). It's common in telephone and internet transactions for the consumer to be asked for an expiration date, and most systems will not allow the would-be customer to keep guessing at the date, as the guessing suggests that he may be an identity thief.

Additional reasons for requiring deletion of the expiration date include that "expiration dates combined with the last four or five digits of an account number can be used to bolster the credibility of a criminal who is making pretext calls to a card holder in order to learn other personal confidential financial information. Expiration dates are solicited by criminals in many e-mail phishing scams ..., are one of the personal confidential financial information items trafficked in by criminals ..., are described by Visa as a special security feature ..., [and] are one of the items contained in the magnetic stripe of a credit card, so it is useful to a criminal when creating a phony duplicate card." Don Coker, "Credit Card Expiration Dates and FACTA," HGExperts.com, www.hgexperts.com/article.asp?id=6665.

[2][3][4] If a violation of the statute is willful, a consumer whose receipt contains as a result of the violation data that should have been deleted, but who sustains no harm because no one stole his identity as a result of the violation, is nevertheless entitled to "statutory damages," as distinct from compensatory or punitive damages, of between $100 and $1000. 15 U.S.C. § 1681n(a)(1)(A). (Statutory damages are in effect bounties—means of inducing private persons to enforce a regulatory law.) In contrast, a consumer harmed by the violation of the statute can obtain actual damages by showing that the violation was the result of negligence, § 1681*o*; he need not prove willfulness.

*2 [5][6] To act "willfully" is, for purposes of civil law, to engage in conduct that creates "an unjustifiably high risk of harm that is either known or so obvious that it should be known," *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)-reckless conduct, in other words, as held in *Safeco Ins. Co. of America v. Burr,* 551 U.S. 47, 56–60, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007), but reckless conduct in the civil sense. Criminal recklessness is generally held to require "knowledge of a serious risk to another person, coupled with failure to avert the risk though it could easily have been averted," *Slade v. Board of School Directors,* 702 F.3d 1027, 1029 (7th Cir.2012); see also *Black's Law Dictionary* 1298–99 (Bryan A. Garner ed., 8th ed.2004), "whereas in civil cases at common law it is enough that the risk, besides being serious and eminently avoidable, is obvious; it need not be known to the defendant." *Slade v. Board of School Directors, supra,* 702 F.3d at 1029.

The known or obvious risk in this case would be failing to delete the expiration date on the consumer's credit-card or debit-card purchase receipt, whereas to be guilty merely of negligence it would be enough that a reasonable person would have deleted it. See *Wassell v. Adams,* 865 F.2d 849, 855 (7th Cir.1989).

Willfulness is an issue in both our cases. But it is a peripheral issue in the RadioShack case, while it is the primary issue in our other case, the Shoe Carnival case. Although both are class action suits, the district court in *Shoe Carnival* dismissed the suit with prejudice before certifying a class; there are no issues in that case concerning class action procedure. (The defendant could have sought class certification in order to prevent future similar suits

Redman v. RadioShack Corp., --- F.3d ---- (2014)

by other class members, but did not.) *RadioShack,* in contrast, is centrally about class action procedure. The parties settled and the district court approved the settlement, and the appeal is by class members who objected to the approval. We begin with that case but defer discussion of the willfulness issue in it to later, when we take up the appeal in *Shoe Carnival.*

RadioShack Corporation is a large, well-known retail purveyor mainly of consumer electronics, cell phones, and related consumer products such as batteries, see "RadioShack," *Wikipedia,* http://en.wikipedia.org/wiki/RadioShack, sold mainly in RadioShack's thousands of stores rather than online. The class action suit was filed on behalf of consumers who bought products at RadioShack stores, paid with credit or debit cards, and received electronically printed receipts that contained the card's expiration date. The suit was filed in September 2011. In May 2013, before any substantive motions had been decided, the named plaintiffs (realistically, class counsel) agreed with RadioShack on terms of settlement. The essential term was that each class member who responded positively to the notice of the proposed settlement would receive a $10 coupon that it could use at any RadioShack store. The class member could use it to buy an item costing $10 or less (but he would receive no change if the item cost less than $10), or as part payment for an item costing more. He could stack up to three coupons (if he had them) and thus obtain a $30 item, or a $30 credit against a more expensive item. He could also sell his coupon or coupons, but the coupons had to be used within six months of receipt because they would expire at the end of that period.

\*3 With regard to three-coupon stacking, the only way a member of the class could obtain more than a single coupon would be to buy one or more coupons from another class member, because the settlement allows only one coupon per customer no matter how many of his or her RadioShack purchases involved the erroneous receipts (in itself an arbitrary restriction on the value of the settlement to class members). But coupons may be difficult to buy. The owner would be reluctant to sell it for less than $10, as that would mean selling at a loss, but no sane person would pay more because a $10 coupon is worth only $10. Doubtless some owners, however, will sell because they don't plan to use the coupon or have no interest in a product that doesn't cost less than $10. Those owners are potential sellers.

Nevertheless the secondary market in coupons is bound to be thin because of the paucity of coupons, the short expiration date, the limit to three per transaction (so people who want big-ticket items won't find the secondary market attractive as a source of coupons), and the bother of going online to buy $10 coupons at small discounts.

Although the class was assumed to contain 16 million members, notice of the proposed settlement was sent to fewer than 5 million. Actually no one can be sure whether the 16 million transactions involved 8 million different consumers, 12 million, or any other number, because of the one-coupon-per-person restriction. This may be a reason why the settlement administrator notified only about 5 million RadioShack consumers, though cost may have been the primary reason.

Of those potential class members who received notice of the proposed settlement, some 83,000 (we'll assume for simplicity that it was exactly 83,000)—a little more than one half of one percent of the entire class, assuming the entire class really did consist of 16 million different consumers—submitted claims for the coupon in response. The magistrate judge's statement that "the fact that the vast majority of class members—over 99.99%—have not objected to the proposed settlement or opted out suggests that the class generally approves of its terms and structure" is naïve, as is her basing confidence in the fairness of the settlement on its having been based on "arms-length negotiations by experienced counsel." The fact that the vast majority of the recipients of notice did not submit claims hardly shows "acceptance" of the proposed settlement: rather it shows oversight, indifference, rejection, or transaction costs. The bother of submitting a claim, receiving and safeguarding the coupon, and remembering to have it with you when shopping may exceed the value of a $10 coupon to many class members. And "arm's-length negotiations" are consistent with the existence of a conflict of interest on the part of one of the negotiators—class counsel—that may warp the outcome of the negotiations. The magistrate judge's further reference to "the considerable portion of class members who have filed claims" questionably treats one-half of one percent as being a "considerable portion."

\*4 Another term of the proposed settlement was that RadioShack would pay class counsel $1 million (reduced by the district court to $990,291.88, but

Redman v. RadioShack Corp., --- F.3d ---- (2014)

we'll round it off to $1 million for simplicity) in attorneys' fees, plus pay various administrative costs including the cost of notice. The agreed-upon attorneys' fees, plus the $830,000 worth of coupons at face value, plus the administrative costs, add up to about $4.1 million. Class counsel argued that since the attorneys' fees were only about 25 percent of the total amount of the settlement, they were reasonable. The district court, agreeing, approved the settlement, precipitating this appeal by two groups of class members who objected to the settlement in the district court.

[7] A trial judge's instinct, in our adversarial system of legal justice, is to approve a settlement, trusting the parties to have negotiated to a just result as an alternative to bearing the risks and costs of litigation. But the law quite rightly requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action. The reason is the built-in conflict of interest in class action suits. The defendant (as RadioShack's lawyer candidly admitted at the oral argument) is interested only in the bottom line: how much the settlement will cost him. And class counsel, as "economic man," presumably is interested primarily in the size of the attorneys' fees provided for in the settlement, for those are the only money that class counsel, as distinct from the members of the class, get to keep. The optimal settlement from the joint standpoint of class counsel and defendant, assuming they are self-interested, is therefore a sum of money moderate in amount but weighted in favor of attorneys' fees for class counsel. Ordinarily—in this case dramatically—individual members of the class have such a small stake in the outcome of the class action that they have no incentive to monitor the settlement negotiations or challenge the terms agreed upon by class counsel and the defendant.

True, there is always a named plaintiff—a member of the class (sometimes several members) listed as the plaintiff in the case filings—because there is no civil suit without a plaintiff. But often (though we were told at argument not in this case) the named plaintiff is the nominee of class counsel, and in any event he is dependent on class counsel's good will to receive the modest compensation ($5,000 in this case) that named plaintiffs typically receive.

[8][9] The judge asked to approve the settlement of a class action is not to assume the passive role that is appropriate when there is genuine adverseness between the parties rather than the conflict of interest recognized and discussed in many previous class action cases, and present in this case. See, e.g., *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir.2014); *Staton v. Boeing Co.*, 327 F.3d 938, 959–61 (9th Cir.2003); *In re GMC Pick–Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 801, 819–20 (3d Cir.1995). Critically the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members. When there are objecting class members, the judge's task is eased because he or she has the benefit of an adversary process: objectors versus settlors (that is, versus class counsel and the defendant).

*5 [10] Unfortunately the magistrate judge in approving the settlement in *RadioShack* failed to analyze the issues properly. Let's begin with the value of the award to the class members. The judge accepted the settlors' contention that the defendant's entire expenditures should be aggregated in determining the size of the settlement; it was this aggregation that reduced the award of attorneys' fees to class counsel to a respectable-seeming 25 percent. But the roughly $2.2 million in administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.

Of course without administration and therefore administrative costs, notably the costs of notice to the class, the class would get nothing. But also without those costs class counsel would get nothing, because the class, not having learned of the proposed settlement (or in all likelihood of the existence of a class action), would have derived no benefit from class counsel's activity. And without reliable administration the defendant will not have the benefit of a valid and binding settlement. Yet although the administrative costs benefit class counsel and the defendant as well as the class members, the district court's fee award incorrectly treated every penny of administrative expense as if it were cash in the pockets of class members. By doing so the court eliminated the incentive of class counsel to economize on that expense—and indeed may have created a perverse incentive; for higher

Redman v. RadioShack Corp., --- F.3d ---- (2014)

administrative expenses make class counsel's proposed fee appear smaller in relation to the total settlement than if those costs were lower.

We are mindful that in *Staton v. Boeing Co., supra,* 327 F.3d at 975, the Ninth Circuit said that "where the defendant pays the justifiable cost of notice to the class—but not, as here, an excessive cost—it is reasonable (although certainly not required) to include that cost in a putative common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees." The reason the court gave was that notice is a benefit to the class. The court overlooked the fact that it is also a benefit to class counsel. And in this case the administrative costs taken into account by the magistrate judge in determining the "fairness" of the attorneys' fee award were not limited to costs of notice to the class.

[11] The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received. At most they received $830,000. That translates into a ratio of attorneys' fees to the sum of those fees plus the face value of the coupons of 1 to 1.83, which equates to a contingent fee of 55% ($1,000,000 ÷ ($1,000,000 + $830,000)). Computed in a responsible fashion by substituting actual for face value, the ratio would have been even higher because 83,000 $10 coupons are not worth $830,000 to the recipients. Anyone who buys an item at RadioShack that costs less than $10 will lose part of the value of the coupon because he won't be entitled to change. Anyone who stacks three coupons to buy an item that costs $25 will lose $5. Anyone who fails to use the coupon within six months of receiving it will lose its entire value. (Six-month coupons are not unusual, but redemption periods usually are longer. See, e.g., *In re Mexico Money Transfer Litigation (Western Union & Valuta),* 164 F.Supp.2d 1002, 1010–11 (N.D.Ill.2000) (35 months); *Henry v. Sears Roebuck & Co.,* 1999 WL 33496080, at *10 (N.D.Ill.1999) (nearly three years).) Anyone who sells his coupon will get less than the coupon's face value. Some recipients of coupons will lose them or forget about them. The chipping away at the nominal value of the settlement by the numerous restrictions imposed in the settlement agreement echoes the even more egregious such chipping away that we encountered in *Eubank v. Pella, supra,* 753 F.3d at 724–26.

*6 No attempt was made by the magistrate judge or the parties to the proposed settlement to estimate the actual value of the nominal $830,000 worth of coupons. Couponing is an important retail marketing method, and one imagines that it would have been possible to obtain expert testimony (including neutral expert testimony by the court's appointing an expert, as authorized by Fed.R.Evid. 706), or responsible published materials, on consumer response to coupons. And likewise it should have been possible to estimate the value of couponing to sellers—a marketing device that in some circumstances must be more valuable than cutting price, as otherwise no retailer would go to the expense of buying and distributing coupons. In fact couponing is believed to confer a number of advantages on a retail seller (which RadioShack is):

> Regular use of good couponing strategy will provide a steady stream of new customers and high quality sales leads.... Coupons have the effect of expanding or increasing your market area. We know that consumers will travel far to redeem a valuable coupon. Coupons will entice new customers that have been shopping at your competitor. It's a proven fact that consumers will break routine shopping patterns to take advantage of a good coupon offer. Coupons attract new residents when they are actively in the market for products and services.... Coupons will re-activate old customers. Those customers that have been lured away by your competitor will start buying from you again when you give them a good reason to do so.... Coupon advertising provides the opportunity for additional profits through sale of related items.... When you offer a special "deal" on a coupon to invite a customer to do business with you, you have to remember that this same customer will probably end up buying additional items

that carry a full profit margin. In addition, you also are being given the opportunity to "sell-up" to a more profitable product or service. You would not have had this opportunity had it not been for the coupon getting the customer through the door in the first place. Coupons build store traffic which results in additional impulse purchases. Coupons are measurable and accountable.... It's simply a matter of counting the number of coupons redeemed to judge the effectiveness of the offer. Wise use of this consumer feedback will guide you in creating future offers that improve your results.

Thom Reece, "How to Use Coupons to Promote Your Business," *business know-how*, www.businessknowhow.com/m arketing/couponing.htm.

Another way in which couponing benefits a firm in RadioShack's position is that it costs the seller only the wholesale price of a product bought by a customer with a coupon in order to give the customer a retail benefit. RadioShack is out of pocket only the wholesale price of a $10 item bought with a coupon; it would have been out a full $10 had the settlement required it to pay class members in cash. True, there are administrative costs in processing coupon transactions, but there are such costs in processing cash transactions as well. And while were there no coupons there would be more cash sales, at full retail price, coupon selling must be advantageous for sellers relative to price cuts or else it wouldn't be as common as it is.

*7 To the extent that couponing would thus benefit RadioShack, it reduces the cost of the proposed settlement and therefore the likelihood that it would endanger the company's solvency. That's fine, as we're about to see, because RadioShack appears to be teetering on the brink of insolvency and if it goes over the brink the value of the coupons may be drastically impaired. But while we don't know how much $830,000 of coupons would be worth to the class, we can be confident that it would be less than

that nominal amount, doubtless considerably so. And we note that were the value only $500,000—and it may indeed be no greater—the agreed-upon attorneys' fee award would be the equivalent of a 67 percent contingency fee.

One possible solution, in a case in which the agreed-upon attorneys' fee is grossly disproportionate to the award of damages to the class, is to increase the share of the settlement received by the class, at the expense of class counsel. Another possible solution is to jack up the award of damages, in this case for example from $830,000 to $2 million (cash, not coupons), while leaving the fee award at $1 million. The administrative costs might also be increased, specifically by increasing the number of class members notified of the settlement, in order to give more class members a slice of the pie. The total cost of the settlement might rise from $4.1 million to say $6 million.

But here's the rub, regarding the second suggested adjustment in the settlement, the adjustment that increases the size of the settlement rather than its division between class counsel and class members: RadioShack is in terrible financial shape. Recently Moody's reduced the company's credit rating to Caa2 ("rated as poor quality and very high credit risk"). Moody's Investor Service, "Rating Action: Moody's Downgrades RadioShack's CFR to Caa2; Outlook Remains Negative," May 5, 2014, www.moodys.com/research/Mood ys-downgrades–RadioShacks–CFR–to–Caa2–outlook -remains-negative-PR—294298. See also Will Ashworth, "RadioShack Stock—Cue the Comeback? RSH Doled Out a Doubler Within a Week, But How Real Are RadioShack's Survival Chances?," *InvestorPlace*, Sept. 2, 2014, http://invest orplace.com/2014/09/radioshack-stock-rsh-comeback/ # .VA9IrvldUnU. An article by William Alden ominously entitled "RadioShack Sees Filing for Bankruptcy Near" was published just last week in the *New York Times*, Sept. 12, 2014, p. B3.

Adding millions to the cost of the settlement to RadioShack might, if not precipitate the company's failure, make it more likely—an outcome that might leave very little for the class members. A modest settlement is the prudent course. And a coupon settlement has the virtue of boosting RadioShack's business, since as we've noted couponing is a marketing device that must sometimes be more effective than an equivalent price cut. So even if the proposed settlement of $830,000 in coupons is

Redman v. RadioShack Corp., --- F.3d ---- (2014)

worth a good deal less than face value and is therefore modest relative to a potential class of millions of consumers, we think it was adequate in the parlous circumstances in which the defendant finds itself. But that is not to say that the $1 million attorneys' fee is reasonable; and if it were cut down the amount saved could be reallocated to the class, thereby increasing the meager value of the settlement to the class members. That was the first possible modification that we mentioned: changing the relative shares of the settlement received by class counsel and class members without increasing the amount of the settlement.

*8 The magistrate judge based the fee award on the amount of time that class counsel reported putting in on the case, but increased the amount so calculated by 25 percent to reflect the risk created by the possibility that the suit would fail—that, for example, RadioShack might be able to refute an inference of willfulness. But the reasonableness of a fee cannot be assessed in isolation from what it buys. Suppose class counsel had worked diligently—as hard and efficiently as they say they worked—but only a thousand claims had been filed in response to notice of the proposed settlement, so that the total value of the class, even treating a $10 coupon as the equivalent of a $10 bill, was only $10,000. No one would think a $1 million attorneys' fee appropriate compensation for obtaining $10,000 for the clients, even though a poor response to notice is one of the risks involved in a class action. In the present case, similarly though less dramatically, the efforts of class counsel yielded an extremely modest harvest, the value of which the district court made no effort to assess, instead assuming unjustifiably that a $10 coupon is worth $10 to every recipient.

[12] Our response is the same to class counsel's further argument that had the case gone to trial the defendant might have won because a jury might decide that the defendant's violation of the Fair and Accurate Credit Transactions Act had not been willful. We'll be discussing the application of the Act's concept of willfulness in connection with our other case; suffice it to note here that, as we've explained, attorneys' fees don't ride an escalator called risk into the financial stratosphere. Some cases should not be brought, because the litigation costs will exceed the stakes, and others are such long shots that prudent counsel will cut his expenditure in litigating them of time, effort, and money to the bone. Neither course was followed by class counsel in this case. But, as it happened, RadioShack's

violation probably *was* willful, as we'll see.

[13] We have emphasized that in determining the reasonableness of the attorneys' fee agreed to in a proposed settlement, the central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation. But in thus emphasizing value over cost we may seem to be taking sides in a controversy over the interpretation of the coupon provisions of the Class Action Fairness Act, in particular 28 U.S.C. §§ 1712(a) and (b)(1), which read as follows:

> (a) Contingent Fees in Coupon Settlements. If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

> (b) Other Attorney's Fee Awards in Coupon Settlements. (1) In general. If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

*9 This is a badly drafted statute. To begin with, read literally the statutory phrase "value to class members of the coupons that are redeemed" would prevent class counsel from being paid in full until the settlement had been fully implemented. For until then one wouldn't know how many coupons had been redeemed. An alternative interpretation of "value ... of the coupons that are redeemed" would be the face value of the coupons received by class members who responded positively to notice of the class action. In this case that would be 83,000 of the millions of class members who received notice, though not all 83,000 will actually use the coupon.

A thoughtful article, after pointing out that "in many situations ... it may not be possible or desirable to wait for actual redemption rates to become known" before a coupon class action is settled, nevertheless reads the statutory language "value ... of the coupons that are redeemed" literally and so is driven to suggest complicated methods, which would require amending the Class Action Fairness Act, for valuing a coupon settlement without delaying

Redman v. RadioShack Corp., --- F.3d ---- (2014)

implementation of the settlement indefinitely. Robert H. Klonoff & Mark Hermann, "The Class Action Fairness Act: An Ill–Conceived Approach to Class Settlements," 80 *Tulane L. Rev*. 1695, 1701–02 (2006). This interpretation of section 1712(a) is, however, in some tension with section 1712(d), which empowers the district court to "receive expert testimony from a witness qualified to provide information on the actual value to the class members of the coupons that are redeemed." Such a witness could be asked to estimate the likely value of the coupons to the class members before the redemption period expires, and such evidence might provide a more efficient method of compensating the class members and winding up the litigation than waiting months or years for the redemption period to expire and then revising the settlement by giving the class members more or less, or class counsel more or less. Moreover, if the settlement can't be wound up until the redemption period expires, this places pressure on the district court to approve a short redemption period, as in this case—and the shorter the period, the less the value of the coupon. And finally "value" could mean estimated economic value of the settlement, rather than face value times number of coupons.

There is no need for a rigid rule—a final choice, for all cases, among the possibilities suggested. In some cases the optimal solution may be part payment to class members and class counsel up front with final payment when the settlement is wound up. That might be appropriate in a case such as this. What was inappropriate was an attempt to determine the ultimate value of the settlement before the redemption period ended without even an estimate by a qualified expert of what that ultimate value was likely to prove to be.

Another problem with section 1712 is that while subsection (a) is mandatory—under it the attorneys' fee in a coupon settlement *must* be based on the coupons' redemption value—subsection (b)(1) provides an alternative method of determining attorneys' fees in such a case: "the amount of time class counsel reasonably expended working on the action"—what is called, in an opaque bit of legal jargon, the "lodestar method" of calculating fee awards for class counsel.

*10/*In re HP Inkjet Printer Litigation*, 716 F.3d 1173, 1183–84 (9th Cir.2013), held (with one judge dissenting) that subsection (b)(1) is limited to cases in which the settlement provides both coupon and cash benefits to the class members—whe there are just coupons subsection (a) *must* be used. The reasoning is that coupon redemption value can't be the sole basis for calculating a reasonable attorneys' fee for class counsel if coupons are not the only benefit to the class, but can be if they are the only benefit. This interpretation reflects the suspicion of coupon settlements (the basis of the suspicion being well illustrated by this case) that was the motivation for the coupon provisions of the Act. We need not complicate this opinion further by taking sides in *HP Inkjet*. The important thing is that the district court should be alert to the many possible pitfalls in coupon settlements—pitfalls that moved Congress to amend the Class Action Fairness Act with specific reference to such settlements.

[14] It wouldn't make difference—maybe it wouldn't make any—if the district court could use the approach of subsection (b)(1) even in all-coupon case like this. The reason is that hours can't be given controlling weight in determining what share of the class action settlement pot should go to class counsel. The judge could start with hours but couldn't rightly stop there. The analogy to hourly billing by law firms fails because law firms bill clients who have agreed to be billed on that basis. Class counsel don't have clients with whom they negotiate billing. Class members do not tell class counsel how much time to expend on a case and how much they can charge per hour. The stakes for an individual class member are typically (as in this case) too slight to induce him to participate actively in the litigation. Class counsel's billing rate and maximum billable hours have to be determined by the court in reviewing the terms of the proposed settlement of the class action. And in that review the amount of the class settlement allocable to class counsel should depend critically on the value of class counsel's work to the class.

Suppose that after working diligently for many days—an amount of work for which normally they would charge a client $1 million—class counsel discovered that the expected value of the litigation (the most reliable predictor of what a judge or jury would award as damages and an appellate court uphold) was $1.1 million, and on that basis they settled the suit with the defendant for that amount. It would be absurd to approve a settlement that awarded class counsel ten times the damages awarded the class ($100,000 in the example), on the basis of "the amount of time class counsel reasonably expended working on the action," even

Redman v. RadioShack Corp., --- F.3d ---- (2014)

if the expenditure was "reasonable" given what class counsel reasonably but mistakenly had thought the case worth to the class. For that would be a settlement in which class counsel had been able to shift the entire risk of the litigation to their clients.

**\*11** Analysis is more complex when the principal benefits of the settlement are nonmonetary, as when equitable relief is awarded rather than damages. A value must be attached to the relief obtained by the class as part of the determination of an appropriate attorneys' fee for class counsel, but a rough estimate may be permissible, especially when, as in civil rights cases, much of the value of the equitable relief may be nonmonetizable.

[15] We have called this case an "all-coupon" case but class counsel call it a "zero-coupon" case. They say that a coupon that can be used to buy an entire product, and not just to provide a discount, is a voucher, not a coupon. "Voucher" is indeed the term used in the settlement agreement, because the parties didn't want to subject themselves to the coupon provisions of the Class Action Fairness Act. But the idea that a coupon is not a coupon if it can ever be used to buy an entire product doesn't make any sense, certainly in terms of the Act. Why would it make a difference, so far as the suspicion of coupon settlements that animates the Act's coupon provisions is concerned, that the proposed $10 coupon could be used either to reduce by $10 the cash price of an item priced at more than $10, or to buy the entire item if its price were $10 or less? Coupons usually are discounts, but if the face value of a coupon exceeds the price of an item sold by the issuer of the coupon, the customer often is permitted to use the coupon to buy the item—and sometimes he'll be refunded the difference between that face value and the price of the item. See, e.g., "Coupons: What Are They and Where Do I Start?," *Penny Pinchin' Mom,* www.pennypinchinmom.com/getting-started-on-penny-pinchin-mom/ coupons-what-are-they-and-where-do-i-star/.

That is the character of RadioShack's proposed coupons: they can be used either to buy entire items priced up to $10 (though without a refund of any difference between the face value of the coupon and the price of the item bought with it) or to obtain a discount on a pricier item. There are no data on how often a $10 coupon would be used in a RadioShack store to buy an item costing $10 or less rather than to obtain a discount on a pricier item. But it's

unlikely that a buyer would use a coupon to buy an item costing less than $10, since the buyer would receive no change. And we are not told how many items in the typical RadioShack store cost exactly $10. (For items that cost more, the coupon is a discount.) We are told that 6000 different products sold by RadioShack are priced at $10 or less, out of some 20,000 different RadioShack products advertised in an online catalog. See *RadioShack— Do It Together,* www.google.com/?gws_rd=ssl# q= RadioShack% 20products & nfpr=1 & start=0. But we are not told how many of each of the low-priced products the average RadioShack store carries. But it is apparent that the products are actively promoted and presumably most in demand by consumers are on average more expensive than $10. See, e.g., *Weekly Electronics Deals and Discounts,* www.radioshack. com/category/index.jsp?categoryId=41803466. And this means that even if "coupon" is narrowly defined to mean a discount, RadioShack's coupons are mainly coupons in just that narrow sense, and only occasionally vouchers.

**\*12** In any event the narrow sense is untenable. As we said before, from the standpoint of the dominant concerns that animate the provisions of the Class Action Fairness Act regarding coupon settlements it's a matter of indifference whether the coupon is a discount off the full price of an item or is equal to (or for that matter more than) the item's full price. The Senate Report on the coupon provisions, S.Rep. No. 109–014, pt. IV.D.1 (Lawyers Receive Disproportionate Shares of Settlements), https:// beta.congress.gov/109/crpt/srpt14/CRPT– 109srpt14.pdf., at pp. 15–20, does not define coupon, but treats the term as interchangeable with "voucher," *id.* at 16, and evinces no wish to treat vouchers differently from coupons in the evaluation of a proposed class action settlement.

Class counsel point out that elsewhere in the legislative history concern is expressed with settlements that compel class members to spend more money with the defendant if they want to benefit from the settlement, as is the case with a discount, but not with a voucher that is simply exchanged for an item so that no cash changes hands. But this was not Congress's only concern, as shown by the Senate Report just cited, which, as we pointed out, in documenting the abuses of coupon settlements does not give "coupon" the narrow definition urged by class counsel.

Redman v. RadioShack Corp., --- F.3d ---- (2014)
_____

This case illustrates *why* Congress was concerned that class members can be shortchanged in coupon settlements whether a coupon is used to obtain a discount off the full price of an item or to obtain the entire item; we have noted the ways in which store credit for $10 is not as valuable to the recipient as $10 in cash. Class counsel's proposed distinction between discount coupons and vouchers also would impose a heavy administrative burden in distinguishing coupons used for discounts on more expensive items ("coupons" in class counsel's narrow sense of coupon) and the identical coupons used to pay the full prices of cheaper items ("vouchers" in class counsel's lexicon and not "coupons" at all). Class counsel *trumpet* the 6000 items that class members can buy with just the coupon—namely any product that costs $10 or less. As the present case illustrates, assessing the reasonableness of attorneys' fees based on a coupon's nominal face value instead of its true economic value is no less troublesome when the coupon may be exchanged for a full product. There is in short no statutory or practical reason for distinguishing among coupons that offer 10 percent, 50 percent, 90 percent, or 100 percent cash savings.

The difficulty of valuing a coupon settlement exposes another defect in the proposed settlement: placing the fee award to class counsel and the compensation to the class members in separate compartments. The $1 million attorneys' fee is guaranteed, while the benefit of the settlement to the members of the class depends on the value of the coupons, which may well turn out to be much less than $830,000. This guaranty is the equivalent of a contingent-fee contract that entitles the plaintiff's lawyer to the first $50,000 of the judgment or settlement plus one-third of any amount above $50,000—so if the judgment or settlement were for $100,000 the attorneys' fee would be $66,667, leaving only a third of the combined value (to plaintiff and lawyer) of the settlement to the plaintiff.

*13[16] Another questionable feature of the settlement is the inclusion of a "clear-sailing clause"—a clause in which the defendant agrees not to contest class counsel's request for attorneys' fees. Because it's in the defendant's interest to contest that request in order to reduce the overall cost of the settlement, the defendant won't agree to a clear-sailing clause without compensation—namely a reduction in the part of the settlement that goes to the class members, as that is the only reduction class

counsel are likely to consider. The existence of such clauses thus illustrates the danger of collusion in class actions between class counsel and the defendant, to the detriment of the class members.

[17] As explained (with copious references to both judicial and academic sources) in William D. Henderson, "Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements," 77 *Tulane L.Rev.* 813 (2003), clear-sailing claus es are found mainly in cases such as the present one in which the value of the settlement to the class members is uncertain because it is not a cash settlement. This complicates the difficulty faced by the district court in determining an appropriate attorneys' fee, and a clear-sailing clause exacerbates the difficulty further by eliminating objections to an excessive fee by the defendant. Clear-sailing clauses have not been held to be unlawful per se, but at least in a case such as this, involving a non-cash settlement award to the class, such a clause should be subjected to intense critical scrutiny by the district court; in this case it was not.

[18] There is still more wrong with the settlement. Rule 23(h) of the civil rules requires that a claim for attorneys' fees in a class action be made by motion, and "notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Class counsel did not file the attorneys' fee motion until after the deadline set by the court for objections to the settlement had expired. That violated the rule. *In re Mercury Interactive Corp. Securities Litigation,* 618 F.3d 988, 993–95 (9th Cir.2010); see also Committee Notes on the 2003 Amendments to Rule 23. From reading the proposed settlement the objectors knew that class counsel were likely to ask for $1 million in attorneys' fees, but they were handicapped in objecting because the details of class counsel's hours and expenses were submitted later, with the fee motion, and so they did not have all the information they needed to justify their objections. The objectors were also handicapped by not knowing the rationale that would be offered for the fee request, a matter of particular significance in this case because of the invocation of administrative costs as a factor warranting increased fees. There was no excuse for permitting so irregular, indeed unlawful, a procedure.

[19][20] A final concern with the settlement involves the lead named plaintiff, Scott Redman. He is employed by a law firm for which the principal class

Redman v. RadioShack Corp., --- F.3d ---- (2014)

counsel, Paul Markoff and Karl Leinberger, once worked. "The named plaintiffs are the representatives of the class—fiduciaries of its members—and therefore charged with monitoring the lawyers who prosecute the case on behalf of the class (class counsel)." *Eubank v. Pella, supra,* 753 F.3d at 719. There ought therefore to be a genuine arm's-length relationship between class counsel and the named plaintiffs. We don't say there wasn't such a relationship in the present case, but we do wish to remind the class action bar of the importance of insisting that named plaintiffs be genuine fiduciaries, uninfluenced by family ties (as in *Eubank* ) or friendships.

**\*14** The magistrate judge, in approving the inadequate settlement proposal, may have been concerned with the cost of litigation to fragile RadioShack if the settlement was disapproved and the case had to be tried. But very few class actions are tried, see *id.* at 720, and this one would not have been an exception. RadioShack can't afford costly litigation, and class counsel can't afford to risk a delay in settling, lest RadioShack declare bankruptcy. A renegotiated settlement will simply shift some fraction of the exorbitant attorneys' fee awarded class counsel in the existing settlement that we are disapproving to the class members.

[21] We come at last to our second case, *Shoe Carnival,* which pivots on the meaning of "willfully" in the Fair and Accurate Credit Transactions Act. The willfulness issue in *RadioShack* case was straightforward. The company had been found in an earlier lawsuit to have left the expiration date on receipts in violation of a parallel state statute, see *Ferron v. RadioShack Corp.,* 175 Ohio App.3d 257, 886 N.E.2d 286 (Ohio App.2008), and apparently failed to take adequate precautions against repeating the violation, this time of the (materially identical) federal statute. By the time RadioShack discovered the mistake, 16 million unlawful receipts had been handed to its customers, as we know. The company had to know that there was a risk of error because the identical risk had materialized previously. Knowing the risk and failing to take any precaution against it—though a completely adequate precaution would have cost nothing—were indicative of willful violation.

That RadioShack's violation probably was willful underscores the meagerness of the settlement value to the class members. Class counsel—a handful of lawyers—divide up a million dollars, under the

settlement that the district court approved, while a relative handful of class members (83,000 out of 16 million potential class members) receive only 10 cents on the dollar, since the coupon is only $10 even though the minimum statutory damages for a willful violation is $100. And 10 cents on the dollar is actually an exaggeration of the benefit of the settlement to the class, because the coupons are worth less in the aggregate than their face value. Yet as we also said, given RadioShack's parlous financial state it would be a mistake to increase the aggregate size of the settlement beyond its current $4.1 million ceiling. Our only concern therefore is the division of spoils between class counsel and class members. It seems apparent that each class member has a valid claim to a good deal more than one $10 coupon, and it would seem therefore that the equities favor a reallocation of some of what we are calling the spoils from class counsel to the class members who have submitted claims for the coupons. We are mindful that recipients of statutory damages are not being compensated for actual injury, but in effect are being paid bounties to assist in efforts to reduce identity theft. But identity theft is a serious problem, and FACTA is a serious congressional effort to combat it.

**\*15**[22] The willfulness issue in *Shoe Carnival* is different from that in *RadioShack.* There was no previous violation to alert the company; and it is not argued that mistakes made by other credit-card sellers should have alerted it to the risk of violating the statute inadvertently. And if there was a violation, it was not willful because it consisted of a permissible interpretation of an ambiguous statute. Cf. *Safeco Ins. Co. of America v. Burr, supra,* 551 U.S. at 68. Instead of omitting the entire expiration date from credit-card receipts, Shoe Carnival omitted just the year; the month in which the credit card expired remained. Now "expiration date" is not a defined term in the statute. It could mean the month, day (if other than the last day of the month), and year in which the card expires, and it is arguable that if any of these are left out there's no actual expiration date on the receipt, just a fragment of such a date.

The first part of the statutory provision, dealing with the credit-card number, is explicit that all the digits that make up the number need not be deleted to avoid a violation; the last five can remain. The second part of the provision, dealing with the expiration date, is not explicit. All that is clear is that "January," with no year, is not an expiration date;

Redman v. RadioShack Corp., --- F.3d ---- (2014)

it's just part of such a date.

There wouldn't be any purpose, however, in allowing the seller to leave the month of expiration on the receipt. The last five digits of the card number are permitted to remain so that in the event of a dispute with the card company or maker of the receipted sale, the customer's ownership of the card can be verified; in addition, "printing any small subset of the digits on a card enables the customer to know which card was used for a particular purpose (that's why merchants want to print some of the digits), without enabling a stranger to learn the full number." *Van Straaten v. Shell Oil Products Co. LLC,* 678 F.3d 486, 490 (7th Cir.2012). All that allowing the month to remain on the receipt does, however, is give an identity thief a datum that he may be able to use in conjunction with other data to determine the cardholder's identity, as when Merchant A prints the last 5 digits and the month, Merchant B prints the last 5 digits and the year, and Merchant C prints no dates inadvertently prints the entire credit card number—and an identity thief gains access to all three receipts. Though that's unlikely to happen, there is no upside to allowing the month to appear on the receipt; and so there is a persuasive argument for interpreting "expiration date" in the statute to mean "expiration date or any part thereof," as held in *Long v. Tommy Hilfiger U.S.A., Inc.,* 671 F.3d 371 (3d Cir.2012), which noted that if part of the expiration date is allowed to remain on the receipt, and different sellers leave different parts of the expiration date on their receipts, a person who found different receipts for purchases by the same cardholder might learn the entire expiration date. This is why the statute permits the receipt to show only the *last* five digits of the card number—if it could show any five digits, an identity thief could reconstruct the entire number if he obtained multiple receipts of sales to the same cardholder.

**\*16** There is, however, sufficient ambiguity attending the provision of the statute regarding the expiration date to justify the district court's determination that Shoe Carnival had not willfully violated FACTA. The interpretation of the statute advanced by the company was possible, indeed plausible, possibly even correct; and that is enough, as the district court held, to negate an inference of willfulness.

To conclude, the judgment approving the settlement in *RadioShack* (Nos. 14–1470, –1471, and –1658) is reversed and the case remanded to the district court for further proceedings consistent with this opinion. The judgment in favor of the defendant in *Shoe Carnival* (No. 14–1320) is affirmed.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT B

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STEPHANIE ROSE, on behalf of herself and all others similarly situated, | Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD |
| Plaintiffs, | **ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS** |
| v. | |
| BANK OF AMERICA CORPORATION, and FIA CARD SERVICES, N.A., | |
| Defendants. | |
| CAROL DUKE AND JACK POSTER, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA, N.A.; BANK OF AMERICA CORPORATION; AND FIA CARD SERVICES, N.A., | |
| Defendants. | |

1

1    Stephanie Rose, Sandra Ramirez, Shannon Johnson, Amin Makin, Carol Duke, Jack Poster,

2    and Freddericka Bradshaw ("Plaintiffs") move for final approval of the parties' proposed

3    Settlement Agreement and for attorney's fees and costs. Bank of America Corporation, Bank of

4    America, N.A., and FIA Card Services, N.A. (collectively, "Defendants") do not object to the

5    motions in the context of the parties' proposed settlement.

6        The final approval hearing was held on April 4, 2014. For the reasons explained below, the

7    motion for final approval is GRANTED. The motion for attorney's fees and costs is GRANTED

8    IN PART AND DENIED IN PART.

9    **I.  BACKGROUND**

10       The proposed Settlement Agreement would resolve all claims in the above-entitled actions

11   as well as claims in the following actions: Ramirez v. Bank of Am., N.A., Case No. 14-CV-02175-

12   EJD (N.D. Cal.); Johnson v. Bank of Am. Corporation, Case No. 14-CV-02177-EJD (N.D. Cal.);

13   Makin v. Bank of Am., N.A., Case No. 14-CV-02176-EJD (N.D. Cal.); and Bradshaw v. Bank of

14   Am. Corp, 13-CV-0431 LAB (JLB) (S.D. Cal.).

15       Plaintiffs brought these actions alleging that Bank of America engaged in a systematic

16   practice of calling or texting consumers' cell phones through the use of automatic telephone dialing

17   systems and/or an artificial or prerecorded voice without their prior express consent, in violation of

18   the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A). Bank of America

19   denies all of Plaintiffs' allegations and argues that it had prior express consent to make automated,

20   prerecorded calls to Plaintiffs and Class Members on their cell phones. The TCPA permits

21   claimants to recover statutory damages in the amount of $500 per violation of the Act, and up to

22   $1,500 per willful violation. 47 U.S.C. § 227(b). In addition, the TCPA permits claimants to seek

23   injunctive relief to prevent future violations.

24       The parties conducted discovery and reached a tentative settlement after mediation. On

25   December 6, 2013, the Court granted preliminary approval of the Settlement Agreement,

26   conditionally certified the proposed Settlement Class, designated class representatives, appointed

27   class counsel, approved the settlement administration plan, and approved a plan for giving notice to

28

2

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Class Members. The Court also set deadlines for objecting to the Settlement Agreement and for

2   requesting exclusion from the settlement class.

3        The final approval hearing was held on April 4, 2014.

4   **II. Motion for Final Approval of Settlement**

5        **a.  Final certification of settlement class**

6             **i.  Class definition and notice to the class**

7        The parties agreed to certification of a Settlement Class defined as all persons in the United

8   States who:

9        (1) received one or more non-emergency, default servicing telephone calls from Bank of

10       America regarding a Bank of America Residential Mortgage Loan Account to a cellular

11       telephone through the use of an automatic telephone dialing system and/or an artificial or

12       prerecorded voice between August 30, 2007 and January 31, 2013 (Mortgage Calls);

13       or

14       (2) received one or more non-emergency, default servicing telephone calls from Bank of

15       America regarding a Bank of America Credit Card Account to a cellular telephone through

16       the use of an automatic telephone dialing system and/or an artificial or prerecorded voice

17       between May 16, 2007, and January 31, 2013 (Credit Card Calls);

18       or

19       (3) received one or more non-emergency, default servicing text messages from Bank of

20       America regarding a Bank of America Credit Card Account to a cellular telephone through

21       the use of an automatic telephone dialing system and/or an artificial or prerecorded voice

22       between February 22, 2009, and December 31, 2010 (Credit Card Texts). This excludes

23       those identified individuals who are included in paragraph (2) above.

24       The Court granted preliminary approval to the parties' proposed notice procedure. The

25   Court is now satisfied that the notice procedure was carried out according to the applicable

26   standards and that it has satisfied the requirements of the federal Class Action Fairness Act

27   ("CAFA"), 28 U.S.C. § 1715, and Fed. R. Civ. P. 23.

28

### 1. Notice under the Class Action Fairness Act

The Class Action Fairness Act ("CAFA") requires defendants to send to the appropriate state and federal officials a copy of the complaint, notice of scheduled judicial hearings, proposed or final notifications to class members, proposed or final class settlements, any other contemporaneous agreements between the parties, any final judgments or notice of dismissal, and the names of class members if feasible. See 28 U.S.C. § 1715(b)(1–8). The Court is satisfied that the notices were sent. See Docket No. 72.

### 2. Notice under Rule 23

The notice program satisfied both Fed. R. Civ. P. Rule 23(c)(2)(B) (requiring that the court provide "the best notice that is practicable under the circumstances") and 23(e)(1) (requiring court to "direct notice in a reasonable manner to all class members who would be bound by [settlement]"). In class action settlements, it is common practice to provide a single notice program that satisfies both of these notice standards. See David F. Herr, Annotated Manual for Complex Litigation § 21.31 (4th ed. 2005).

In this case, postal mail was well suited for locating and notifying class members, since the violations by defendant arose out of auto-dialed telephone calls and text messages made to cellular telephones, which typically have a name and physical mailing address associated with them.

The Court reviewed and approved these notices before they were disseminated and found that they were written in plain language. The notice clearly stated the nature of the action; the class definition; the class claims, issues, and defenses; that class members could appear through counsel; when and how class members could elect to be excluded; and the binding effect of a class judgment on class members. See Fed. R. Civ. P. 23(c)(2)(B). It also informed class members of the amount of attorneys' fees requested by Class Counsel. Fed. R. Civ. P. 23(h)(1).

During the preliminary approval hearing, the Court requested the parties insert language in the settlement notice documents to notify class members that they may be entitled to statutory damages of $500 to $1500 per violation. The Court also asked the parties to improve accessibility

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1  to information regarding the Settlement Agreement for Spanish language-only Class Members.

2  The parties complied with both requests.

3      The Court finds that the notice was reasonably calculated under the circumstances to

4  apprise the Settlement Class of the pendency of this action, all material elements of the Settlement,

5  the opportunity for Settlement Class Members to exclude themselves from, object to, or comment

6  on the settlement and to appear at the final approval hearing.  The notice was the best notice

7  practicable under the circumstances, satisfying the requirements of Rule 23(c)(2)(B); provided

8  notice in a reasonable manner to all class members, satisfying Rule 23(e)(1)(B); was adequate and

9  sufficient notice to all Class Members; and, complied fully with the laws of the United States and

10  of the Federal Rules of Civil Procedure, due process and any other applicable rules of court.

### ii.  Scope of release

12      The parties have agreed that upon entry of final approval of the Settlement Agreement, the

13  Class Members who did not opt out will provide a release tailored to the practices at issue in this

14  case.  Specifically, they will release all claims "that arise out of or relate" to the "use of an

15  'automatic telephone dialing system' or 'artificial or prerecorded voice' to contact or attempt to

16  contact Settlement Class Members."

### iii.  Final certification

18      The parties jointly moved the Court to resolve this case as a Settlement Class. In order to

19  certify a Settlement Class, the requirements of Rule 23 must generally be satisfied and each are

20  considered here.  See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998) (citing

21  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997)).  In assessing Rule 23 requirements in

22  the settlement context, a court may consider that there will be no trial.  See Amchem, 521 U.S. at

23  620 ("court need not inquire whether the case, if tried, would present intractable management

24  problems . . . for the proposal is that there be no trial.").

25      For certification of a settlement class, Rule 23(a) requires: (1) numerosity, (2)

26  commonality, (3) typicality, and (4) adequacy of representation.  Under Rule 23(b)(3) a class

27  action must meet two additional requirements: (1) common questions must "predominate over any

28

5

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1   questions affecting only individual members;" and (2) class resolution must be "superior to other

2   available methods of fair and efficient adjudication of the controversy."

3        In granting preliminary approval of the Settlement Agreement, the Court held that the

4   requirements of Rule 23(a) and Rule 23(b)(3) were satisfied.  Having fully reviewed the record, the

5   Court finds that the Settlement Agreement continues to satisfy Rule 23(a) and Rule 23(b)(3).

6        **b.  Final Approval of the Settlement Agreement**

7             **i.  Applicable legal standards**

8        This court may approve the class action settlement after hearing and upon a finding that the

9   settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C).  Therefore, the question

10  is "not whether the final product could be prettier, smarter, or snazzier, but whether it is fair,

11  adequate, and free from collusion."  Hanlon, 150 F.3d at 1027.  Further, it is "the settlement taken

12  as a whole, rather than the individual component parts, that must be examined for overall fairness."

13  Id. at 1026.

14       A settlement under Rule 23(e) requires that the Court balance a number of factors,

15  including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely

16  duration of further litigation; (3) the risk of maintaining class action status throughout trial; (4) the

17  amount offered in settlement; (5) the extent of discovery completed; (6) the experience and views

18  of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class

19  members to the proposed settlement.  Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 575 (9th

20  Cir. 2004).

21       Prior to formal class certification, there is an even greater potential for a breach of fiduciary

22  duty owed the class during settlement.  Accordingly, such agreements must withstand an even

23  higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily

24  required under Rule 23(e) before securing the court's approval as fair.  Hanlon, 150 F.3d at 1026;

25  Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago, 834 F.2d 677, 681 (7th

26  Cir. 1987) (Posner, J.) ("[W]hen class certification is deferred, a more careful scrutiny of the

27  fairness of the settlement is required."); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)

28

6

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

(Friendly, J.) (reviewing courts must employ "even more than the usual care"); see also Manual for Complex Litig. § 21.612 (4th ed. 2004).

Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.  Staton v. Boeing Co., 327 F.3d 938, 960 (9th Cir. 2003).  A few such signs are:

(1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded," Hanlon, 150 F.3d at 1021; see Murray v. GMAC Mortg. Corp., 434 F.3d 948, 952 (7th Cir. 2006); Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877, 882 (7th Cir. 2000);

(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class," Lobatz v. U.S. W. Cellular of California, Inc., 222 F.3d 1142, 1148 (9th Cir. 2000); see Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991) ("[L]awyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees."); and

(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund, see Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004) (Posner, J.).

### ii.  The strength of the Plaintiff's case and the risk, expense, complexity, and likely duration of further litigation

Plaintiffs argue that they believe they have a strong case, but that the case raised several novel legal issues that favor approving a settlement.  In particular, the parties have competing interpretations of what constitutes "prior express consent" under the TCPA based on the FCC's January 4, 2008 declaratory ruling, In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 23 F.C.C.R. 559.

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

1    Having reviewed the parties' statements regarding their dispute and the relevant authorities,

2    the Court finds that both parties have legitimate and material positions.  Furthermore, even if

3    Plaintiffs prevailed at trial, the sheer size of the award against Defendants, who could be liable for

4    $500 or $1,500 per violation for potentially millions of violations, would likely raise significant

5    post-trial concerns.  Such an award would almost certainly be appealed, potentially reversed, and

6    litigation would not be resolved for a significant amount of time.

7    In light of these considerations, the Court finds that factors 1 and 2 weigh in favor of

8    granting final approval.

9    ### iii.   The risk of maintaining class action status throughout trial

10   As the parties point out, "[c]ourts have split on class certification in TCPA cases, increasing

11   the risk of maintaining the class action through trial." Arthur v. Sallie Mae, Inc., 2012 WL

12   4075238 (W.D. Wash. Sept. 17, 2012).  This factor weighs in favor of granting final approval.

13   ### iv.   The amount offered in settlement

14   The Settlement Agreement requires Defendants to pay over $32 million dollars into a non-

15   reversionary Settlement Fund.  The parties have described this recovery as the largest "ever

16   obtained in a TCPA class action."  As discussed further below, the Court has determined that the

17   amount of the Settlement Fund, considered in light of the size of the class, is in line with recoveries

18   obtained in similar TCPA class action settlements.

19   ### v.   The extent of discovery completed

20   A sufficient amount of discovery was completed.  Plaintiffs claim that they reviewed

21   thousands of pages of documents, took the depositions of five different 30(b)(6) witnesses, and

22   successfully moved to compel discovery in the Ramirez action.  In addition, Bank of America

23   voluntarily provided Class Counsel with, and Class Counsel reviewed, the call record data.  The

24   parties participated in three full-day mediations before coming to a tentative agreement.  Thus, this

25   factor weighs in favor of approving the Settlement Agreement.

26

27

28

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

### vi. The experience and views of counsel

Class Counsel are experienced litigators. Several of the attorneys have participated in a large number of TCPA class action settlements. This factor weighs in favor of approval.

### vii. The presence of a governmental participant

Although CAFA notice was sent to various governmental entities, none sought to participate in the settlement proceedings by objection or comment. Thus, this factor weighs in favor of approval.

### viii. The reaction of the class members to the proposed settlement

Out of about 7 million individuals in the Class, 227,701 individuals have made claims, 16 have made objections, and 390 opted out. While low, the participation rate is in line with other settlements of this size. Having reviewed the objections, the Court finds that no Class Member has stated grounds that would provide a substantial reason to deny approval. Thus, this factor weighs in favor of approval.

### ix. The absence of collusion in the settlement procedure

The Settlement Agreement is the result of negotiations between the parties as well as three full-day mediations presided over by the Honorable Edward A. Infante, Ret.. The parties represent that negotiations were hard-fought and adversarial, and the parties' positions were only reconciled by Judge Infante's proposal. Judge Infante's declaration, attached to the Motion for Final Approval, lends support to the parties' representations regarding the settlement procedure.

Furthermore, none of the three "subtle signs" of collusion described in In re Bluetooth are present here: 1) Class counsel are not receiving a disproportionate distribution of the settlement because 25% is the standard allocation (and administration costs are reasonable considering the size of the class), 2) there is no "clear sailing" arrangement because attorney's fees are paid out of the class fund, and 3) the parties did not arrange for fees not awarded to revert back to defendants; rather, fees not awarded will be added to the class fund.[1]

Thus, this factor weighs in favor of approval.

---

[1] Class Counsel represents that the Settlement Agreement is non-reversionary. A review of the Settlement Agreement confirms this; specifically, Sections 2.34 and 4.04.

9

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

**III. Motion for attorney's fees and costs and for service awards to the class representatives**

     **a. Applicable legal standards**

While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount. See Staton, 327 F.3d at 963–64; Knisley v. Network Assoc., 312 F.3d 1123, 1125 (9th Cir. 2002); Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328–29 & n. 20 (9th Cir. 1999). The reasonableness of any fee award must be considered against the backdrop of the "American Rule," which provides that courts generally are without discretion to award attorneys' fees to a prevailing plaintiff unless (1) fee-shifting is expressly authorized by the governing statute; (2) the opponents acted in bad faith or willfully violated a court order; or (3) "the successful litigants have created a common fund for recovery or extended a substantial benefit to a class." Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 275 (1975) (Brennan, J., dissenting); accord Zambrano v. City of Tustin, 885 F.2d 1473, 1481 & n. 25 (9th Cir. 1989).

The award of attorneys' fees in a class action settlement is often justified by the common fund or statutory fee-shifting exceptions to the American Rule, and sometimes by both. See Staton, 327 F.3d at 972; see also Court Awarded Attorney Fees, Third Circuit Task Force, 108 F.R.D. 237, 250 (1985) (purpose of common-fund exception is to "avoid the unjust enrichment of those who benefit from the fund that is created, protected, or increased by the litigation and who otherwise would bear none of the litigation costs"). The Ninth Circuit has approved two different methods for calculating a reasonable attorneys' fee depending on the circumstances.

The "lodestar method" is appropriate in class actions brought under fee-shifting statutes (such as federal civil rights, securities, antitrust, copyright, and patent acts), where the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized, but where the legislature has authorized the award of fees to ensure compensation for counsel undertaking socially beneficial litigation. See Hanlon, 150 F.3d at 1029; In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 55 F.3d 768, 821 (3d Cir. 1995).

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1    The lodestar figure is calculated by multiplying the number of hours the prevailing party

2    reasonably expended on the litigation (as supported by adequate documentation) by a reasonable

3    hourly rate for the region and for the experience of the lawyer. Staton, 327 F.3d at 965. Though

4    the lodestar figure is "presumptively reasonable," Cunningham v. Cnty. of Los Angeles, 879 F.2d

5    481, 488 (9th Cir. 1988), the court may adjust it upward or downward by an appropriate positive or

6    negative multiplier reflecting a host of "reasonableness" factors, "including the quality of

7    representation, the benefit obtained for the class, the complexity and novelty of the issues

8    presented, and the risk of nonpayment," Hanlon, 150 F.3d at 1029 (citing Kerr v. Screen Extras

9    Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975)). Foremost among these considerations, however, is

10   the benefit obtained for the class. See Hensley v. Eckerhart, 461 U.S. 424, 434–36 (1983);

11   McCown v. City of Fontana, 565 F.3d 1097, 1102 (9th Cir. 2009) (ultimate reasonableness of the

12   fee "is determined primarily by reference to the level of success achieved by the plaintiff"). Thus,

13   where the plaintiff has achieved "only limited success," counting all hours expended on the

14   litigation—even those reasonably spent—may produce an "excessive amount," and the Supreme

15   Court has instructed district courts to instead "award only that amount of fees that is reasonable in

16   relation to the results obtained." Hensley, 461 U.S. at 436, 440.

17   Where a settlement produces a common fund for the benefit of the entire class, courts have

18   discretion to employ either the lodestar method or the percentage-of-recovery method. In re

19   Mercury Interactive Corp., 618 F.3d 988, 992 (9th Cir. 2010) (citing Powers v. Eichen, 229 F.3d

20   1249, 1256 (9th Cir. 2000)). Because the benefit to the class is easily quantified in common-fund

21   settlements, the Ninth Circuit has allowed courts to award attorneys a percentage of the common

22   fund in lieu of the often more time-consuming task of calculating the lodestar. Applying this

23   calculation method, courts typically calculate 25% of the fund as the "benchmark" for a reasonable

24   fee award, providing adequate explanation in the record of any "special circumstances" justifying a

25   departure. Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990);

26   accord Powers, 229 F.3d at 1256–57; Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272

27   (9th Cir. 1989).

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result. See In re Coordinated Pretrial Proceedings, 109 F.3d 602, 607 (9th Cir. 1997) (citing In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1294–95 n. 2 (9th Cir. 1994)). Thus, for example, where awarding 25% of a "megafund" would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead. Six Mexican Workers, 904 F.2d at 1311; see In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions, 148 F.3d 283, 339 (3d Cir. 1998) (explaining that basis for inverse relationship between size of fund and percentage awarded for fees is that "in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel" (internal quotation marks omitted)).

### b.   Application

#### i.   Calculation of a reasonable lodestar amount

At the time Class Counsel filed declarations supporting their request for fees, they had calculated their lodestar of approximately $1,396,523.75 from a total of 2,560.7 hours of work. Since the filing of their declarations, Class Counsel have expended an unknown number of hours seeking approval of the Settlement, administering the Settlement, and assisting Class Members. Class Counsel also claim (and the Court accepts) that they will continue to assist Class Members with individual inquiries, oversee the claims resolution process, and will help resolve Class Member challenges to the result of their claims submissions. Thus, it is likely that the "final" lodestar calculation will be based on more than 2,560.7 hours.

Exhibits 1 through 10 to Docket No. 74 of Rose are declarations submitted by each of the 10 law firms who represent the Class and support Class Counsel's request for fees.

#### 1.   Billing rates

The Court finds that the billing rates for partners, associates, and paralegals are reasonable. Paralegal rates fall between $100 per hour and $305 per hour, which is an ordinary range.

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

1    Associates billed at the following rates: two associates from Meyer Wilson Co., LPA at

2    $325 per hour, one associate from Terrell Marshall Daudt & Willie PLLC at $525 per hour, and

3    two associates from Lieff Cabraser Heimann & Bernstein, LLP at $435 and $465 per hour. One

4    attorney, who held the titles of both Law Clerk and Contract Attorney, billed at $325 per hour.

5    Only the $525 per hour rate appears high, but not unusually so, particularly in light of the fact that

6    the associate billing at that rate is a 2004 law school graduate.

7          Partners[2] billed at rates between $350 per hour and $775 per hour. The partners' rates

8    generally line up with their experience. Two of the three highest-billing partners, Jonathan D.

9    Selbin and Douglas J. Campion, represented the Class during the preliminary approval hearing and

10   the final approval hearing, and appeared to have roles of authority amongst Class Counsel. Mr.

11   Selbin and Mr. Campion, along with the other partners billing above $600 per hour, all have

12   significant experience to justify their high billing rates.

**2. Hours spent**

14         Upon review of the billing submissions, the Court finds that Class Counsel included an

15   unreasonable number of hours in their lodestar calculation.

16         Class Counsel filed separate declarations, one for each law firm, that go into varying

17   amounts of detail as to how time was spent. For the most part, each law firm divided their hours

18   spent into the categories of: Initial case investigation, motions practice, discovery, settlement

19   negotiations and mediations, drafting settlement and motion for approval papers, and overseeing

20   settlement administration. Saeed & Little, LLP included an additional category entitled client

21   management. Every law firm except for Terrell Marshall Daudt & Willie PLLC specified how

22   many hours were spent in each category. Terrell Marshall Daudt & Willie PLLC specified only the

23   total number of hours spent.

24         Of the total 2,560.7 hours accrued, 390 hours were spent in initial case investigation, 200

25   hours were spent in motions practice, 600 hours were spent in discovery, 800 hours were spent in

26   settlement negotiations and mediations, 300 hours were spent in drafting the settlement agreement

_____

[2] For purposes of this discussion, the Court defines "Partners" as those attorneys who hold the title of Partner, Of Counsel, Owner, or Manager, or are solo practitioners.

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   and the motions for approval, 180 hours were spent in settlement administration, and 90 hours were

2   spent in client management (figures are estimated and rounded down).[3]

3       The 800 hours in settlement negotiations and mediation stands out as particularly excessive.

4   Representative counsel for all firms participated in three full-day mediations before Judge Infante.

5   In the Court's experience, there is little reason why so many attorneys would need to be present

6   during the mediation sessions.  Rather, lawyers on the same side often find it more efficient to

7   prepare their negotiating position in advance, then delegate a small number of attorneys to execute.

8   Furthermore, no reasonable client would approve 800 hours of firm time to complete the tasks

9   under this category, especially at these rates.  The Court therefore reduces the number of hours

10  billed under this category to 400.

11      In addition, much of the work done prior to settlement negotiations and mediation was

12  duplicative, despite Class Counsel's claims that they used best efforts to avoid duplicative work.

13  Much of the work done in the initial case investigation, motions practice, and discovery was

14  redundant, made necessary only by the particular litigation strategy Class Counsel chose to pursue.

15      The Court notes that the instant settlement resolves six separate actions, all seeking to hold

16  Defendants liable for allegedly making automated phone calls in violation of the TCPA.  The first

17  case, Rose, was filed on May 16, 2011, by Douglas J. Campion and Anthony J. Trepel.  Thereafter,

18  the remaining five cases followed throughout 2011 through 2013.  This is typical in class actions

19  involving large, nationwide classes where the defendant's allegedly unlawful conduct occurred

20  over a particular time period, or where the defendant's conduct was revealed by a source such as a

21  news story or an investigative report.  In such cases, once the unlawful conduct is uncovered,

22  plaintiff's attorneys essentially race to the courthouse to avoid losing their lawsuit to the "first-to-

23  file" rule.[4]

24

25

26  [3] Because Terrell Marshall Daudt & Willie PLLC did not divide their hours by category, the Court took the total
    reported hours and divided them evenly among each category.

27  [4] The "first-to-file" rule is a "generally recognized doctrine of federal comity which permits a district court to decline
    jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another

28  district." Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 95–96 (9th Cir. 1982) (citations omitted).

14

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

1    In the typical scenario, the first-to-file rule would serve as a deterrent for plaintiff's

2    attorneys to initiate a lawsuit that is "substantially similar" to one that is already in litigation. See

3    Best W. Int'l, Inc. v. Mahroom, 2007 WL 1302749, at *2, n.1 (D. Ariz. May 3, 2007) (finding, in

4    the context of the first to file rule, lawsuits "need only be substantially similar and not exactly

5    identical[ ]"). Here, the first case, Rose, focused on FIA Card Services and Bank of America

6    Corporation's practices with regard to credit card customers. Ramirez, filed on August 31, 2011,

7    focused on any automated calls to Bank of America, N.A.'s customers.[5] Duke, filed on July 30,

8    2012, focused on calls to all Defendants' credit card and mortgage customers, as well as all other

9    customers affected by these practices (the instant settlement, of course, resolves only claims

10   regarding mortgage and credit card customers). Johnson, filed on December 29, 2011, focuses on

11   any automated calls to Bank of America Corporation's customers.[6] Makin, filed on March 27,

12   2012, focuses on individuals in Indiana, Illinois, or Wisconsin who received a prerecorded call

13   after the called party had filed a Chapter 13 bankruptcy or otherwise demanded that the calls cease.

14   Bradshaw, filed on February 22, 2013, focuses on text messages rather than calls to cellular

15   telephones.

16       Class Counsel should not be compensated for pre-mediation work completed in Duke and

17   Johnson because the cases are "substantially similar" to Rose and Ramirez. Normally, the Court

18   would expect that Duke and Johnson would never have been filed due to the first-to-file rule. Or, if

19   the subsequent filers were unaware of Rose and Ramirez, Defendants would have moved (likely

20   successfully) to have Duke and Johnson dismissed. In fact, Defendants filed a motion to dismiss

21   the Duke action based on the first-to-file rule. However, the parties stipulated to removing

22   Defendants' motion from the calendar to engage in mediation.

23

24   _____

25   [5] Although the moving papers represent that Ramirez focuses on automated calls made to Bank of America, N.A.'s
mortgage customers only, a review of the Complaint shows that Ramirez sought to certify a class consisting of credit
card customers, consumer and business loan customers, home mortgages, and "all other persons whom Defendant or its
26   affiliates dialed (or mis-dialed). 14-CV-2175-EJD, Docket No. 1.
[6] Although the moving papers represent that Johnson focuses on automated calls made to Bank of America, N.A.'s
27   mortgage customers, a review of the Complaint shows that Johnson was actually filed against Bank of America
Corporation, and it sought to certify a class consisting of "all persons within the United States who received any
28   telephone call from Defendant . . ." 14-CV-2177-EJD, Docket No. 1.

15

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1      What is unusual here is that the attorneys who filed <u>Duke</u> and <u>Johnson</u> had previously

2  worked together with the attorneys who filed <u>Rose</u> and <u>Ramirez</u>, in <u>Arthur v. Sallie Mae</u>, 10-CV-

3  198-JLR (W.D. Wash.), another TCPA class action settlement. In other words, the attorneys who

4  filed these four cases were not at arm's length. From the Court's perspective, Class Counsel

5  appear to have coordinated their efforts from very early on in the proceedings, perhaps deliberately

6  selecting a litigation strategy whereby Defendants would be overwhelmed by attacks on several

7  fronts and consequently forced to negotiate from a weaker position. As a result, Class Members

8  are asked to pay the costs of litigating six separate actions with a total of 18 attorneys and 8

9  paralegals. As explained in the following section, the results achieved in the litigation do not

10  justify such an expense.

11      Accordingly, the Court reduces the number of hours in the lodestar calculation by the

12  number of hours logged in <u>Duke</u> and <u>Johnson</u> prior to settlement negotiations and mediation: 560

13  hours. In addition to the 400 hour reduction discussed above, the Court reduces the lodestar by 960

14  hours. Since the initial calculation of 2,560.7 hours does not include time spent by Class Counsel

15  after the instant motions were filed, the Court adds 100 hours to the final total. Therefore, the

16  lodestar calculation is adjusted to reflect a total of 1,700.7 hours of work, at the prior-calculated

17  blended billing rate of $545.37, resulting in a final lodestar of $927,507.30.

18      As a sidenote, the Court notes that Class Counsel's choice of involving 10 different law

19  firms in this matter introduced other inefficiencies. Of the 2,560.7 hours reported in the

20  declarations, 1,670.8 hours were billed by attorneys with rates of more than $500 per hour, leaving

21  only 889.9 hours billed by attorneys/paralegals with rates of $500 per hour or less. Few clients

22  would stand for such an inefficient allocation of time. However, the Court believes that its

23  reduction of the hours logged in <u>Duke</u> and <u>Johnson</u> prior to mediation should, at least in part,

24  compensate for this factor. No further reduction is necessary.

25

26

27

28

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

### ii. Percentage method

Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002).

Class Counsel seek 25% of the Settlement Fund, which amounts to $8,020,976, inclusive of costs expended by Class Counsel of $64,365.14. Prior to the Court's reduction of the lodestar, the lodestar cross-check using Class Counsel's calculated lodestar would have produced a multiplier of 5.34. Using the reduced lodestar of $927,507.30, a $8,020,976 award would now result in a multiplier of 8.65.

The Court compared a number of TCPA class action settlements in which attorneys from the instant case participated: in Grannan, 2012 WL 216522, a granted request for 25% of the Settlement Fund reflected a multiplier of 1.47. In Adams v. AllianceOne, Inc., 08-CV-248-JAH (S.D. Cal. Sept. 28, 2012), a granted request for 30% of the Settlement Fund reflected a multiplier of 3.81. In Arthur v. Sallie Mae, Inc., 10-CV-198-JLR (W.D. Wash.), a granted request for 20% of the Settlement Fund reflected a multiplier of 2.59.

However, Class Counsel point to several cases in which multipliers higher than 5.34 were approved. See Vizcaino, 290 F.3d at 1052 appx. (9th Cir. 2002) (collecting cases); see also Steiner v. Am. Broad. Co., Inc., 248 F. App'x 780, 783 (9th Cir. 2007) (approving multiplier of 6.85).

The 25% benchmark rate is a starting point for analysis. Vizcaino, 290 F.3d at 1048. Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case. Id. Thus, a high multiplier such as 8.65 might be justified if supported by the circumstances of the case. Class Counsel have identified the following factors as supporting their request for fees.

### 1. Results achieved

The results obtained for the class are generally considered to be the most important factor in determining the appropriate fee award in a common fund case. See Hensley, 461 U.S. at 435.

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

1    Class Counsel argue that this factor, standing alone, supports their fee request. The Court

2    disagrees.

3         The Settlement Agreement provides both monetary relief and prospective relief. Class

4    Counsel estimated, at the time they filed the instant motions, that claimants will receive an average

5    recovery of between $20 to $40. Of course, it is unlikely that a settlement would result in

6    claimants receiving the full $500 or $1,500 per violation they might be entitled to under the TCPA.

7    Even so, the $20 to $40 range falls in the lower range of recovery achieved in other TCPA class

8    action settlements. For example, in Grannan, 2012 WL 216522, each class member received

9    between $300 to $325. In Malta v. Fed. Home Loan Mortg. Corp., 10-CV-1290-BEN (S.D. Cal.),

10   after final approval, each of the 120,547 claimants that made a timely and valid claim as well as the

11   103 claimants that made a late claim received the sum of $84.82. In Kramer v. B2Mobile, 10-CV-

12   2722-CW (N.D. Cal.), each claimant was to be paid $100, but subject to a pro-rata reduction based

13   on the maximum amount of the fund, and it was unclear from the final approval order how much

14   money each claimant actually received. The monetary relief in this case, however, lines up with

15   that achieved in Arthur v. Sallie Mae, where each claimant was estimated to receive between $20

16   and $40.

17        Furthermore, the Court questions the "prospective relief" provided by the Settlement

18   Agreement, which is described as such: "The Settlement focuses on prospective practice changes

19   designed to protect Settlement Class Members from receiving automated calls in the future.

20   Specifically, in consideration for the Settlement and in response to the Complaints filed in the

21   Actions, Defendants developed and implemented significant enhancements to its servicing systems

22   that are designed to prevent the calling of a cell phone unless a loan servicing record is

23   systematically coded to reflect the borrower's prior express consent to call his or her cell phone."

24        The Court was concerned that the prospective relief would not be of any benefit to

25   consumers because it would not prevent Defendants from continuing to call Class Members. The

26   mere fact that Defendants changed their systems to reflect the borrower's prior express consent

27   means very little in the context of this lawsuit. "Prior express consent" under the TCPA is a term

28

18

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1   of art with an unsettled meaning. In fact, this lawsuit centers around the question of whether

2   Defendants' or Plaintiffs' definition of "prior express consent" should prevail. Defendants have

3   maintained throughout this action, and the related actions, that they have always had their

4   customers' prior express consent.

5         Class Counsel were questioned during the final approval hearing as to whether Defendants

6   would change their definition of prior express consent. Class Counsel confirmed that Defendants

7   would not. The "prospective relief" touted by the Settlement Agreement merely provides that

8   Defendants will not call anyone unless Defendants had that person's prior express consent. But

9   because Defendants continue to use the same definition of "prior express consent," it would appear

10  that most, perhaps all, Class Members will continue receiving automated calls. Because the

11  primary goal of this litigation, as described by Class Counsel, was to put an end to these phone

12  calls, the touted relief falls short and is of particular concern.

13        The non-monetary relief achieved here is particularly nominal in comparison to non-

14  monetary relief achieved in other TCPA class action settlements. For example, in Grannan, the

15  defendant agreed to a one-year injunction whereby the defendant would "scrub" their automated

16  dialing lists of cell phone numbers, and agreed not to call those numbers using an automated

17  dialing system. In Arthur v. Sallie Mae, the defendants agreed not to make calls to the cell phones

18  of class members who submitted forms revoking their consent in conjunction with their claim

19  forms. In Kramer v. B2Mobile, defendants agreed to a four-year injunction whereby they agreed to

20  keep documented proof of prior express consent received from cell phone owners. As part of the

21  injunction, defendants agreed that, prospectively, prior express consent would require an

22  affirmative action on the part of the customer such as clicking a box saying "I Accept." In

23  addition, the claim forms in this settlement contained an option that class members could select in

24  order to remove their cell phone number from defendants' calling lists. However, the prospective

25  relief achieved in the instant case appears the same as the prospective relief achieved in Malta v.

26  Fed. Home Loan Mortg. Corp.

27

28

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1    Because the results achieved here are not "exceptional" in the context of other TCPA class

2    action settlements, and in fact are on the lower end of the scale, this factor does not support the

3    granting of a high multiplier.

4             **2.  Risk of continuing litigation**

5    "The risk that further litigation might result in Plaintiffs not recovering at all, particularly a

6    case involving complicated legal issues, is a significant factor in the award of fees." In re

7    Omnivision Technologies, Inc., 559 F. Supp. 2d 1036, 1046-47 (N.D. Cal. 2008); see also

8    Vizcaino, 290 F.3d at 1048 (risk of dismissal or loss on class certification is relevant to evaluation

9    of a requested fee).

10    Class Counsel argues that there was a significant risk because the issue of prior express

11    consent is an open question and that the Court may not have adopted Class Counsel's view.  If not,

12    the Court may have denied a motion to certify the class.

13    The Court agrees that this factor supports the requested fee.

14             **3.  The skill required**

15    The "prosecution and management of a complex national class action requires unique legal

16    skills and abilities" that are to be considered when evaluating fees. Omnivision, 559 F. Supp. 2d at

17    1047 (citation omitted).

18    The Court agrees that this factor supports the requested fee; Class Counsel are experienced

19    TCPA litigators and clearly have a wealth of experience in this area.  This factor supports the

20    requested fee.

21             **4.  Contingency rationale**

22    The Ninth Circuit has long recognized that the public interest is served by rewarding

23    attorneys who assume representation on a contingent basis to compensate them for the risk that

24    they might be paid nothing at all for their work.  In re Washington Pub. Power Supply Sys. Sec.

25    Litig., 19 F.3d at 1299 ("Contingent fees that may far exceed the market value of the services if

26    rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of

27    assuring competent representation for plaintiffs who could not afford to pay on an hourly basis

28

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1    regardless whether they win or lose."); Vizcaino, 290 F.3d at 1051 (courts reward successful class

2    counsel in contingency cases "for taking the risk of nonpayment by paying them a premium over

3    their normal hourly rates").

4              The Court is not fully convinced that the contingency rationale lends much support to Class

5    Counsel's fee request. Class Counsel, for the most part, have a great deal of experience litigating

6    TCPA class actions and presumably would "know how to pick a winner." Furthermore, Class

7    Counsel's apparent strategy of filing numerous small, related cases, with a few attorneys working

8    on each, hedges against the the risk of recovering nothing for their work. For example, if Rose and

9    Ramirez had looked unpromising, Class Counsel could simply have chosen not to file Duke,

10   Bradshaw, Makin, and Johnson. This strategy also puts heavy pressure on defendants to settle the

11   case early. Finally, because the TCPA has the potential of ruinous financial liability ($500 or

12   $1,500 per violation, and some defendants are accused of millions of violations), defendants will

13   almost always settle if there is any merit at all to the case. This factor does not support the

14   requested fee.

15              **iii.  Conclusion as to fees**

16              The relevant factors do not justify an award of 25% of the common fund, nor do they justify

17   a high lodestar multipler such as 5.34 or 8.65. A lower multiplier is still warranted, however; the

18   Court does not mean to imply that Class Counsel achieved nothing nor that they took no risk in

19   bringing these actions against Defendants. Class Members still receive monetary compensation for

20   their statutory injuries and were unlikely to have filed suit on their own. The Court determines that

21   a multiplier of 2.59 is appropriate (the same multiplier awarded in Arthur v. Sallie Mae, where

22   many of the same attorneys were present, similar arguments were made,[7] and similar results were

23   achieved).

24

25   _____

26   [7] In both the instant case and Arthur v. Sallie Mae, the parties disagreed over the interpretation of the FCC's January 4,
     2008 declaratory ruling addressing prior express consent in the context of creditor-debtor relationships (In the Matter

27   of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 F.C.C. Rcd. 559 (2008)). The plaintiffs
     in both cases argued that prior express consent is deemed to be granted only if the cell phone number be provided
     during the loan's origination. Defendants in both cases argued that prior express consent could be given at any time

28   during the life of the loan.

                                                21
Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California

1    A 2.59 multiplier applied to the $927,507.30 lodestar results in a total fee award of

2    $2,402,243.91 (inclusive of costs).

3    Finally, the requested $2,000 award to each of the seven named Plaintiffs is fair and

4    reasonable, falling squarely in line with incentive awards granted in other cases.

5    **IV.   CONCLUSION**

6    After consideration of the above, the Court GRANTS the motion for final approval of

7    settlement, and GRANTS IN PART AND DENIES IN PART the motion for attorney's fees and

8    costs.

9    **IT IS SO ORDERED**

10   Dated: August 29, 2014

11

12   EDWARD J. DAVILA
     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD
ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT; GRANTING IN
PART AND DENYING IN PART MOTION FOR ATTORNEY'S FEES AND COSTS

United States District Court
For the Northern District of California



**United States District Court**
**Southern District of New York**
*Pro Se Intake Unit*

SCANNED

| | |
|---|---|
| **To:** | Hon. Lewis A. Kaplan |
| **From:** | S. Coretto, Pro Se Intake Clerk, Docket Services, Ext. 1177 |
| **Date:** | October 10, 2014 |
| **Re:** | Dobina v. Weatherford International Ltd. et al, 11-CV-1646 |

The attached document, which was received by the Pro Se Intake Unit on October 10, 2014, has been submitted to the Court for filing. The document is deficient as indicated below. Instead of docketing the document for public access, it has been docketed as a "Court-view Only" docket entry. I am forwarding it to you for your consideration. *See* Fed. R. Civ. P. 5(d)(2)(B), (4).

☒    No original signature.

☐    No Affirmation of Service/ proof of service.

☒    Other:  Non-Party, Jeff Brown, submits Notice regarding new authority and supplement to objection to the Pro Se Unit. Please advise whether to accept filing or return to party.  Advise whether to add party as an Intervener.   *NO*

If you memo-endorse the filing, you do not need to return this memorandum to the Pro Se Intake Unit. Once your memo-endorsement is docketed and filed, all ECF users on the case will be notified.

In the alternative, please return this memorandum with the attached papers to this Unit, indicating at the bottom what action should be taken.

☐    **ACCEPT FOR FILING**

☐    **RETURN TO *PRO SE* LITIGANT**

**Comments:**

RECEIVED
OCT 17 2014
PRO SE OFFICE

Dated:_____                          _____
                                            United States District / Magistrate Judge