UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

WEATHERFORD INTERNATIONAL
SECURITIES LITIGATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Civ. 1646 (LAK)

## MEMORANDUM AND ORDER

LEWIS A. KAPLAN, *District Judge.*

       This is a putative securities class action, the background of which is set out in *Dobina v. Weatherford International Ltd.*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012), and in several decisions by Magistrate Judge James C. Francis IV on discovery matters. The matter now is before the Court on plaintiffs' motions (1) for final approval of a $52.5 million class action settlement and plan of allocation [DI 250], and (2) for an award of attorneys' fees and reimbursement of litigation expenses [DI 252].

       The Court has considered the proposed settlement and the very few objections carefully. It has concluded that the objections to the settlement are without merit and that the settlement is fair, reasonable and adequate. Nonetheless, the Court notes two of its concerns.

       First, plaintiffs seek awards of attorneys' fees and expenses in the aggregate amounts of $14,001,660.28 in favor of Lead Counsel, the Kessler Topaz firm, and $193,685.75 in favor of The Law Offices of Curtis V. Trinko. The fee portion of the proposed award to the Kessler Topaz firm is said to be just shy of its lodestar and would amount to 24 percent of the settlement. The Court regrets to say that it has misgivings about the lodestar and, both independent and in consideration of the lodestar, the size of the requested fee.

       As in initial matter, Kessler Topaz seeks compensation for over 30,000 hours of time. While the Court assumes that over 30,000 hours of time were recorded, it has serious doubts – based in part on 24 years in practice, including the litigation of securities cases, and more than 20 years on the bench, as well as the evidence submitted – whether this case, handled efficiently and especially for a paying client, would have justified an expenditure of hours that great. These concerns are magnified by the fact that time was recorded by eight partners, ten associates, sixteen staff attorneys, eight investigators, and eight paralegals in addition to one individual described only as "professional staff."[1] Thus, Kessler Topaz used 34 lawyers on this case, of whom eleven billed

---

[1] Kessler Decl., May 27, 2014 [DI 254, Ex. 5].

2

more than 1,000 hours each and fifteen more billed more than 100 hours each.[2] Staff attorneys, moreover, accounted for over 45 percent of all time recorded, and they spent a significant part of their time looking at documents and putting together what amounted to packets of documents for use in depositions of particular witnesses.[3]

Second, and relatedly, Kessler Topaz billed out its staff attorneys – who, as noted, accounted for more than 45 percent of the total hours billed – at rates ranging from $375 to $395 per hour.[4] As Kessler Topaz has conceded, the hourly rates for which the firm seeks compensation for these staff attorneys are more than 600 percent of their direct cost to the firm, and the Court has been provided with nothing persuasive from which to conclude that this sort of markup is reasonable.

At the end of the day, the Court fears, the foregoing only scratches the surface. It is common knowledge that almost all securities class actions are settled. Those that are settled typically are resolved on terms pursuant to which any fee award comes out of the overall settlement fund and thus is of no concern to the defendant and its counsel. The courts asked to approve these fees thus are left without any effective adversarial testing of the claimed lodestar except in rare cases. While objectors sometimes come forward, those that do often are derided as "professional objectors" and attacked as inherently suspect. More importantly, objectors only rarely have the information or the resources to mount well informed criticisms of the proposed fees. In consequence, courts in the position in which this one finds itself are left pretty much at sea, aided however by the principles that (1) the Court is a fiduciary for the class members who ultimately pay any fee, (2) the class lawyers' interests at this stage diverge sharply from those of the class members, (3) it is the lawyers who bear the burden of justifying the size of the award they seek at their clients' expense, and (4) the risk of non-persuasion is with those lawyers.

The alternative to this unhappy situation is the percentage-of-recovery model that many plaintiffs' counsel relentlessly urge upon this and other courts. That of course has the benefit of simplicity and, where employed, avoids the problems of the lodestar.[5] But it has the drawbacks of encouraging premature settlements, as well as settlements that serve the lawyers' interests but perhaps not those of the classes they represent.[6] Its benefits also are somewhat illusory. Given that the fee awards in most class action settlements are determined subject to the problems articulated above, it is not much help to say, for example, that the fees ultimately approved in class actions that

---

[2] *See id.*

[3] *See id.*; Greenstein Decl., May 27, 2014 [DI 254].

[4] *See* DI 254, Ex. 5.

[5] *See, e.g., In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 77-78 (S.D.N.Y. 2000).

[6] *See id.* at 77.

3

settle in the range of $25 million to $100 million average around 25 percent of the recovery, as they do.[7] The so-called lodestar check does little to control excessive fee awards, for reasons to which reference already has been made, and the lack of defendant or effective objector participation in determining fee awards in most cases means that the percentage of recovery approved usually is determined without any effective market check.

In the last analysis, then, what is to be done? For purposes of this case, the Court determines that it will adjust the numbers before it to take account of its concerns about the amount of time that should have been devoted to this case, and about the rates charged for the staff attorneys (recognizing that the charges for them represent a share of the total fees sought that is significantly smaller than the proportion of the hours they put into the case), as well as to consider the average fee award in class action settlements of this size, recognizing the flaws in those figures as well. It therefore reduces the compensable hours and the staff attorney hourly rates to the extent necessary to yield a lodestar for the Kessler Topaz firm of $9,450,000, and awards it a fee in that amount plus expenses of $1,381,724.59. The Trinko firm's application is granted in its entirety. The overall fee award therefore is between 18 and 19 percent of the settlement.

In addition, the Court approves the application for awards of $13,790.58 to plaintiff AFME and $6,145.11 to plaintiff GFPF. The Plan of Allocation is approved.

The plaintiffs' counsel would like these awards paid now. Inasmuch as one or more objectors might appeal this ruling, in which case the repayment of any portion of the fees and expenses not ultimately upheld on appeal would be subject to the risk of insolvency of the law firms involved, one half of the awards approved in this order shall be paid upon entry of the order and the balance only upon further order of the Court, the intention being to grant such approval when the judgment here becomes final and not subject to further appeal.

---

[7] See Renzo Comolli & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2013 Full-Year Review* 34 (2014), *available at* http://www.nera.com/content/dam/nera/publications/archive2/PUB_2013_Year_End_Trends_1.2014.pdf.

4

One final point to avoid any misunderstanding: Plaintiffs' counsel have done a professional job and obtained a reasonable settlement. The Court has taken into account all of their arguments, including the risks they ran in taking on this contingent fee case, the difficulties involved, the economic effect of delayed payment, and so on. Moreover, the Court imputes no wrongdoing to any of the lawyers engaged in this case. The concerns it has voiced are very largely systemic in nature. The Court has merely done the best it can with the tools at hand, given the lack of any real adversarial testing of any of the key issues, to ensure that the division of the $52.5 million settlement between the lawyers and the clients is reasonable and fair.

SO ORDERED.

Dated:       January 5, 2015

_____
Lewis A. Kaplan
United States District Judge